# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* PAULA BOURNE and LA'TASHA GOODWIN, | : : : | Civil Action No. 1:12-cv-935 |
| Plaintiffs and Relators, | : : | Judge Dlott |
| v. | : : : | |
| BRIAN COLLERAN C/O Provider Services Holding, Inc. 1255 Euclid Avenue Cleveland, Ohio 44115-1810 | : : : : : | **FILED UNDER SEAL** Pursuant to 31 U.S.C. § 3730(b)(2) and Local Rule 3.2 |
| PROVIDER SERVICES HOLDING, INC. 1255 Euclid Avenue Cleveland, Ohio 44115-1810 | : : : : | **DO NOT PUT ON PACER** |
| PROVIDER SERVICES, INC. 1255 Euclid Avenue Cleveland, Ohio 44115-1810 | : : : : | |
| BCFL HOLDINGS, INC. 2500 Country Club Blvd Ste 255 North Olmsted, OH 44070 | : : : : | |
| DESTINY HOSPICE, LLC 6162 Salem Road Cincinnati, Ohio 45230 | : : : : | |
| TRIDIA HOSPICE CARE, INC. 2215 Citygate Dr. Suite E Columbus, Ohio 43219 | : : : : | |
| NP INSIGHT, LLC 2500 Country Club Blvd Ste 255 North Olmstead, Ohio 44070 | : : : : | |
| OPTIBILL, INC. 25000 Country Club Rd., Ste 258 North Olmstead, Ohio, 44070 | : : : : : : | |

TRIUMPHANT RETURN REHAB, LLC :
D/B/A/ OLYMPIA THERAPY, INC. :
7172 Columbia Road :
Olmsted Falls, Ohio 44138 :
:
OLYMPIA THERAPY, INC. :
2500 Country Club Blvd Ste 255 :
North Olmsted, Ohio 44070 :
:
ADVANCED HOME MEDICAL, LLC :
1258 East Livingston Avenue :
Columbus, Ohio 43205 :
:
OMNICARE, INC. :
900 Omnicare Center :
401 E. Fourth Street :
Cincinnati, Ohio 45202 :
:
DOUGLAS SPEELMAN :
C/O AMBER HOME CARE, LLC :
1430 South High Street :
Columbus, Ohio :
:
AMBER HOME CARE, LLC :
1430 South High Street :
Columbus, Ohio :
:
MT. CARMEL HEALTH SYSTEMS :
6150 East Broad Street :
Columbus, Ohio 43213, :
:
      Defendants. :

## COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

## I.   INTRODUCTION

1.    Relators Paula Bourne and LaTasha Goodwin bring this action on behalf

of the United States and themselves against their employer, Defendant Tridia Hospice,

its owners, Defendants Brian Colleran, Provider Services Holdings, Inc., BCFL

Holdings, Inc., Provider Services, Inc. and other  related companies to recover damages

and penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq.* Taken together, the defendants are the largest provider of skilled nursing services (with more than 6,000 beds) and one of the largest providers of hospice services in Ohio. They have submitted and caused the submission of false claims for payment to federally-funded government healthcare programs for patient care as a result of illegal financial relationships between Defendants and their referral sources, and have also submitted and caused submission of false claims in connection with therapy and hospice services.

2.      Defendants Omnicare, Inc., Amber Home Care, LLC and its owner Douglas Speelman, Mt. Carmel Health Systems, and Advanced Home Medical are health providers which have kickback relationships with the Colleran Defendants.

3.      Relators also bring claims for retaliation in violation of the False Claims Act, 31 U.S.C. § 3730(h), as when they began advising the Colleran Defendants of the fraud alleged herein, their salaries, bonuses, and responsibilities were sharply reduced.

## II.    JURISDICTION AND VENUE

4.      This action arises under the United States Civil False Claims Act, 31 U.S.C. § 3729 *et seq.*

5.      This Court has subject matter jurisdiction pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331, and has personal jurisdiction over the Defendants, because they do business in this District.

6.      Venue is proper in this District under 28 U.S.C. § 1391 and 31 U.S.C. §3732(a) because Defendants operate and transact business within this District.

7.      The facts and circumstances alleged in this Complaint have not been publicly disclosed in a Federal criminal, civil, or administrative hearing in which the

Government or its agent is a party in a congressional, nor in a Government Account-
ability Office, or other Federal report, hearing, audit, or investigation; or from the news
media.

8.     Relators are original sources of the information upon which this complaint
is based, as that term is used in the False Claims Act.

9.     Prior to filing this action, Relators voluntarily disclosed to the United States
the information on which their allegations are based.  Additionally, should there have
been a public disclosure of any aspect of these allegations prior to the filing of this
action, Relators have knowledge that is independent of and materially adds to the pub-
licly disclosed allegations or transactions.

**III.    PARTIES**

10.    The real party in interest to the claims set forth herein is the United States
of America.

11.    Plaintiff and Relator Paula Bourne is an Ohio resident.  She has been
employed by Colleran-owned businesses since April 2004, first as the Executive
Director at Highbanks Care Center, and since 2008, as the Executive Director for Tridia
Hospice.  Ms. Bourne is a Licensed Nursing Home Operator with a Masters of Science
in Management, earned in 2009.  She served as Director of Marketing and Admissions
at Rocky Creek Health & Rehabilitation from 2003-2004 as her first position with
Provider Services.  Prior to working for Colleran, she worked as a Community Education
Manager for Odyssey Healthcare from 2001-2003.

12.    Plaintiff and Relator La'Tasha Goodwin, R.N. is an Ohio resident.  She
was hired in 2006 as Director of Nursing with Highbanks Care Center, and since 2008,

-4-

has been the Director of Clinical Services for Tridia Hospice until recent demotion to the title of Director of Nursing. From 1996-2010, she worked as a Staff Registered Nurse at Mt. Carmel East Hospital in Columbus, Ohio.  Prior to working for Colleran, she served as the Director of Nursing Services at Wesley Glen Health Center (2004-2006) and Forest Hills Nursing Center (2000-2003).  Ms. Goodwin earned a B.S.N. in 1998, and a Masters of Science (Management) in 2010.

13.     Defendant Brian Colleran is an individual who lives in Rocky River, Ohio and has a business office in North Olmsted, Ohio.  Defendant Colleran is the principal owner and president of Provider Services Holding, Inc., Provider Services, Inc., and BCFL Holdings, Inc. ("Provider" or "Colleran Defendants").  He also has held ownership interests in companies providing pharmacy, therapy services, Durable Medical Equipment and home health services at issue in this Complaint.  He is a principal architect of the schemes outlined in this Complaint.  Colleran is a corporate officer in many, if not all, of the Provider facilities.

14.     Defendant Provider Services Holdings, LLC is an Ohio limited liability corporation incorporated in 2005. Its principal shareholder is Defendant Colleran. Provider Services, Inc. was an Ohio corporation until 2010, when it merged with BCFL Holdings, Inc. It is registered in Ohio as a trade name of BCFL Holdings, Inc.  Its principal place of business is in North Olmsted, Ohio.

15.     Defendant BCFL Holdings, Inc. is a Florida corporation whose principal owner is Brian Colleran.  It transacts business in Ohio as Provider Services, Inc.

16.     Provider owns, operates, leases and/or manages assisted living nursing facilities (nursing homes) and long term care facilities and touts itself as the largest

-5-

operator of long term care facilities in Ohio. Provider also owns and/or manages separate companies which provide hospice services, nursing services, enteral supplies, and home healthcare to residents of Provider-owned nursing homes, among other services. Provider owns, operates, leases or manages about 80 nursing homes located throughout Ohio, and has been involved with another 20 or so facilities during times relevant to the allegations of this Complaint.

17.     Defendant Destiny, LLC is a Kentucky limited liability corporation, licensed to do business in Ohio, with its principal place of business in Cincinnati. It provides hospice care in Ohio. Provider Services purchased Destiny in May, 2011 as part of its acquisition of Carington Health Systems.

18.     Defendant Tridia Hospice Care, Inc. is an Ohio corporation incorporated in September 2008. It provides hospice services with locations in Columbus, Cleveland, Akron Ashtabula and Holmes County, Ohio.

19.     Defendant NP Insight, LLC is an Ohio limited liability corporation, incorporated in 2008. It is owned by Brian Colleran and operated by his brother Edward Colleran. It provides certified Nurse Practitioner services to Provider facilities.

20.     Defendant OptiBill, Inc. an Ohio corporation located in North Olmstead, Ohio, is an Ohio supplier of enteral nutrition supplies, diabetic shoes and inserts, oxygen supplies and equipment and other medical supplies.

21.     Defendant Triumphant Return Rehab, LLC was established in May 2009. Olympia Therapy, Inc. was established in December 2004 and was owned by Brian Colleran. In 2009, Colleran sold Olympia's assets to Triumphant Return Rehab, who continues to do business as Olympia Therapy.

22.     Defendant Advanced Home Medical, LLC is a supplier of durable medical equipment. The company began in 2001 and is incorporated in Ohio. Until November 2012, Colleran had partial ownership in the company. The company's majority owner is Durenda Kuharik.

23.     Defendant Omnicare, Inc. is a Delaware corporation with its principal place of business in Covington, Kentucky. Omnicare is engaged in the business of providing pharmacy services, pharmaceutical goods and respiratory services and goods through licensed pharmacies and affiliates throughout the United States. Omnicare provides such services and goods to assisted living and nursing home facilities and their residents in the District of Columbia and at least 47 states, including Ohio.

24.     Defendant Douglas Speelman is the owner of defendant Amber Home Care, LLC. He resides in Columbus, Ohio.

25.     Defendant Amber Home Care, LLC is an Ohio limited liability corporation, Charter No. 167005, incorporated in 2007. Amber Home Care is owned by defendant Douglas Speelman. Douglas Speelman is the brother of Robert Speelman, who is the Administrator at Provider Services Holdings Co. Amber Home Care provides home health services.

26.     Defendant Mount Carmel Health Systems is an Ohio not-for-profit corporation. It is comprised of four hospitals, Mount Carmel East, Mount Carmel West, Mount Carmel St. Ann's and Mount Carmel New Albany. It also offers an array of other health services, including surgery centers, outpatient facilities, physician offices, medical transportation, home health, hospice and community outreach services.

IV.    RULE 9(b), FED. R. CIV. P. ALLEGATIONS

27.    Some of the factual information necessary to prove the allegations set out in this Complaint is exclusively in the possession of the Defendants, the United States, or the State of Ohio.

28.    Having been employed by Colleran-owned companies since 2004 and 2005, respectively, Relators Bourne and Goodwin are personally aware that claims for payment under federally-funded health insurance programs are in fact submitted to the United States and the State of Ohio.

29.    Each assertion herein that an allegation is made upon information and belief identifies a situation in which Relators have, based on their knowledge, a reasoned factual basis to believe the allegation, but may lack complete factual knowledge of it.

V.    THE STATUTORY AND REGULATORY ENVIRONMENT

30.    Defendants improperly submit reimbursement claims under Medicare and other federally-funded healthcare programs by billing for improper hospice services and by falsifying records to support bogus claims. These claims are not covered or payable by federal healthcare programs.

31.    Defendants offer and provide other healthcare facilities kickbacks to induce them to refer patients. Defendants also solicit and receive kickbacks to refer patients to other businesses. In exchange for these illegal inducements, Provider-owned and managed Skilled Nursing Facilities and hospices refer Medicare and Medicaid patients to Provider-owned and managed companies and/or companies in which Defendant Colleran has an investment interest. Defendants' conduct violates the Anti-

Kickback Statute and the resulting claims are not covered or payable by federal programs.

**A.    Reimbursement by federally-funded healthcare programs**

32.    Medicare and Medicaid are federal healthcare programs established by the 1965 Social Security Act and administered and funded by and through the federal government and state governments.

33.    Medicare provides reimbursement for healthcare benefits, items and services, including pharmaceutical drugs and supplies. It provides those reimbursements to participating healthcare providers on behalf its beneficiaries, through contracted intermediaries, or directly to its beneficiaries, who are primarily elderly persons. Medicare is administered by the federal Centers for Medicare & Medicaid Services ("CMS"), and by and through various regional intermediaries and coordinators.

34.    Medicare consists of four parts. Part A authorizes the payment of federal funds for hospitalization and post-hospitalization care. 42 U.S.C.§ 1395c-1395i-2 (1992). Part A of the Medicare Program is a 100 percent federally-funded health insurance program for qualified residents of the United States aged 65 and older, younger people with qualifying disabilities, and people with end stage renal disease (permanent kidney failure requiring dialysis or transplant). The majority of Medicare Part A's costs are paid by United States citizens through their payroll taxes.  Part A benefits include hospice care under 42 U.S.C. §1395x(dd).

35.    Medicare Part B authorizes the payment of federal funds for medical and other health services, including separately payable therapy services. 42 U.S.C. § 1395(k),(i), and (s). Medicare Parts C and D are not directly at issue in this case.

36.     With certain exceptions, Part A reimbursement for inpatient Medicare services is according to a per-patient standardized rate, called the Diagnostic Related Group ("DRG") rate.  42 U.S.C. § 1395ww(d)(3)(A), (D). Medicare's Prospective Payment System ("PPS") reimburses facilities for the operating costs of inpatient healthcare services rendered to Medicare beneficiaries according to a per-patient standardized rate, called a per diem.

37.     For Part A beneficiaries, hospitals, skilled nursing facilities and other facilities submit claims for services as part of the Part A claims for the per diem assigned to that patient.  Claims for reimbursement are submitted to Medicare on Claim Form 1450 (also called a UB-04). Of note, every Medicare claim form contains a separate affirmative certification of the medical necessity of the service rendered.

38.     For Part B beneficiaries, the providers of services submit claims for payment under the Medicare Fee Schedule ("MFS").  Reimbursement under the MFS is determined according to a standardized coding system assigned to procedures set forth in the Health Care Financing Administration's Common Procedure Coding System ("HCPCS").  Under the HCPCS, standardized codes, called Current Procedural Terminology ("CPT") codes, are assigned to various procedures.  The CPT code assigned to a medical procedure determines the payment amount under Part B. Service providers submit claims on Form CMS-1500.  Every Medicare claim form contains a separate affirmative certification of the medical necessity of the service rendered.

39.     Medicaid provides healthcare benefits for American citizens of limited means or with disabilities, and with respect to persons over age 65, provides long-term

-10-

care once personal financial resources are exhausted. Medicaid is administered and funded in part with federal funds, and in part with state funds. The federal involvement in Medicaid includes providing matching funds and ensuring that states comply with minimum standards in the administration of the program. The federal share of Medicaid payments, known as the Federal Medical Assistance Percentage, is based on each state's per capita income compared to the national average, in Ohio, is between 63% and 73% of expenditures. The state funds the rest. Total Medicaid expenditures in the State of Ohio in 2010 were $15,392,264,438. The United States's share of this amount was $11,087,084,098, and Ohio's share of Medicaid expenditures in 2010 was $4,305,180,340. This amount constituted 3.2% of the state's entire economy.

40.     Medicaid is the largest funder of long-term care for senior citizens and those with disabilities. In 2010, Ohio Medicaid covered more than 112,000 seniors. In 2011, just over 20% of Ohio Medicaid participants were elderly, blind, or disabled. This 20% of beneficiaries accounted for 67.5% of Medicaid expenditures, with about 21% of total expenditures on beneficiaries aged 65 and older. Thus, Ohio's citizens expended more than $900,000,000 (nine hundred million dollars) on elder care in 2011, and the United States and Ohio combined spent almost $3.1 billion dollars on elder care.

41.     Medicaid provides reimbursement for healthcare benefits, items and services, including pharmaceutical drugs and supplies, to participating providers on behalf of its beneficiaries, or directly to its beneficiaries. Medicaid is administered federally by CMS, and in each of the states by agencies of state and county government.

-11-

42.    In addition to Medicare and Medicaid, the federal government funds and administers various healthcare programs, including, by way of example but not limited to, TRICARE and CHAMPUS (Civilian Health and Medical Program of the Uniformed Services) and the Veterans Administration.  Reimbursement under these programs is similar to coverage under the Medicare Program.

B.    **Reimbursement for Hospice**

43.    The Medicare hospice benefit is designed to provide care to ease the pain and discomforting symptoms of beneficiaries who have been certified as having a terminal illness which will inevitably result in death within six months if the illness runs its normal course. The benefit also provides psycho-social and spiritual support for patients and their loved ones.  Hospice is intended to improve the comfort and quality of life of terminally ill patients in their final days, rather than to attempt to cure the patient's underlying terminal condition, and represents a low-cost alternative to high priced curative treatments that have little chance of success.

44.    The hospice Medicare benefit covers services, including nursing care, medical, social services, physician's services, counseling services, short-term inpatient care, respite care for relief of care givers, general inpatient care for pain control and symptom management (not equivalent to hospital level of care), medical appliances and supplies, including drugs and biologics, home health aide and homemaker services, skilled therapies, and other items and services included in the plan of care.

45.    Pursuant to 42 C.F.R. § 418.20, in order to be eligible to elect hospice care under Medicare, an individual must be—(a) Entitled to Part A of Medicare; and (b) Certified as terminally ill in accordance with § 418.22.

-12-

46.    According to 42 C.F.R. § 418.3, "terminally ill" means that a person "has a medical prognosis that his or her life expectancy is six months or less if the illness runs its normal course."

47.    Hospice is available to individuals for two initial 90-day periods, and then an unlimited number of 60-day periods, provided the individual's terminal condition is certified in writing by a physician at the beginning of each period.

48.    As of January 1, 2011, a hospice physician or hospice nurse practitioner is required to have a face-to-face encounter with each patient whose total stay across all hospices is anticipated to reach the third benefit period. The encounter must occur prior to, but not more than 30 calendar days prior to, the third benefit period recertification and every benefit period recertification thereafter, to gather clinical findings to determine continued eligibility for hospice care. 42 C.F.R. § 418.22.

49.    The initial 90-day period must be certified by (a) the Medical Director of the hospice or physician-member of the hospice inter-disciplinary group and (b) the attending physician, if the individual has an attending physician. For subsequent periods, certification requires either the hospice medical director or the physician member of the hospice interdisciplinary group. 42 C.F.R. § 418.22.

50.    The written certification requires: (1) a statement that the individual's medical prognosis is that his or her life expectancy is six months or less if the terminal illness runs its normal course; (2) clinical information and other documentation that support the prognosis; (3) a physician narrative explanation of the clinical findings that supports a life expectancy of six months or less; (4) beginning with the third benefit period, attestation in writing by the nurse practitioner or non-certifying physician who

-13-

performed the face-to-face encounter that he or she had the encounter, including the date of that visit and stating that the clinical findings of that visit were provided to the certifying physician for use in determining continued eligibility for hospice care; and (5) the dated signature(s) of the physician(s). *Id.;* Medicare Benefit Policy Manual ("Policy Manual"), Chapter 9, § 20.1.

51. The physician narrative must be either part of the certification and recertification forms, or attached as an addendum. If provided as part of the forms, the physician narrative must be located immediately prior to the physician's signature. If provided as an addendum, in addition to the physician's signature on the certification or recertification form, the physician must also sign immediately following the narrative in the addendum. The physician must confirm that he or she composed the narrative based on his or her review of the patient's medical record or, if applicable, his or her examination of the patient. It must reflect the patient's individual clinical circumstances and cannot contain check boxes or standard language used for all patients. The narrative associated with the third benefit recertification and every subsequent recertification must include an explanation of why the clinical findings of the face-to-face encounter support a life expectancy of six months or less.

52. The written certification must be timely obtained for each of the 90-day and 60-day periods. The hospice must obtain the written certification before it submits a claim for payment and the certifications may be completed no more than 15 calendar days prior to the effective date of election or prior to the start of the subsequent benefit period.

53.    A Medicare beneficiary who elects the hospice benefit waives the right to receive standard Medicare benefits related to the illness, including all treatment aimed at attempting to reverse the terminal illness. The beneficiary may however continue to access standard Medicare benefits for treatment of conditions unrelated to the terminal illness.

54.    Hospices are paid a per diem rate based on the number of days and level of care provided during the election period. Policy Manual, Chapter 9, § 40; 42 C.F.R. § 418.302. From this daily rate the hospice care provider, at its expense, is responsible for furnishing directly, or arranging for, all medical services, supplies, equipment and medications related to the hospice patient's terminal illness, except the services of an attending physician. The Medicare benefit for hospice care does not cover expenses for room and board at nursing homes, or long-term care and assisted living facilities. 42 C.F.R. § 418.202

55.    Assuming that the hospice is a certified and otherwise eligible to receive Medicare payments, it may submit claims pursuant to provisions of federal regulations at 42 C.F.R. Part 418. To be covered, hospice services must be:

> Reasonable and necessary for the palliation and manage-ment of the terminal illness as well as related conditions. The individual must elect hospice care in accordance with § 418.24. A plan of care must be established and periodically reviewed by the attending physician, the medical director, and the interdisciplinary group of the hospice program as set forth in § 418.56. That plan of care must be established before hospice care is provided. The services provided must be consistent with the plan of care. A certification that the individual is terminally ill must be completed as set forth in § 418.22.

42 C.F.R. § 418.200.

56.     It is a condition of participation that hospices must maintain a clinical record for each hospice patient that contains "correct clinical information." All entries in the clinical record must be "legible, clear, complete, and appropriately authenticated and dated..." 42 C.F.R. § 418.104.

57.     Medicare's regulations governing hospices require the hospice medical record to include "clinical information and other documentation that support the medical prognosis" and "the physician must include a brief narrative explanation of the clinical findings that supports a life expectancy of six months or less as part of the certification and recertification forms." 42 C.F.R. § 418.22(b)(2) and (3).

58.     Under the regulations the four levels of care that determined the daily reimbursement rate are 1) routine home care, 2) continuous home care, 3) inpatient respite care, and 4) general inpatient care.   The hospice, including its medical director, is responsible for determining that a patient is qualified and the correct level of care for each patient, as reflected on the patient's care plan.

59.     During fiscal year 2009, the average *per diem* reimbursement rate that Medicare paid for routine homecare was $140.15, and the *per diem* rate for general in-patient care was $662.66.

60.     During fiscal year 2010, the average *per diem* reimbursement rate that Medicare paid for routine homecare was $143.10, and the *per diem* rate for general in-patient care was $635.74.

61.     During fiscal year 2011, the average *per diem* reimbursement rate that Medicare paid for routine homecare was $146.82 per day, and the *per diem* rate for general in-patient care was $652.27.

-16-

62.     During the fiscal year 2012, the *per diem* reimbursement rate that Medicare paid for routine homecare was $151.23 per day and the *per diem* rate for general in-patient care was $671.84.

63.     If a hospice patient does not qualify for the general in-patient level of care, then the patient receives routine home care and the hospice is reimbursed at the lower rate.

64.     Hospices may provide care at the general in-patient level only for short term periods and only when medically indicated. The specific circumstances allowed by the regulations are "pain control" and "symptom management" 42 CFR §418.98 (a).

65.     CMS provides guidance with regard to "Short-Term Inpatient Care:"

General inpatient care may be required for procedures necessary for pain control or acute or chronic symptom management that cannot feasibly be provided in other settings. Skilled nursing care may be needed by a patient whose home support has broken down if this breakdown makes it no longer feasible to furnish needed care in the home setting…[A] brief period of general inpatient care may be needed in some cases when a patient elects the hospice benefit at the end of a covered hospital stay. If a patient in this circumstance continues to need pain control or symptom management which cannot be feasibly provided in other settings while the patient prepares to receive hospice home care, general in patient care is appropriate. Other examples of appropriate general inpatient care include a patient in need of medication adjustment, observation, or other stabilizing treatment, such as psycho-social monitoring, or a patient whose family is unwilling to permit needed care to be furnished in the home.

CMS Medicare Benefit Policy Manual, Chapter 9, § 40.1.5.

66.     Pursuant to 42 C.F.R. § 418.204(a), Hospice nursing care may be covered for up to 24 hours a day as continuous care during "periods of crisis."

67.     A "period of crisis" under 42 C.F.R. § 418.204(a) is defined as a period in which an individual needs continuous care for palliation and to address acute symptoms in order to be able to stay in his or her home.

68.    Coverage for continuous care under Pub. 100-02, Chapter 9 § 40.2.1, Centers for Medicare Policy Manual, extends only to "acute" medical crises in which "direct" patient care by a registered nurse or a licensed practical nurse is needed for a terminally-ill patient to remain in their place of residence.

69.    When fewer than eight hours of care are needed in a 24-hour period, services must be billed as routine care rather than continuous home care.

70.    At least 51% of the minimum eight hours of care must be provided by a registered nurse or a licensed practical nurse.  The remaining 49% may be provided by the homemaker or home health aide.

71.    The crisis care rates are much higher than the normal hospice rates, as the following comparison of rates for Cincinnati, Ohio show:

| Fiscal Year | Crisis Rate/Hour | Normal Rate |
|---|---|---|
| 2007 | $763.37/$31.81 | $130.79 |
| 2008 | $788.55/$32.86 | $135.11 |
| 2009 | $841.68/$35.07 | $144.32 |
| 2010 | $847.39/$35.55 | $145.32 |
| 2011 | $851.06/$35.36 | $145.95 |
| 2012 | $884.23/$36.88 | $151.65 |

**C.    False Claims in Violation of the Anti-Kickback Statute**

72.    The Medicare and Medicaid Patient Protection Act, 42 U.S.C. § 1320a-7b(b) (the "Anti-Kickback Statute" or "AKS"), prohibits knowing soliciting, receiving, offering, or paying any remuneration, in cash or in kind, for any referral or a person or product for which payment is sought from any federally-funded health care program. Violation of the statute triggers criminal and civil exposure, as well as exclusion from participation in federally-funded healthcare programs.

-18-

73.     Claims resulting from kickbacks violate the False Claims Act. A claim "that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim" for purposes of the False Claims Act.  42 U.S.C § 1320a-7b(g).

74.     Compliance with the AKS is a material condition of payment of all claims submitted for reimbursement by Medicare, Medicaid, and other federally-funded programs, and claims submitted or caused to be submitted in violation of the AKS are false claims.

75.     All federally-funded healthcare programs require every provider who seeks payment from the program to sign Provider Agreements in order to establish their eligibility to seek reimbursement from the Medicare and Medicaid Programs.  As part of these agreements, without which the providers may not seek reimbursement from federal healthcare programs, the provider must sign the following certification:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to [me]. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the [provider's] compliance with all applicable conditions of participation in Medicare.

Form CMS-855A.  Business entities, such as professional corporations, professional associations, and limited liability companies, must complete a similar Provider Agreement to become eligible to seek reimbursement from Medicare and Medicaid programs.  Form CMS-855I.

76.     Every claim for payment is subject to the terms of the provider's certification that the services for which payment is sought were delivered in compliance with the AKS.

-19-

77.    The AKS arose out of congressional concern that payoffs to those who can influence healthcare decisions will result in goods and services being provided that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population. To protect the integrity of the program from these difficult-to-detect harms, Congress enacted a per se prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback gave rise to overutilization or poor quality of care. First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. See Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

78.    The AKS is designed to, inter alia, ensure that patient care will not be improperly influenced and corrupted by compensation arrangements which are not directly related to the care of patients or which influence patient care decisions. The AKS makes it a criminal offense knowingly and willfully to offer, pay, solicit, or receive any remuneration to induce or reward referrals of items or services reimbursable by a Federal healthcare program. 42 U.S.C. 1320a-7b.  For purposes of the anti-kickback statute, "remuneration" includes the transfer of anything of value, directly or indirectly, overtly or covertly, in cash or in kind.  Payment of remuneration of any kind violates the statute if one of the purposes the payment is to induce referrals.

79.    Various of the defendants have kickback relationships with each other, as alleged more specifically below.  For example, Omnicare is alleged to have paid a

-20-

single, massive kickback to one or more of the Colleran defendants in exchange for a referral of all patients in Colleran-owned facilities. Colleran is alleged to have received per-patient kickbacks from defendants Speelman and Amber Care. Defendant Mt. Carmel has offered an arrangement to certain Colleran-owned facilities pursuant to which Mt. Carmel will refer patients based on the extent to which the Colleran facilities utilize Mt. Carmel's services and facilities. And the various Colleran-owned defendants are rife with preferred referral arrangements which are financially beneficial, including at a minimum provision of management services at below-market cost.

80.     These kickback relationships resulted in the submission of false claims for to federally-funded healthcare programs.

## VI.     FACTS

### A.     Background

81.     In approximately 1996, Defendant Brian Colleran founded Provider Services ("Provider") to manage a skilled nursing facility, Villa Angela, in Columbus, Ohio. Colleran expanded to management of other skilled nursing facilities and also began to purchase the buildings housing the facilities. In 2004, Provider managed eleven skilled nursing facilities. Provider grew rapidly as Colleran purchased skilled nursing facilities and added ancillary service providers. In 2011, Colleran purchased the 31-facility, statewide Carington Health Systems, after Carington was sued by the Ohio Attorney General for Medicaid fraud. Provider currently owns and operates approximately 80 skilled nursing facilities located throughout Ohio, with more than 6,000 beds.

-21-

82. In approximately 2008, Defendant Colleran directed Relators to start a hospice program to serve his nursing homes. The hospice operation began in Columbus later that year. In 2008, Colleran formed defendant Tridia, receiving hospice accreditation in 2009. In 2010, Tridia expanded to Akron/Cleveland and Dayton. In 2011, Tridia expanded to Ashtabula and purchased Destiny Hospice in Cincinnati. In 2012, Tridia expanded to Holmes County, Ohio. Tridia is managed by Provider Services, Inc. (PSI).

83. Colleran and Provider have consistently expanded Provider's reach into all aspects of health care services provided to nursing home patients. PSI manages all Provider-owned skilled nursing facilities and hospices. On information and belief, PSI and its owner Brian Colleran offer below fair market value management services to these facilities and hospices to induce the SNFs to refer its patients to other Provider or Colleran-owned businesses.

84. As detailed below, Provider-owned and managed nursing facilities are required to refer patients to other Provider-owned companies which provide services reimbursed by federal healthcare programs, including without limitation nursing services, hospice and medical supplies. Provider-owned and managed hospices are similarly required to refer their patients to the same Provider-owned companies. Provider-owned nursing facilities and hospices are also required to refer patients to companies in which defendant Colleran has or has had personal investments, including a pharmacy, an ambulance provider, a home health provider, and durable medical equipment company. Defendant Colleran routinely uses his influence as an investor to

-22-

steer the Provider referral stream to Colleran-owned businesses. Colleran also has encouraged the false billing of hospice and therapy services to maximize federal reimbursement.

      B.      **Defendants' Hospice Operations, in all locations other than Columbus, routinely failed to obtain essential documentation certifying that patients were terminally ill and otherwise entitled to hospice benefits**

     85.     Colleran-owned hospices, including at least Destiny Hospice in Southwestern Ohio and Tridia Hospice in Northeastern and Northwestern Ohio, systematically provided hospice care to patients for whom proper eligibility determinations were not made.

     86.     These material failures included failing to perform required face-to-face evaluations, failing to properly employ certified nurse practitioners to perform face to face visits, falsely certifying that face-to-face evaluations had occurred when they had not been performed, failing to obtain physician certifications, obtaining incomplete physician certifications, and obtaining untimely certifications. These failures, which are material to the government's decision to pay for hospice services, occurred systematically in all hospice locations with the exception of Columbus, where relators ensured that certifications were obtained.

     87.     By way of example, as of January 1, 2011, a hospice physician or hospice nurse practitioner is required to have a face-to-face encounter with each patient whose total stay across all hospices is anticipated to reach the third benefit period. From at least May, 2011 through August, 2012, Destiny systematically failed to perform the

required face-to-face ("F2F") evaluations correctly. In Dayton, Destiny did not have any F2F visits conducted or certified. In Cincinnati, Destiny often did not conduct F2F visits. Representative examples include the following government-insured patients:

| Patient | Admit Date | Period of Failure (between 5/1/2011 and 8/9/2012) | Status (as of 8/9/2012) |
|---------|-----------|---------------------------------------------------|-------------------------|
| PB | 5/11/2011 | 11/7/2011 - 2/24/2012 | Died |
| PC | 6/25/2009 | 5/1/2011 - 5/2/2012 | Died |
| FH | 6/14/2010 | 5/1/2011 - 6/5/2011 | Discharged |
| MG | 4/5/2011 | 12/1/2012 - 4/30/2012 | Discharged |

88. Destiny also used progress notes by its hospice medical director, Dr. Andrew Grubbs, as purported evidence of F2F evaluations. However, Dr. Grubbs did not sign or attest that the clinical findings of the visit were provided to the certifying physician for use in determining continued eligibility for hospice care. His certifications are often out of compliance because the visits are neither within the allowed 30 day period nor reported in his own hand. Representative examples include the following government-insured patients:

| Patient | Admit Date | Period of Failure (between 5/1/2011 and 8/9/2012) | Status (as of 8/9/2012) |
|---------|-----------|---------------------------------------------------|-------------------------|
| LB1 | 11/16/2010 | 5/15/2011 - 5/26/2012 | Died |
| GC | 12/9/2010 | 5/1/2011 - 6/1/2012 | Discharged |
| DB | 5/1/2010 | 5/1/2011 - 10/16/2011 | Died |

89. Destiny's management was fully aware of its failures. By way of example, on February 16, 2012, Tracy Helwig, Destiny Clinical Manager, wrote Julie Hyrbiniak, Destiny Hospice General Manager, regarding the material requirement that a Certified Nurse Practitioner perform F2F evaluations for Dayton patients. She advised Hyrbiniak

that evaluations are required by law, and that Destiny had not been in compliance since
May 2011.

90.    Tridia and Provider are aware that Destiny was systematically failing to
comply with its F2F obligations. By way of example, on June 20, 2012, Relator Bourne
informed Sean Riley that Destiny had not been doing F2F evaluations in Dayton and not
performing them correctly in Cincinnati for the previous year. She has informed Riley
many times that Destiny is either not performing F2Fs at all, or not performing them
correctly.

91.    Relator Bourne spoke to defendant Colleran in June 2012, regarding the
lack of face to face visits in the Cincinnati office. Bourne stated "I tried to tell you about
the compliance problems in Cincinnati back in October, but you had Dan call me and tell
me to stay away from Cincinnati." Colleran replied "so what? Now I need to be served
my f***ing lunch". In another conversation later that month regarding the
noncompliance, Bourne told Colleran that she was trying to get the programs back in
compliance and was worried about keeping Colleran out of jail. Colleran hung up on
Bourne and the two have not spoken since, despite having talked routinely for many
years.

92.    On June 21, 2012, Tridia terminated Tracy Helwig's employment. Chris
Zeek, Tridia Human Resources Director, wrote to Dan Cobb, Provider's Director of
Human Resources, Dan Cobb, that:

> Tracy told us that Julyie Hrybiniak (GM) was completely aware the
> required face 2 face assessments were not being completed. Julie says
> Tracy did tell her and Julie wasn't concerned about the noncompliance.
> Julie says she is just as guilty as Tracy. ... Tracy was also guilty of

-25-

falsifying records, and stubbing in visits for nurses without backup
documentation[.]

Ms. Zeek also stated that the Destiny General Manager, Julie Hyrbiniak, knowingly

violated Medicare guidelines.

93.    Tridia also terminated Ms. Hyrbiniak. The Provider defendants indicated to

Relator Bourne that Tridia would repay Medicare and Medicaid for only a small number

of the false claims submitted by Tridia, refused to investigate further, and specifically

ordered Relator Bourne to engage in no further investigation of noncompliance.  John

Krystowski advised Relators, who were involved in documenting the failure to perform

required evaluations at Destiny, that he could not report what he did not know about,

and directed them to conduct no further audits or inquiries.

94.    On January 16, 2012, Jodi Rohrer, previous Clinical Director of Nursing for

Tridia, wrote Cynthia Shahed, Nurse Practitioner in Akron/Cleveland for Tridia, that

there were two patients whose F2F recertifications had not been performed, and

indicated that those recertifications would have to be "fudged."

95.    Relators have observed that records reflecting numerous F2F visits

appear to have been falsified by Shahed or others in the Akron/Cleveland hospice. The

hospice facilities keep a log of clinician visits by date, starting time of the visits, ending

time and length of visits. A comparison of a January-August, 2012 visit log to the face

to face certifications in a sampling of patient files revealed there was no record on the

visit log of a visit by the nurse Cynthia Shahed on days she had certified conducting the

F2F evaluations. The following government-insured patients had invalid certifications

for the third benefit period or a subsequent period because the F2F visits were falsely

-26-

certified as having taken place when, on information and belief, they did not take place

because they do not appear on the visit logs:

| Patient | F2F evaluation dates that do not appear on visit logs | Falsified Benefit Periods |
|---------|------------------------------------------------------|---------------------------|
| VA | 7/28/2011 | 6th |
| AB | 2/8/2011 | 3rd |
| AC | 2/15/2012 | 4th |
| TC | 2/28/2012; 5/15/2012 | 2nd; 3rd |
| FD | 6/30/2011; 7/28/2011; 10/18/2011; 1/31/2012; 4/3/2012 | 3rd; 4th; 5th; 7th; 8th |
| JH1 | 12/13/2011 | 5th |
| GJ | 1/27/2012; 3/26/2012 | 4th; 5th |
| AM | 7/28/2011; 1/31/2012 | 7th; 10th |
| CP | 5/13/2011; 11/11/2011 | 3rd; 6th |
| AT | 10/17/2011; 2/15/2012 | 6th; 8th |

96.     Tridia is often noncompliant in failing to properly employ certified

nurse practitioners to perform face to face visits.  CMS regulations state Hospices can

employ NPs on a full-time, part-time, or *per diem* basis, if needed, to conduct face-to-

face encounters. However, at the Ashtabula office, Sean Riley has instructed that NP

Insight contractor Janet Gavin perform many of the face-to-face encounters.   While Ms.

Gavin is an independent contractor of NP Insights, she is not an employee of Tridia

Hospice.  As of December 4, 2012, Tridia has still not gathered the needed paperwork

from NP Insight to legally employ Gavin.

97.     By way of further example of Destiny's material noncompliance to make

proper eligibility determinations, the written certification for the third and subsequent

benefit periods must contain an attestation in writing by the nurse practitioner or non-

certifying physician who performed the face-to-face encounter that he or she had the

encounter, including the date of that visit and stating that the clinical findings of that visit

-27-

were provided to the certifying physician for use in determining continued eligibility for hospice care. Medicare Benefit Policy Manual ("Policy Manual"), Chapter 9, § 20.1. All Tridia locations with the exception of Columbus were noncompliant with the requirement that the nurse practitioner provide the clinical findings of the visit to the certifying physician.

98.    Tridia nurse practitioners do not have direct contact with patient's physicians or the hospice's or nursing homes' medical directors. Instead, they are trained to communicate clinical findings on the Physician Face to Face Encounter form, which is also the form on which they certify they conducted the encounter. They then hand the forms into Administration, and Administration passes the forms along to the physicians as an addendum to the accompanying certification. Therefore, if the clinical findings do not appear on the form, the nurse practitioners falsely certified that they provided the clinical findings to the physicians when they did not.

99. With the exception of one nurse practitioner who is married to a Medical Director in Cleveland, there is no opportunity for communication between the nurse practitioner and the Medical Director. On information and belief, the married practitioner and Medical Director did not communicate about the encounters other than through this form. Relators understand that the nurse practitioners never communicate the findings verbally or otherwise.

100.    Physicians have signed certifications prior to the F2F evaluation being conducted. In such cases, it is impossible for the certified nurse practitioner to provide

-28-

the clinical findings.  By way of example, patient LS1 was recertified eligible for hospice

care on 11/9/11 but the F2F, if it occurred, took place on 11/11/11.

101.   By way of further example, the initial 90-day period must be certified by (a)

the Medical Director of the hospice or physician-member of the hospice inter-

disciplinary group and (b) the attending physician, if the individual has an attending

physician.

102.   The written certification requires, *inter alia*: (1) a statement that the

individual's medical prognosis is that his or her life expectancy is six months or less if

the terminal illness runs its normal course; (2) clinical information and other

documentation that support the prognosis; and (3) a physician narrative explanation of

the clinical findings that supports a life expectancy of 6 months or less.

103.   Representative examples of government-insured patients with respect to

which Tridia had invalid certifications for the initial 90-day period because they lacked

*any* physician's narrative explanation of the clinical findings that supports a life

expectancy of 6 months or less by one or both of the required physicians are:

| Patient |
|---------|
| LA |
| TB |
| AB |
| AB1 |
| AC |
| EC |
| TC |
| OD |
| MF |
| AF |
| EG |
| FG |
| JH1 |

| |
|---|
| NH |
| GH |
| JK1 |
| HL1 |
| EM |
| CP |
| AW |

104.    Representative examples of government-insured patients had invalid certifications for the initial 90-day period because they lacked a *sufficient* physician narrative explanation of the clinical findings that supports a life expectancy of 6 months or less by one or both of the required physicians, are:

| Patient | Reason narrative is insufficient |
|---|---|
| GB | No reason for 6-mo. or less life expectancy |
| DB1 | Only 2 words |
| EM2 | No reason for 6-mo. or less life expectancy |
| BT | Does not support diagnosis |
| RW | No reason for 6-mo. or less life expectancy |

105.    For subsequent periods, certification requires only one of the aforementioned physicians. 42 C.F.R. § 418.22.  The following patients are representative examples of patients who had invalid certifications for one or more of the subsequent certification periods because they lacked a physician narrative explanation of the clinical findings that supports a life expectancy of 6 months or less:

| Patient | Subsequent Benefit Periods Lacking Narrative |
|---|---|
| LA | 2nd |
| VA | 3rd, 5th, 8th, 10th |
| BB | 4th |
| DB1 | 2nd |
| AB | 3rd |
| CB1 | 3rd |
| AB1 | 2nd, 4th |
| AC | 2nd, 3rd, 4th, 5th, 6th |

| TC | 2nd, 3rd |
|----|----|
| FD | 3rd, 4th, 5th, 6th |
| AF | 2nd, 4th |
| JH1 | 3rd, 4th, 5th |
| GJ | 2nd, 3rd, 4th, 5th, 6th, 7th |
| JK | 3rd |
| CP | 2nd, 3rd, 4th, 5th, 6th, 7th |
| AT | 3rd, 4th, 5th, 6th, 7th, 8th, 9th, 10th |

106.    The North Division of Tridia, which covers Akron and Cleveland, was systematically noncompliant through at least August 2012 with respect to obtaining required physician narratives or signatures.  By way of example, General Manager Laura Upson e-mailed Sean Riley on August 28, 2012 regarding "things that were missing in the past.  Such as doctor narratives or signatures.  Do we go back and get those now that the doctors have been educated or do we just move forward?"

107.    By way of further example, Dr. Mohamed Shahed is regularly absent from required meetings.  The hospice interdisciplinary group (in collaboration with the individual's attending physician, if any) must review, revise and document the individualized plan as frequently as the patient's condition requires, but no less frequently than every 15 calendar days.  This function must entail the entire hospice team- including the medical director. 42 CFR Part 418.56(a) and (d).   Dr. Shahed is regularly absent from these meetings and hospice personnel is instructed to take documents to him to sign at a later date.

108.    Beginning on January 1, 2011, a hospice physician or hospice nurse practitioner is required to have a face-to-face encounter with each patient whose total

-31-

stay across all hospices is entering the third benefit period and within thirty days prior to each following benefit period.

109. The written certification for these benefit periods must contain an attestation in writing by the nurse practitioner or hospice physician who performed the face-to-face encounter that he or she had the encounter, including the date of that visit and stating that the clinical findings of that visit were provided to the certifying physician for use in determining continued eligibility for hospice care. The physician narrative associated with the third benefit recertification and every subsequent recertification must include an explanation of why the clinical findings of the face-to-face encounter support a life expectancy of 6 months or less.

110. The following are representative examples of government-insured patients had invalid certifications for the third benefit period or a subsequent period because the F2F visit did not occur or was not contained in the certification:

| Patient | Benefit Periods Lacking F2F visit |
|---------|-----------------------------------|
| LB | 3rd and all subsequent |
| CB | 3rd |
| NH | 3rd, 4th, 5th |
| JK | 3rd, 4th |
| EM | 4th |
| EM1 | 3rd, 4th |
| BN | 3rd |
| JS | 3rd, 4th, 5th |
| LS1 | 5th, 6th, 7th |
| HW | 3rd, 4th, 5th, 6th |
| RW | 3rd, 4th |

111. The encounter must occur prior to, but not more than 30 calendar days prior to, the third benefit period recertification and every benefit period recertification

-32-

thereafter, to gather clinical findings to determine continued eligibility for hospice care. 42 C.F.R. § 418.22.

112.    The following are representative examples of government-insured patients had invalid certifications for the third benefit period or a subsequent period because the F2F visits were untimely.

| Patient | Affected Benefit Period | Benefit Start Date | Untimely F2F visit |
|---------|------------------------|--------------------|--------------------|
| BA | 4th | 11/3/11 | 10/2/11 |
| LA | 3rd | 3/31/12 | 4/3/12 |
| AB | 4th | 7/16/12 | 7/17/12 |
| GB1 | 7th | 2/1/12 | 2/3/12 |
| CB | 4th | 7/29/12 | 8/4/12 |
| JH1 | 4th | 11/3/11 | 11/8/11 |
| GJ | 3rd | 12/3/11 | 12/6/11 |
| EM | 3rd | 4/9/12 | 4/10/12 |
| LS1 | 3rd, 4th | 11/9/11; 1/8/2012 | 11/11/11; 2/3/2012 |

113.    Relators are aware that the North Division of Tridia (Akron/Cleve-land) regularly failed to timely complete F2F evaluations.

114.    The written certification must be timely obtained for each of the 90-day and 60-day periods.  The hospice must obtain the written certification before it submits a claim for payment and the certifications may be completed no more than 15 calendar days prior to the effective date of election or prior to the start of the subsequent benefit period.

115.    Government-insured patient DR was admitted on May 9, 2011, died on May 12, 2011, but the attending and medical director did not sign his certification until June 16, 2011.

-33-

116.    The following are representative examples of government-insured patients had invalid certifications for one or more of the benefit periods because the written certification was not timely obtained:

| Patient | Affected Benefit Period | Benefit Start Date | Late Certification Date |
|---------|------------------------|--------------------|-------------------------|
| AF | 1st | 9/23/2011 | 10/27/2011(attending) and 10/26/2011 (medical director) |
| EG | 1st | 3/10/2012 | 5/31/2012 (medical director) |
| CK | 1st | 3/15/2012 | 5/4/2012 (attending) |
| EM1 | 1st | 3/27/2012 | 4/3/2012 (medical director) and 4/12/2012 (attending) |
| AN | 1st | 5/20/2011 | 6/6/2011(medical director) and 6/16/2011 (attending) |

117.    Relators have documented many backdated certifications.  This abuse is easily observable because the print date appears on the certification form and the organization's electronic medical record system tracks the progression of a document and shows when a document was completed.  The following are repre-sentative examples of government-insured patients had invalid certifications for one or more of the benefit periods because the written certification was falsely certified as having been timely obtained:

| Patient | Affected Benefit Period | Benefit Start Date | Back-date | Date form created |
|---------|------------------------|--------------------|-----------|-------------------|
| AB | 1st | 8/3/2010 | 8/4/2010 | 8/5/2010 |
| CB1 | 1st | 9/22/2011 | 9/22/2011 | 9/23/2011 |
| TC | 2nd; 3rd | 2/28/2012; 5/28/2012 | 2/28/2012; 5/28/2012 | 2/29/2012; 5/29/2012 |
| VF | 1st | 5/5/2012 | 5/6/2012 | 5/11/2012 |
| AF | 4th | 5/20/2012 | 5/20/2012 | 5/22/2012 |
| LF | 1st | 9/12/2011 | 9/12/2012 | 9/14/2011 |
| JH | 3rd | 7/26/2012 | 7/24/2012 | 7/27/2012 |

| EH | 1st | 7/6/2012 | 7/8/2012 | 7/9/2012 |
|----|-----|----------|----------|----------|
| PM | 1st | 1/21/2012 | 1/21/2012 | 1/22/2012 |
| LS | 1st | 6/7/2012 | 6/8/2012 | 6/14/2012 |

118.    The written certification must contain the signature of the physician for each benefit period.

119.    The following are representative examples of government-insured patients had invalid certifications for one or more of the benefit periods because the written certification did not contain a physician signature:

| Patient | Affected Benefit Period | Physician Failure to Sign |
|---------|------------------------|---------------------------|
| FD | 1st | Medical Director |
| FG | 1st | Attending Physician |
| JH1 | 1st | Attending Physician |
| RM | 1st | Attending Physician |

120.    The written certification must be dated.  The following are representative examples of patients had invalid certifications for one or more of the benefit periods because the written certification was not dated:

| Patient | Affected Benefit Period | Physician Failure to Date |
|---------|------------------------|---------------------------|
| VA | 1st | Medical Director |
| AB1 | 1st | Medical Director |
| LB1 | 4th | Medical Director |
| EC | 1st | Attending Physician |
| LF | 1st | Attending Physician |
| FG | 1st | Attending Physician |
| LJ | re-admitted for 3rd | Attending Physician |
| CP | 3rd | Medical Director |
| AF | 2nd | Medical Director |

121.    An individual (or his authorized representative) must elect hospice care to receive it.  Medicare Benefit Policy Manual, Chapter 9, Section 10.  The election

-35-

statement to hospice must include the effective date of the election.  Id. at Section 20.1.

The following are representative examples of government-insured patients did not

contain an effective date:

| Patient |
| --- |
| CB |
| EC |
| OD |
| VF |
| GJ |
| BK |
| EM1 |
| BN |

122.    Tridia failed to obtain a consent form for patient GK for her readmission to

hospice.

123.    Tridia also failed to obtain a certification for patient LA for the fourth

benefit period, starting May 30, 2012.

**C.    Provider Services used its joint ownership of nursing homes and hospices to facilitate a scheme pursuant to which hospice administrative personnel, rather than physicians, initiated hospice care for nursing home patients**

124.    Congress enacted the Health Insurance Portability and Accountability Act

of 1996 ("HIPAA") to ensure individuals' right to privacy over their medical records.

Pub.L. 104-191, 110 Stat. 1936 (1996) (codified at 42 U.S.C. §§ 1320d-1329d-8

(1996)). The statute delegated to the Secretary of HHS the authority to make final

regulations to implement the Act.

125.    In accordance with this rulemaking authority, the Secretary promulgated

regulations, known as the HIPAA Privacy Rule, to regulate how and under what

-36-

circumstances "covered entities" may use or disclose "protected health informa-tion" about an individual. 45 CFR parts 160, 164. "Protected health information" means "individually identifiable health information." 45 CFR part 160.103. "Individually identifiable health information" includes health information that identifies the individual, including demographic information, or can be reasonably used to identify the individual. *Id.*

126. Under HIPAA, "covered entities" include a provider of medical or health services as well as any other person or organization that furnishes, bills, or is paid for health care in the normal course of business. 45 C.F.R. § 160.103. "Health care" includes any care, services, or supplies related to the health of an individual, including the sale or dispensing of a drug, device, equipment, or other item in accordance with a prescription. 45 C.F.R. §160.103. Under this definition, both Defendants' nursing homes and its separately-incorporated hospices are "covered entities" for purposes of HIPAA.

127. A covered entity may use or disclose protected health information without obtaining prior written authorization of the individual only for treatment, payment, or health care operations. 45 C.F.R. § 164.502(a)(ii); 45 C.F.R. § 164.508(a)(1). A covered entity must obtain prior authorization from a patient for any use or disclosure of protected health information for "marketing" purposes. See 45 C.F.R. § 164.508.

128. All Colleran-owned nursing homes and hospices operate under a business model that required hospice administrators, marketers and administrative staff to review non-hospice resident medical records to find patients who may be eligible for hospice

care. This process thereby short-circuited the medical judgment of the patients' physicians.

129.    Defendant Colleran instructed Relator Bourne to review medical files at Colleran-owned nursing homes to select patient candidates for hospice. She was instructed to monitor the hospice census at Provider Buildings and to alert regional administrators when nursing home residents were admitted to a non-Provider-owned hospice. Additionally, when the census of the Provider-owned hospice dropped, she was instructed to perform chart audits to suggest to nursing-home administrators which patients were eligible for hospice. Ms. Bourne was not employed by any of these nursing homes. Ms. Bourne also was directed to follow up with regional administrators if a patient was "suggested" for hospice and the CNP or nursing home staff did not approach the family.

130.    Relator Bourne understands that administrative personnel at all other Tridia offices, and at Destiny's offices, also have been directed to review nursing home patient files to identify patients for referral to hospice. Relator Bourne was instructed by Colleran and Riley to use Provider's electronic medical record system, "Point Click Care," when training new General Managers and Clinical Directors in methods by which to identify referral opportunities.

131.    These chart audits let to the regular admission to hospice of many patients in Colleran-owned nursing homes. The following are representative examples of patients who were admitted to hospice despite there having been no request for hospice services by the patient, family, or physician:

132.   On July 18, 2011, Relator Bourne identified multiple patients at Arlington that had 10% weigh loss in the previous six months as potential hospice candidates. Julie Hrybiniak promised to follow up with Roy Hodges at Arlington regarding these patients.  Many of these government-insured patients were admitted to Tridia Hospice as a result.

133.   On June 7, 2012, Relator Bourne contacted Roy Hodges at Arlington regarding three government-insured patients that she identified as potential hospice targets:

a.   Patient  A, whose chart indicated increased confusion, pureed diet, incontinence and need for extensive assistance in ADLs.

b.   Patient C, who experienced weight loss and needed extensive assistance for ADLs.

c.   Patient H who spent the majority of the day in bed or chair, needed extensive to total care for ADLS and charted increased confusion and agitation.

134.   Patients A and H were admitted to hospice.

135.   On August 16, 2012, Tridia employee Julie Scholl spoke with a social worker regarding patients at Darby Glenn.  They identified six potential government-insured hospice patients: HS1, MF1, TD, RP (receiving therapy), LP1 (receiving therapy) and C1 (receiving therapy).

136.   On November 1, 2012, Relator Goodwin and Kerry Bossenbroek, a nurse at Tridia, identified patient government-insured patient AM1 at Villa Angela as a potential candidate for hospice.  AM1 lost 17.5 pounds within the previous six months,

-39-

her diet was downgraded to puree. Ms. Bossenbroek indicated that she would look through the chart to see what else she could find, such as lab results.

**D. Colleran-owned SNFs are required to unnecessarily maintain patients as skilled in order to maximize reimbursement for skilled-service. Olympia Therapy false billed for these therapy services.**

137. When a Medicare beneficiary is discharged from an inpatient hospital stay, Medicare Part A pays for post-hospital care in skilled nursing facilities (SNFs) for up to 100 days during each spell of illness. A "spell of illness" begins on the first day a patient receives Medicare-covered inpatient hospital or skilled nursing facility care and ends when the patient has spent 60 consecutive days outside the institution, or remains in the institution but does not receive Medicare-coverable care for 60 consecutive days.

138. Skilled nursing facility coverage includes the services generally available in a SNF: nursing care provided by registered professional nurses, bed and board, physical therapy, occupational therapy, speech therapy, social services, medications, supplies, equipment, and other services necessary to the health of the patient.

139. On information and belief, Defendant Colleran-owned facilities have provided medically-unnecessary skilled services through Olympia Therapy to patients that were eventually admitted to hospice. Relators are aware of numerous instances in which patients who were provided high levels of therapy, including occupational, arrived at hospice in a condition in which there could have been no therapeutic value to these services. Many of these patients died shortly after admission to hospice. Moreover, Relators and other administrators have been specifically directed by Defendant Colleran not to take a patient off skilled care for hospice care. Relators also observed SNF

-40-

administrators plan when they would make the hospice referral based on when skilled coverage expired.

140.    Representative examples of government-insured patients include whom Relators have reasonable basis to believe received unnecessary skilled services include the following.

141.    Patient JP was admitted to hospice on July 16, 2012.  On July 21, 2012, he was admitted to the hospital and then re-admitted to the nursing home where, on information and belief, he was unnecessarily skilled for a week with a RUG score of HD2, which translates to a *per diem* rate of $377.10.  While in the hospital, he was seen by a palliative team and a handwritten hospice evaluation order was included in his discharge summary.  Upon readmission to the nursing home on August 9, 2012, a patient note recorded that the patient "want[ed] to talk with hospice nurse and sign admission papers."  The Darby Glenn nurse phoned Tridia triage nurse to request the patient be readmitted to hospice care due to his uncontrollable pain and patient's request.  Relator Bourne contacted Darby Glenn administrator, Dionne Nicol, to inquire whether Tridia could proceed with the admission.  Nicole stated not to admit the patient and allow Darby Glenn to skill the patient.  The Darby Glenn nurse, F. Stephan, RN, wrote the following note when JP returned back from the hospital Patient JP was in severe pain for the week that Darby Glenn skilled him and refused all food and medications with the exception of his pain medication.  He was not re-referred to hospice until August 14, 2012, and he died on August 27, 2012.  Upon readmission to hospice care, the hospice nurse worked for 2-3 days by titrating pain and anxiety

-41-

medications in an effort to provide optimal comfort. Skilling JP after his hospitalization postponed the hospice nurse's ability to institute interventions that could return JP to a comfortable state and allow him to live his remaining days in a comfortable and dignified manner.

142.    Patient SO received skilled services on July 19, 2012 until September 7, 2012 at the RUG rate of RVC, or $450.26 per day. She was not admitted to Tridia Hospice until September 8, 2012 and she died later that day. The therapy was provided by Olympia Therapy at Provider-owned Villa Angela. The therapy is believed to have been unnecessary because there is documentation that the patient began becoming non-compliant by refusing therapy at times, some medication and some peritoneal dialysis treatments. On August 30, 2012 there is a documented change in condition where the patient was refusing all therapy and dialysis treatment. On September 2, 2012 the patient became unresponsive, was placed in bed and slowly began to arouse. The patient refused to be sent to the emergency room and changed her code status at that time to a DNRCC. The patient continued to refuse some treatments, medications until a hospice referral was made.

143.    Patient IZ received skilled services beginning on 5/14/2012 until June 10, 2012. For her first 14 days of her therapy, her RUG Score was RUB ("Ultra High") for which reimbursement is paid by the United States at the rate of $532.32 per day. Ms. I.Z. was not admitted to Tridia Hospice on June 11, 2012, and she died on June 17, 2012. The therapy was provided by Olympia Therapy at Provider-owned Country View of Sunbury. The therapy is believed to have been unnecessary because the patient

-42-

started having significant medical declines on June 1, 2012. The family had called

several times to inquire about her status. On June 8, 2012, the facility held a care

conference with the family. A social worker documented on that same date, "Spoke

with POA about hospice and we would like Tridia to call and speak with him. Tridia

notified and they will call. Therapist stated they will discharge resident from therapy on

6/10/12, explained to POA about the cut letter and that resident would be private pay

starting 6/11/12. POA aware." The patient was eligible for services earlier and the

family was in agreement, but the SNF chose to maximize skilled service and was even

able to plan a cut date and the referral to hospice.

144. Patient PG unnecessary skilled therapy beginning on May 8, 201 2until

May 25, 2012 at a RUG rate of $452.56. She was not admitted to Tridia until May 26,

2012. She died on August 5, 2012. The therapy was provided by Olympia Therapy at

Provider-owned nursing home Highbanks Care Center. The therapy is believed to have

been unnecessary because the physician had noted on May 20, 2012 that the patient

needed hospice due to lung cancer with brain mets. It was the physician's belief that

the best course of treatment for this patient was hospice. Any therapy that would have

contributed to the patient's quality of life could have been provided by the hospice

organization and been included as part of the hospice's daily per diem. However, the

SNF chose to skill the patient to provide this therapy because the reimbursement was

higher. The patient was seen by palliative care in the hospital and there are notes that

physician discussed the poor prognosis with the family. Further, on May 23, 2012,

Provider employee Traci Schutte at High Banks Care Center facility notified Relator

-43-

Bourne to "watch for referrals" on government-insured patients CS1 and PG. She indicated that Patient PG was skilled until May 25th but then could be "picked up."

145.    Patient EN received skilled services until May 29, 2012 at RUG rate RUC, or $532.32 per day.  She was not admitted to Tridia hospice until May 29, 2012.  She died on June 3, 2012.  The therapy was provided by Olympia Therapy at Provider-owned Arlington.  The facility MDS Nurse complained to Tridia marketer, Rebecca Dasse, that Trida admitted the patient to hospice a day before her eligibility for skilled nursing care expired, thus depriving the SNF of the ability to bill for that day of skilled nursing care, and requested that Tridia change its admission date until the follow day so that Arlington could bill for the therapy that was provided on May 29, 2012.  The therapy is believed to have been unnecessary because the patient was having health declines beginning on May 13, 2012.  It is charted on that date that the patient was not eating well and the patient's diet was downgraded.  The patient was noted to be very weak on May 26, 2012 and not eating or drinking.  On May 28, 2012, it is charted that the patient had to be encouraged to swallow her nightly medications.  On May 29, 2012, it is charted that the patient had to be turned and repositioned every two hours.  It was not until later in the day on May 29, 2012 that there is any documentation of the physician being notified of her decline and allowing the physician to make an order for hospice.

146.    Patient EH1 received skilled services from approximately July 10, 2012 until September 12, 2012 at RUG rate RMC, or $336.40.  She was not admitted to Tridia Hospice until September 13, 2012.  The therapy was provided by Olympia Therapy at Provider-owned nursing home Darby Glenn.  The therapy is believed to have

-44-

been unnecessary because the admitting nurse indicated on September 7, 2012, that Darby Glenn was delaying hospice evaluation until Ms. EH1's therapy would be completed on September 11, 2012.

147.   Defendants' manipulation of the Medicare system for maximum profit by providing inappropriate patients skilled nursing care delaying hospice referrals violates the False Claims Act.

E.   **Colleran-owned Destiny Hospice in Southwestern Ohio systematically and illegally treated all dying hospice patients as being entitled to crisis care, regardless of their medical condition**

148.   Hospices are permitted by Medicare regulations to provide "crisis care" under strictly-limited circumstances.  42 C.F.R. 418.204(a) defines a crisis as the period in which an individual requires continuous care for as much as 24 hours to achieve palliation and management of acute medical symptoms.

149.  While hospice care was (in 2009-10; rates increment slightly each year) generally reimbursed by Medicare or Medicaid pursuant to Code T2042 at a *per diem* rate in the range of $148 (in Franklin County; rates vary with geography), crisis care is reimbursed pursuant to Code T2043 at an *hourly* rate in the range of $40—or $863 for a 24-hour day.  Thus, a hospice operator may be paid more than 700%more  for a day of crisis care than for a day of routine hospice care.

150.   In or around May 2011, Relators Bourne and Goodwin learned that Destiny Hospice provided crisis care to almost every patient who died (unless they died unexpectedly) regardless of whether the conditions of those patients were adequately severe to qualify for such a placement under 42 C.F.R. 418.204(a).

151.    Relators gained direct knowledge of this scheme through detailed reviewing of patient records and speaking to Traci Helwig, Destiny Hospice Director of Nursing. Ms. Helwig stated that she was very proud of the crisis care model that was developed and that Destiny used it as a marketing tool.

152.    By way of example, Relators reviewed the medical file for government-insured patient AN. This patient was provided crisis care for approximately 4 days but did not qualify because the patient was not experiencing any unmanageable symptoms or distress that would warrant crisis care. Destiny RN, Lamin Suwreh, wrote the order to admit the patient to crisis care on May 21, 2011 for decreased LOC (Level of consciousness), which is not a valid reason to institute this higher care level per Medicare guidelines. In the notes that followed, Suwreh documents that the patient was sleeping or unresponsive, not having any pain issues, vital signs remained stable and there were not distressing symptoms that the patient was experiencing.

153.    Relators Bourne and Goodwin immediately instructed Ms. Helwig and the clinical team to stop providing crisis care for patients who did not meet the clinical qualifiers for this level of care. However, this instruction was met with resistance from several members of the Destiny Hospice team because this service had been promised to all of the physicians and nursing facilities who made hospice referrals to Destiny. Ms. Helwig made the statement that the nurses would need to become creative with their documentation in order to continue the practice of providing crisis care.

154.    Relators Bourne and Goodwin again instructed Ms. Helwig to follow  the guidelines at 42 C.F.R 418.204 (a) when making the determination to provide crisis

-46-

care.  Destiny finally began slowing down its improper practice of providing unnecessary crisis care during the summer of 2011.

155.    Destiny Hospice submitted numerous false claims for payment to federal healthcare programs for patients who did not properly qualify for crisis care until at least July, 2011.

**F.      Facts relating to the kickback paid by defendant Omnicare to defendants Colleran and Pure Service Pharmacy in exchange for making Omnicare the exclusive pharmacy of the Colleran/Provider Services companies**

156.    On or about July 8, 2003, defendants Provider Services, Inc. and Omnicare, Inc. entered into a contract, known as the "Preferred Provider Agreement," pursuant to which Provider Services contracted with Omnicare to serve as the "preferred pharmacy" for all Provider Services facilities.

157.    The contract guaranteed Omnicare exclusive rights to sell prescription drugs, respiratory services, and durable medical goods to all residents of Provider Services-owned facilities.

158.    This exclusive contract was for a four-year term, with an automatic renewal for a fifth year unless Provider Services terminated the contract.  It provided that Provider Services. "on behalf of itself and each of the Provider Facilities designates Omnicare as its pharmacy of choice and as the preferred provider of Pharmacy Services.  Respiratory Services. and House Stock ("Preferred Provider") for all current and future Provider Facilities and their residents."

159.   As time passed, Defendant Colleran became frustrated with the fact that Omnicare was realizing substantial profit from its provision of drugs, services, and goods to Colleran-owned nursing homes.

160.   In early 2005, Colleran formed his own pharmacy, called Pure Service Pharmacy.  He personally owned almost 30%, with the remainder owned by two companies formed by one of his lawyers, as well as that attorney.

161.   Pure Service Pharmacy started providing prescription drugs and other items to residents of nursing homes owned by Provider Services which had not yet shifted their business to Omnicare.

162.   Once Omnicare got wind of the fact that Colleran had started his own pharmacy and was servicing Provider Services-owned nursing homes, it sued Colleran, Pure Service, and others.  That case, filed in the United States District Court for the Northern District of Ohio on November 4, 2005, was captioned Omnicare, Inc. v. Provider Services, Inc., et al., and assigned Civil Action No. 1:05CV2609.

163.   According to Omnicare's complaint, Colleran conceded that the exclusivity provisions in his contract with Omnicare were strong.

164.   On May 24, 2006, Omnicare advised the Court that the case was settled and the complaint was dismissed without prejudice. Pure Service Pharmacy had no customers other than Colleran-owned Provider Services, Inc. entities, or entities owned by one of the other owners.

165.   On information and belief, Pure Service Pharmacy, LLC had entered into contracts for Pharmacy Services with each of the provider-owned pharmacies.  Each

-48-

contract contained an Exclusive Provider clause, except that they could not deny any resident's right to freely select the supplier of his choice.

166.    Defendant Omnicare purchased Defendant Pure Service Pharmacy in or around May 2008.

167.    Defendant Colleran told Relator Bourne that Omnicare paid him $50,000,000 for Pure Service Pharmacy.   Former administrator of Pure Service Pharmacy Paul Bergsten also confirmed the purchase price to Relator Bourne.

168.    Omnicare paid Pure Services Pharmacy a grossly inflated price $50 million to purchase Pure Services Pharmacy, to induce Provider owned companies to sign pharmacy contracts pursuant to which they steered their nursing home patients, including Medicare and Medicaid patients, to Omnicare for pharmacy dispensing services.

169.    Pure Service transitioned its clients to Omnicare-owned pharmacies beginning in May, 2008.  Pure Service clients were all Provider-owned facilities, or that of the other Pure Service owners and amounted to approximately 58 Nursing Homes with 4,488 number of beds.  These nursing homes entered into contracts with Omnicare as a result of the kickback paid to Pure Service Pharmacy:

| Omnicare Pharmacy | Provider Facility | Number of Beds |
|---|---|---|
| Omnicare of Northwest Ohio | Admirals Point Nursing and Rehab | 100 |
| NCS Eastlake | Beachwood Nursing & Healthcare | 160 |

| | | |
|---|---|---|
| NCS Dover | Beacon Pointe Rehabilitation Center | 67 |
| NCS Dover | Bowerstom Point Health and Rehabilitation | 25 |
| Omnicare of Wadsworth | Canal Point | 168 |
| Omnicare of Wadsworth | Canterbury Villa of Alliance | 92 |
| Ommicare Central Ohio | Country View of Sunbury | 95 |
| NCS Dover | Crestriew Healh Care (Cumberland Pointe) | 98 |
| Omnicare Central Ohio | Crown Point Care Center | 100 |
| NCS Dover | Emerald Pointe | 72 |
| NCS Dover | Fairview | 16 |
| NCS Eastlake | Geneva Pointe | 132 |
| Omnicare of Northwest Ohio | Great Lakes Transitional Care | 46 |
| NCS Dover | Greenfield | 14 |
| Omnicare of Wadsworth | Hickory Ridge Nursing & Rehabilitation Center | 170 |
| Omnicare Central Ohio | Highbanks Care Center | 56 |
| Omnicare of Wadsworth | Hudson Elms Nursing Home | 50 |
| NCS Eastlake | Jefferson Healthcare Center | 116 |

| NCS Dover | Lafayette Pointe | 96 |
|---|---|---|
| Omnicare of Wadsworth | Longmeadow Care Center | 120 |
| NCS Eastlake | Manor Home | 54 |
| Omnicare Central Ohio | Morrow Group Homes | |
| Omnicare Central Ohio | Marion Group Homes | |
| Omnicare Central Ohio | Canterbury Villa of Centerburg | |
| Omnicare Central Ohio | Central Ohio Group Homes | 129 |
| NCS Dover | Oak Pointe Nursing and Rehabilitation | 100 |
| Omnicare of Wadsworth | Palmcrest-Sensicare (Palmcrest) | 51 |
| Omnicare of Wadsworth | Palmcrest-Sensicare (Sensicare) | 20 |
| NCS Eastlake | Pine Grove Care Center | 120 |
| NCS Eastlake | Riverview | 83 |
| Omnicare of Wadsworth | Roselawn Terrace | 44 |
| NCS Dover | Scenic Pointe | 164 |
| NCS Dover | Sienna Pointe Nursing and Rehabilitation | 43 |
| NCS Dover | Sienna Woods Nursing and Rehabilitation | 88 |

| | | |
|---|---|---|
| NCS Eastlake | Steward Lodge | 54 |
| NCS Dover | Sycamore Run | 146 |
| Omnicare of Wadsworth | The Merriman | 132 |
| NCS Eastlake | The Oaks at the Woods (Huntington Woods) | 50 |
| Omnicare Central Ohio | Villa Angela Care Center | 235 |
| Omnicare Central Ohio | Yorkland Park Care Center | 200 |
| Omnicare of Wadsworth | Rockhill Place | |
| Homecare Ashland | Arcadia Nursing Home | 64 |
| Homecare Cincinnati | Crestwood Nursing Home | 50 |
| Homecare Ashland | Hickory Creek of Athens | 168 |
| Homecare Cincinnati | Highland Hills | |
| Homecare Cincinnati | Hillcrest Nursing Home | 50 |
| Homecare Ashland | Muskingham Valley Nursing | 60 |
| Homecare Cincinnati | Pine Crest Nursing Center | 95 |
| Homecare Ashland | Riverside Care Center | 82 |
| Homecare Ashland | Twin Maples | 42 |

| Homecare Cincinnati | Brookside | 108 |
| Homecare Cincinnati | Fairfield Center | 119 |
| Homecare Cincinnati | Hunsford | 8 |
| Homecare Cincinnati | North Bend | 8 |
| Homecare Cincinnati | Woodbine | 8 |
| Homecare Cincinnati | Vienna Meadows | 20 |
| Homecare Cincinnati | Whispering Pines | 34 |
| Homecare Cincinnati | Foundations | 66 |

170.    On information and belief, Omnicare entered into individual Pharmacy Consultant Agreements and Pharmacy Products and Services Agreements pursuant to a Master Pharmacy Products and Services Agreement with Provider Services Holdings, LLC.

171.    By way of example, Omnicare entered into such contracts with High Banks dated October 1, 2009.   Both Contracts referenced a Master Pharmacy Products and Services Agreement, dated September 1, 2009 between Provider Services Holdings, LLC and Omnicare, Inc.  Similarly, Omnicare entered into a Pharmacy Products and Services Agreement with Country View of Sunbury on the same date.

172.    On information and belief, SNFs purchased by Colleran since the sale have also entered into Pharmacy Consultant Agreements with Omnicare pursuant to the Master Pharmacy and Services Agreement with Provider Services Holdings, LLC.

173.    The Office of Inspector General of HHS has advised that, if all or any part of the purchase price for a business acquisition is intended by a part to the transaction as inducement for the referral of business reimbursed by Medicare, Medicaid, or other federal programs, the payment is an illegal kickback.

174.    When determining the true purpose of such a payment, one relevant factor is whether the amount paid reflects the fair market value of the acquired business. When determining the fair market value of goodwill and other intangible assets of a healthcare entity that refers business reimbursed by Medicare or other federal programs, traditional methods of valuation "do not comport with the prescriptions of the anti-kickback statute." For example, a payment made for a referral stream is not reflective of fair market value if the referrals are for business reimbursed by federal programs. (Letter from D. McCarthy Thornton, HHS-OIG, to T.J. Sullivan, IRS Dec. 22, 1992, available at https://oig.hhs.gov/fraud/docs/safeharborregulations/acquisition122292.htm  See also HHS-OIG Special Fraud Alert, Dec. 19, 1994, advising that, in the context of a transaction involving entities that receive reimbursement from federal healthcare programs, "'fair market value' must reflect an arm's length transaction which has not been adjusted to include the additional value which one or both of the parties has attributed to the referral of business between them").

175. Pure Services Pharmacy did not have a fair market value anywhere near $50 million. In fact, Omnicare shut down Pure Services Pharmacy shortly after acquiring the company. The sole value to Omnicare was Pure Services' referral stream of Provider-owned nursing facilities. The ostensible purchase price paid to Colleran was a kickback to Colleran for this referral stream, in violation of the Anti-Kickback Statute.

176. For the years leading up to Pure Services' sale to Omnicare, Defendant Colleran also submitted false claims to Medicare by charging his nursing facilities' patients, many of whom received federal reimbursement, inflated prices for prescription drugs and other items. When Relator Bourne and other administrators questioned the validity of such prices, Colleran informed them that he intentionally was inflating the prices to increase the value of Pure Services.

177. In addition to reaping illegal profits by selling drugs at improper prices, Colleran used this false pricing scheme to inflate the sales of Pure Service in order to command a higher price from Omnicare.

178. As a result of Omnicare's kickback, Colleran arranged for Omnicare to become the exclusive provider of pharmacy services for all Provider Services entities. Omnicare submits reimbursement claims on behalf of Provider Services patients to their insurers, including Medicaid and prescription drug sponsors acting on behalf of Medicare Part D.

179. All claims resulting from violations of the AKS are in violation of material conditions of payment by Medicaid, Medicare or other government healthcare

-55-

programs, and are not covered and payable. Thus, all claims to government healthcare programs resulting from these illegal referrals are false claims.

180.    By knowingly causing the submission of claims that are not covered and payable by federal healthcare programs, Defendant Omnicare and Colleran have caused the submission of false claims in violation of the FCA.

**G.    Facts relating to the kickbacks paid by defendant Amber Home Care to defendant Colleran in exchange for referrals of patients from Colleran/Provider Services entities to Amber Home Care**

181.    Amber Home Care, LLC is an Ohio limited liability corporation, Charter No. 167005, incorporated in early 2007. Amber Home Care is owned by Douglas Speelman. Douglas Speelman is the brother of Robert Speelman, Administrator at Provider Services Holdings Co. Robert Speelman is understood by Relators to be defendant Brian Colleran's "right hand man."

182.    Amber Home Care has been Colleran's "preferred provider" of home health services for Columbus properties since Douglas Speelman took over partial ownership in January 2008.

183.    Defendant Colleran has advised Relator Bourne that he is paid $100 by Douglas Speelman for each patient referred by the Provider Services defendants to Amber Home Care. Colleran has told other Provider employees that he had a financial stake in the success of Amber Home Care.

184.    Provider Services has purchased its own home health company to provide home health services to its network of providers. Up until at least the fall of 2012, Defendant Colleran has required social workers in the Columbus-area SNFs to keep a

log and state why a discharge went to a home health provider other than Amber Home

Care.

185. Colleran has involved Provider Services in ensuring referrals went to

Amber Home Care. For instance, on June 25, 2009, Provider's CFO John Krystowski

emailed several administrators and informed them: "Brian Colleran is interested in our

home healthcare relationships and has asked that we compile a count of discharges

with home-healthcare referrals over the last three months by facility and by agency."

186. Doug Speelman was given authority to question Provider Administrators

about the quantity of referrals that were being sent to Amber Care. By way of example,

in an email dated February 7, 2011 to Matt Dapore, Speelman stated

> I am working with Dan Parker in trying to maximize the number of home
> health patients we are getting from the Provider buildings.
>
> We noticed that the number of patients coming from Countryview has
> been really low. In fact, we just saw 13 patients in 2010. …[W]e can take
> Medicare and Humana MCR plans and we are only getting a small portion
> of these discharges. In fact, there were 4 of them in January and we got
> no calls on any of them.

187. At Colleran's direction, Provider Services referred the majority of its

patients to Amber Home Care from 2008-2012. Amber Home Care submits

reimbursement claims on behalf of Provider Services patients to their insurers, including

to government healthcare programs. On information and belief, PSI (owned 100% by

Colleran) offers below fair market value management services to Provider-owned and

managed SNFs and hospices to induce them to refer their patients to NP Insight.

188. Each payment by Douglas Speelman and/or Amber Home Care to

defendant Colleran constitutes illegal remuneration in violation of the Anti-Kickback

Statute. The resulting claims violate material conditions of payment by Medicaid,

Medicare or other government healthcare programs, and are not covered and payable.

189. By knowingly causing the submission of claims that are not covered and

payable by federal healthcare programs, Defendants Speelman, Amber Home Care and

Colleran have caused the submission of false claims in violation of the False Claims

Act.

### H. Kickbacks involving Mt. Carmel

190. On or about September 2012, representatives of Mount Carmel Health

System, including Chad Evans, met with various Long Term Care leaders, including Jim

Park, a regional administrator at Provider-managed Villa Angela. Evans indicated that

MCHS is looking to partner with a limited amount of facilities. The decision on which

facilities MCHS would choose would be based in part on utilization of MCHS products

(such as Medigold, Mt. Carmel Home Health, Mt. Carmel Hospice, MCHS

Transportation and MCHS Lab). MCHS further stated it expected to receive its patients

back when hospital readmission occurs. Whereas at that time, St. Ann's provided a list

of 30 SNF's to residents/families that need placement, MCHS announced it was

reducing this list to five facilities. Evans also stated that MCHS would offer "social

admissions," identified as admissions requests by the family for a three-day stay, to

partnered facilities on a rotating basis. MCHS indicated plans to have the same

meeting at Mt. Carmel East and West with long-term facilities in those areas.

191. As of the filing of the Complaint, Provider facility McNaughtin Point

(formerly called Yorkland Park) had agreed to MCHS terms. Provider internally

-58-

commented that it agreed to the deal because it wanted to have at least one building in Columbus "play ball" with Mt. Carmel.

192.    Thus, Provider agreed to use MCHS products such as Medigold, Mt. Carmel Health, Mt. Carmel Hospice, MCHS Transportation and MCHS Lab for MCHS hospital St. Anne's patient referral stream.  Even though previously, in August, 2011, Colleran commented on MCHS product Medigold "[t]hey pay like shit and only suckers use them."

193.    This quid pro arrangement violates the AKS.

194.    Provider submits reimbursement claims on behalf of the illegally-referred patients to their insurers, including to government healthcare programs.

195.    All claims resulting from violations of the AKS are in violation of material conditions of payment by Medicaid, Medicare or other government healthcare programs, and are not covered and payable.

196.    Thus, all claims to government healthcare programs resulting from these illegal referrals are false claims.

197.    By knowingly causing the submission of claims that are not covered and payable by federal healthcare programs, Defendants Mount Carmel and Provider have caused the submission of false claims in violation of the FCA.

I.      **Kickbacks involving Provider support services**

198.    Provider funnels patients throughout their own circle of businesses in order to bill Medicare or other insurance on multiple levels (Part A for skilled/hospice/home health, Part B for therapy, respiratory or CNP visits, Part D for

pharmacy). Rather than decisions being made in the best interests of patient health, the decisions regarding which services to provide and when are made to maximize reimbursement to Provider's family of businesses.

### 1. Hospice

199. Tridia and Destiny are preferred hospice providers of all Provider SNFs (about 80). Provider-owned facilities (or their Medical Directors) have been responsible for the overwhelming majority of admissions to Tridia/Destiny. Provider-owned facilities/Medical Directors referred 86 of Tridia's 90 patient admissions in 2009, 202 of Tridia's 211 patients in 2010, and 733 of Tridia/Destiny's 813 patient admissions in 2011. All of the patients received government-insured coverage.

200. Tridia and Destiny received other favorable treatment from Provider Services. By way of example, they were the only Hospices Brian Colleran allowed Provider Services to accept 95% of the facility room and board rate rather than 100%. For instance, on July 24, 2009, John Krystowski wrote an email to all administrators stating, "Brian Colleran just asked me to contact each of you to make sure that we are not accepting any hospice contract that pays 95% of the facility Medicaid rate. He asked that we replace any Hospice other than Tridia that will not pay 100% of the Medicaid rate."

201. Also, Tridia and Destiny were allowed to use facility equipment and supplies for free that an outside Hospice would have to pay for or bring in at its own expense. Sean Riley pointed out to Daniel Parker and Tridia administrators in May, 2012: "The real opportunity here would be for Tridia/Destiny to be able to use Provider-

Service facility owned equipment, i.e., oxygen concentrators. It could also be construed as a potential fraud and abuse issue—because of the relationship between Provider Services and Tridia. Would we do the same with a non-related hospice?" Manager Laura Upson pointed out that non-provider hospice has to have equipment delivered, yet Daniel Parker agreed that "the usage of facility equipment should be included with the room and board we pay the facilities." Although Upson pointed out when Tridia previously switched to using Provider facility-owned supplies, the facilities had required a lot of "education," Parker instructed Tridia administrators to begin using facility equipment ASAP and to send an email to all regional administrators of the facilities to inform them. Further, Tridia and Destiny do not reimburse NP Insight for Nurses Janet Gavin and Cynthia Shahed when using NP Insight employees to conduct visits on their behalf.

202.    The Provider-owned hospice business model is to primarily "market" to other Provider-owned facilities. One such "marketing" tactic is to track Provider referrals and informing Provider Regional Administrators when referrals are "non-compliant" (i.e. when referrals are to non-Provider-owned hospices).

203.    At Colleran's direction, Provider and Tridia kept close track of the facilities' referrals. Sean Riley of Tridia also was involved. On November 9, 2011, he attached a utilization spreadsheet to an email he sent several administrators, noting "'other] hospice utilization remains entirely too high. After being informed, Jim Homa and Steve Wolf have taken specific actions to curb and/or eliminate 'other.' Please advise as to

how you would like non-compliants to be addressed, *i.e.*, directly from Tridia, regional ops support, both, etc."

204. As a result of this pressuring, Tridia and Destiny received most of Provider's referrals. By way of example, on March 8, 2012, Sean Rile wrote to PSI representatives Kim Coleridge and Kevin McMahon: "At this stage of the game it is an exception for a Provider Service building to be upside down with their hospice census-more competitor than Tridia."

205. At Destiny, General Manager Julie Hrybiniak, required any non-Destiny hospice contract for a Cincinnati-area Provider patient to go through her to ensure that Destiny received the majority of Provider referrals.

206. Provider employees were involved in ensuring Provider referrals went to Provider-owned hospice. For example, on September 28, 2012, Joe Altieri wrote Relator Bourne and others:

> Regionals: I am having hospice meetings (Columbus and Millersburg) with my admins and social service workers...since we have areas the border each other, I will invite your buildings as well (will Cc you on the invite). We need to get everyone onboard with using our product.

The meeting with all of the Provider administrators and social workers took place on October 11, 2012. Everyone was told to use Tridia and Ideal home health almost exclusively. They gave statistics of how many current Provider service residents who were currently not on "core service" and how much revenue that was costing the company.

207. Relator Bourne attended a meeting on November 7, 2012 with Sean Riley, Rebecca Dasse, Darrell Miller and the administrators of Heath Nursing and

Rehabilitation and Arlington Care Center. At this meeting, Riley addressed the number of patients that were not on "core" hospice services. Of 15 hospice patients at Heath, only eight were referred to Tridia. The Heath administrator suggested implementing a form where special approval would be needed in order to refer any resident to a non-Provider hospice. When a recent hire at Tridia raised the concern that a Medicare auditor might have a problem with this form, Riley responded ""Nah...we will just say it is part of quality assurance."

208. By way of example, in July 2012, Columbus-area Provider homes referred to Tridia patients who utilized 2,114 days of hospice service, and referred to all other hospice providers patients who utilized 1,017 days of service. The number for Columbus-area Provider homes were not unique:

**July, 2012:**

| Region | Total Census | Provider Hospice Days | Non-Provider Hospice Days | Average Daily Census Provider Hospice | Average Daily Census non-Provider Hospice |
|---|---|---|---|---|---|
| Akron - Cleveland | 1,615 | 1,149 | 466 | 38.3 | 15.53 |
| Ashtabula | 1,556 | 1,119 | 437 | 37.3 | 14.57 |
| Columbus | 3,131 | 2,114 | 1,017 | 70.47 | 33.9 |
| Holmes | 283 | 203 | 80 | 6.77 | 2.67 |
| Dayton | 77 | 77 | 0 | 2.57 | 0 |
| Cincinnati | 3,615 | 3,387 | 228 | 112.9 | 7.60 |

| Total Average Daily Census | 342.57 | | | 78% | 22% |
|---|---|---|---|---|---|

**August, 2012**

| Region | Total Census | Provider Hospice Days | Non-Provider Hospice Days | Average Daily Census Provider Hospice | Average Daily Census non-Provider Hospice |
|---|---|---|---|---|---|
| Akron - Cleveland | 1524 | 1001 | 523 | 33.37 | 17.43 |
| Ashtabula | 1648 | 1250 | 398 | 41.67 | 13.27 |
| Columbus | 3121 | 2237 | 884 | 74.57 | 29.47 |
| Holmes | 340 | 203 | 137 | 6.77 | 4.57 |
| Dayton | 344 | 344 | 0 | 11.47 | 0 |
| Cincinnati | 3787 | 2954 | 833 | 98.47 | |
| Total Average Daily Census | 358.80 | | | 74% | 26% |

**September, 2012**

| Region | Total Census | Provider Hospice Days | Non-Provider Hospice Days | Average Daily Census Provider Hospice | Average Daily Census non-Provider Hospice |
|---|---|---|---|---|---|
| Akron - Cleveland | 1596 | 1033 | 563 | 34.43 | 18.77 |

| Ashtabula | 1534 | 1208 | 326 | 40.27 | 10.87 |
|---|---|---|---|---|---|
| Columbus | 3048 | 2178 | 870 | 72.6 | 29 |
| Holmes | 324 | 191 | 133 | 6.37 | 4.43 |
| Dayton | 328 | 293 | 35 | 9.77 | 1.17 |
| Cincinnati | 3338 | 2661 | 677 | 88.7 | 22.57 |
| Total Average Daily Census | 338.93 | | | 74% | 26% |

209. Defendants Tridia and Destiny submit reimbursement claims on behalf of Provider Services patients to their insurers, including to government healthcare programs, for hospice services. On information and belief, PSI provides management services to Provider-owned and managed SNFs below fair market value, to induce the SNFs to refer patients to Tridia and Destiny. This quid pro quo arrangement between Provider-owned facilities, Tridia, and Destiny is a violation of the AKS.

210. All claims resulting from violations of the AKS are in violation of material conditions of payment by Medicaid, Medicare or other government healthcare programs, and are not covered and payable. Thus, all claims to government healthcare programs resulting from these illegal referrals are false claims.

211. By knowingly causing the submission of claims that are not covered and payable by federal healthcare programs, Defendants Provider, Colleran, Tridia and Destiny have caused the submission of false claims in violation of the FCA.

### 2.    NP Insight

212.    NP Insight is owned by Brian Colleran and operated by his brother Ed

Colleran. It provides certified Nurse Practitioners to visit Provider facilities and bill

Medicare for Part B services.  Brian Colleran requires that all Provider facilities use NP

Insights.

213.    On February 16, 2009, Brian Colleran notified all PSI administrators:

> We are working with a company called NP Insight to provide a Nurse
> Practitioner in each of our facilities throughout the state. … Over the next
> several months you will be contacted by a representative from NP Insight.
> We need your support to make this successful.  The physicians in your
> facilities need to know that we are making this decision to improve
> resident care and they should be on board and support this decision.

214.    Defendant NP Insight submits reimbursement claims on behalf of Provider

Services patients to their insurers, including to government healthcare programs, for

nursing services.  On information and belief, PSI offers management services to

Provider-owned and managed SNFs and hospices below fair market value, to induce

them to refer their patients to NP Insight. This quid pro quo arrangement between a

Provider facility or hospice and NP Insight constitutes a violation of the AKS.

215.    All claims resulting from violations of the AKS are in violation of material

conditions of payment by Medicaid, Medicare or other government healthcare

programs, and are not covered and payable.  Thus, all claims to government healthcare

programs resulting from these illegal referrals are false claims.

216.    By knowingly causing the submission of claims that are not covered and

payable by federal healthcare programs, Defendants Provider Holdings, PSI, Tridia,

Destiny, Colleran and NP Insight have caused the submission of false claims in violation of the FCA.

### 3.    Optibill

217.    Optibill provides enteral nutrients, equipment, and supplies oxygen equipment and supplies and diabetic shoes. Brian Colleran requires all Provider companies to use Optbill for these products.

218.    On October 9, 2012, Brian Colleran sent a memo to all administrators regarding OptiBill:

> As you know, we have consolidated and streamlined the method for all our facilities to order diabetic shoes and orthotic products via OptiBill. To date, most facilities have done an excellent job in identifying residents and ordering diabetic shoes and inserts, … [a]s it relates to compliance and response to custom orthotics ordering … your immediate attention is now needed.  To date, we have received very few requests for these items. … We will begin measuring utilization of all facilities to see who remains out of compliance.  We are one of the few LTC companies that look for ways to give our residents supplies and equipment without charging them privately.

He attached a report to show who had been complying.

219.    Defendant OptiBill submits reimbursement claims on behalf of Provider Services patients to their insurers, including to government healthcare programs, for supplies it furnishes.  On information and belief, PSI offer below fair market value management services to Provider-owned and managed SNFs and hospices to induce them to refer their patients to OptiBill.  This quid pro quo arrangement between a Provider facility or hospice and Optibill constitutes a violation of the AKS.

220.    All claims resulting from violations of the AKS are in violation of material conditions of payment by Medicaid, Medicare or other government healthcare

programs, and are not covered and payable. Thus, all claims to government healthcare programs resulting from these illegal referrals are false claims.

221. By knowingly causing the submission of claims that are not covered and payable by federal healthcare programs, Defendants Provider Holdings, PSI, Tridia, Destiny, Optibill and Colleran have caused the submission of false claims in violation of the FCA.

### 4. Triumphant Return Rehab, LLC d/b/a/ Olympia Therapy

222. Olympia Therapy, Inc. was owned by Brian Colleran. In 2009, he sold its assets to Triumphant Return Rehab, LLC for $60,000,000. As part of this agreement, the Company provided Triumphant with an agreement to provide therapy services to residents in Colleran facilities as long as certain annual performance standards were met.

223. Triumphant Return d/b/a Olympia Therapy is owned by Brian Colleran's nephew, Daniel Parker. Olympia Therapy provides speech, occupational and physical therapy to Provider facilities' patients.

224. On July 1, 2009, Olympia and Provider Services Holdings, LLC entered into a contract wherein Olympia agreed to provide speech, physical and occupational therapy services to the Provider owned SNFs. The agreement contained an exclusivity clause wherein Olympia would be the exclusive agent to furnish services. The fee schedule for Part A rehab was .88 per minute and the Part B/other was 75% of CPT. The agreement covered the following facilities:

Admiral's Point Nursing and Rehabilitation

| |
|---|
| Arcadia Nursing Center |
| Beachwood Pointe Care Center |
| Beacon Pointe Rehabilitation Center |
| Bowerston Pointe Health and Rehabilitation |
| Broadfield Care Center |
| Canal Pointe Nursing and Rehabilitation Center |
| Canterbury Villa of Alliance |
| Concord Health and Rehabilitation Center |
| Country Glenn Nursing and Therapy Center |
| Country View of Sunbury |
| Crestwood Nursing Home |
| Crown Pointe Care Center |
| Cumberland Pointe Care Center |
| Emerald Pointe Health and Rehabilitation Center |
| Geneva Pointe Skilled Nursing and Rehabilitation |
| Grand Valley Country Manor |
| Great Lakes Transitional Care |
| Hickory Creek Nursing Center |
| Hickory Ridge Nursing and Rehabilitation Center |
| Highbanks Care Center |
| Hillcrest Nursing Home |
| Hudson Elms Nursing Home |
| Huntington Woods Care and Rehabilitation Center |
| Jefferson Healthcare Center |
| Keystone Pointe Health and Rehabilitation |
| Lafayette Pointe Nursing and Rehabilitation Center |
| Longmeadow Care Center |
| Maria-Joseph Living Care Center, The |
| Merriman, The |
| Mill Creek Nursing and Rehabilitation |
| Muskingum Valley Nursing and Rehabilitation |
| Oak Pointe Nursing and Rehabilitation |
| Olentangy Woods Nursing and Rehabilitation |
| Palm Crest |
| Park Health Care |
| Pinecrest Nursing Center |
| Pine Grove Healthcare Center |
| Renaissance North Healthcare Center |
| Riverside Country Care Center |
| Riverview Pointe Care Center |

| Roselawn Terrace |
| --- |
| Saybrook Landing |
| Scenic Pointe Nursing and Rehabilitation Center |
| Sienna Pointe Nursing and Rehabilitation Center |
| Sienna Woods Nursing and Rehabilitation Center |
| Summit Transitional Care |
| Sycamore Run Nursing and Rehabilitation Center |
| Twin Maples Nursing Home |
| Valley Renaissance Healthcare Center |
| Villa Angela Care Center |
| Yorkland Park Care Center |

225.   Upon information and belief, SNFs purchased by Colleran since the sale are also covered by this agreement. Relators are aware that all Provider-owned SNFs are currently using Omnicare.

226.   All referrals from Provider-owned facilities to Olympia Therapy were the result of illegal kickbacks. Brian Colleran required through a variety of methods that Provider facilities use Olympia Therapy. For instance, former Villa Angela Administrator Paul Bergsten informed Relator that Colleran offered him $10,000 to stop using Encore Therapy Company and begin using Olympia Therapy Company. When Relator asked if he complied, he responded, "Hell yeah I did it."

227.   In addition, Triumphant paid Colleran a grossly inflated price of $60 million for Olympia Therapy's assets, to induce Provider owned companies to sign pharmacy contracts pursuant to which they steered their nursing home patients, including Medicare and Medicaid patients, to Triumphant for nursing services. This above fair market value sale constitutes illegal remuneration in violation of the Anti-Kickback Statute.

-70-

228.   Defendant Triumphant, d/b/a Olympia, submits reimbursement claims on behalf of Provider Services patients to their insurers, including to government healthcare programs, for rehabilitation services.

229.   On information and belief, PSI offer below fair market value management services to Provider-owned and managed SNFs and hospices to induce them to refer their patients to Olympia. This quid pro quo arrangement with a Provider facility or hospice constitutes a violation of the AKS.

230.   All claims resulting from violations of the AKS are in violation of material conditions of payment by Medicaid, Medicare or other government healthcare programs, and are not covered and payable. Thus, all claims to government healthcare programs resulting from these illegal referrals are false claims.

231.   By knowingly causing the submission of claims that are not covered and payable by federal healthcare programs, Defendants Provider Holdings, PSI, Colleran, Tridia, Destiny, and Triumphant have caused the submission of false claims in violation of the FCA.

### 5.   DME Advanced Home Medical

232.   Advanced Home Medical is a DME business partially owned by Brian Colleran until approximately November 1, 2012. Prior to the spring of 2012, Brian Colleran required all Provider companies to use Advanced Home Medical for their DMEs.

233.   By way of example, Daniel Parker sent several facility administrators an email on May 17, 2011 stating: "Effective May 2011 Advanced Home Medical should be

doing all Home Care discharges in the Cleveland/Columbus and surrounding areas. Please send all your DME equipment referrals to Advanced Home Medical. As we diminish AHM's role on the rental side, we want business to pick up on the DME side (the reason we bought into the company in the first place). ... AHM will track their referrals against PCC's monthly discharge reports to let us know how compliant everyone is. If you have a legitimate reason you should not be using them for 100% of your home care DC's, please tell me."

234. In spring of 2012, Provider directed its businesses to begin using Therapy Support in place of AHM for rental costs. Daniel Parker wrote several administrators that "Seems like AHM is still getting a lot of business. I'd like to confirm that AHM is not getting any new business, and that the home offices of each region are creating all orders to Therapy Support online (and hopefully scrutinizing)."

235. AHM submits reimbursement claims on behalf of Provider Services patients to their insurers, including to government healthcare programs. On information and belief, PSI offer below fair market value management services to Provider-owned and managed SNFs and hospices to induce them to refer their patients to AHM. These quid pro quo arrangements with a Provider facility or hospice constitutes a violation of the AKS

236. All claims resulting from violations of the AKS are in violation of material conditions of payment by Medicaid, Medicare or other government healthcare programs, and are not covered and payable. Thus, all claims to government healthcare programs resulting from these illegal referrals are false claims.

237. By knowingly causing the submission of claims that are not covered and payable by federal healthcare programs, Defendants Provider Holdings, PSI, Tridia, Destiny, Colleran and AHM have caused the submission of false claims in violation of the FCA.

**J.    Other kickbacks**

238. Defendants regularly provide free Continuing Education credits ("CEUs") to referral sources for the purpose of inducing referrals to their SNFs and Hospice companies. A single CEU can have the retail value of approximately $50-75.00. In addition to the free CEUs, Defendants provide meals and other entertainment, including college football tickets, concert tickets, massages and door prizes. Provider Services employs Jim Collins whose sole purpose is to instruct the free CEUs. He was hired in May 2005. The CEUs are typically hosted at Provider nursing homes. At the beginning of each program, the building representatives stand up and give an overview about their building. The chart below identifies a small percentage exemplary of the events that PSI sponsors:

| Event Date | CEU credit | Entertainment | Provider Sponsor |
|------------|-----------|---------------|------------------|
| 12/5/2012 | 6 CEUs for nurses, social workers, administrators, OTs, PTs, dieticians and activities professionals. | Breakfast, lunch; door prizes and giveaways | Jefferson Healthcare |
| 10/25/ | 1 CEU for nurses and social workers | Live Band; 2 free drink tickets; tailgating food | Provider Services |

| | | | |
|---|---|---|---|
| 8/30/2012 | N/A | Door Prizes, Open Bar, Pig Roast, Live Music, Massages | McNaughten Point; Provider Services; Tridia Hospice |
| 10/11/ | 2 CEUs for nurses and social workers | Dinner and Door prizes | Darby Glenn Nursing Facility; Provider Services; Tridia Hospice |
| 6/21/ | 8 CEUs for nurses; 4 CEUs for social workers; 3 CEUs for administrators and activity professionals | | Tridia Hospice |
| 4/5/2011 | 2 CEUs for nurses, social workers, counselors, marriage and family therapists, administrators, occupational therapists, activity professionals, registered dieticians, certified case managers | Dinner | Darby Glenn; Provider Services; Tridia Hospice |
| 3/8/2011 | 2 CEUs nurses, social workers, counselors, marriage and family therapists, occupational therapists, activity professionals, LNHA, dieticians, and certified case managers | Dinner | Crown Point; Provider Services; Tridia Hospice |
| 11/17/2010 | 3 CEUs nurses and social workers | Dinner | Darby Glenn; Tridia Hospice |
| 8/10/2010 | 1 CEU for RNs and SWs | Drinks and Appetizers | Tridia Hospice |
| 8/4/2010 | 4 CEUs for RNs and SWs | Charter Bus, Casino, $25 dollar play card; breakfast | Country View of Sunbury; Tridia Hospice |
| 8/25/ | 1 CEU for RNs and SWs | Happy Hour; drinks; appetizers; neck and shoulder massages | Provider Services; 7 SNFs; Amber Home Care; NP Insight; Tridia; Crown Point. |

| | | | |
|---|---|---|---|
| 4/27/2010 | 1 CEU for RNs and SWs | Refreshments; neck massages | Yorkland Park Care Center; Tridia Hospice |
| 5/21/2010 | 6 CEUs for RNs, administrators, dieticians, SWs, PT/OT, certified case managers and activity professionals | Lunch | High Banks Care; C. Howard;Tridia Hospice |
| 12/3/2009 | CEU program (not identified) | Food, cocktails, give aways | Country View of Sunbury; Tridia Hospice |
| 12/16/2009 | 6 CEUs for administrators, nurses, dieticians, SWs, OT, PT and activity professionals | Lunch | 6 SNFs; Tridia Hospice and 2 other associations/charities |
| 10/20/ | 2 CEUs for nurses, SWs, therapists, activity professionals | Dinner | Yorkland Park; Tridia Hospice |
| 10/29/ | N/A | Bingo, manicures, massages, door prizes, health screening | Highbanks Care Center |
| 11/2/ | 2 CEUs for nurses and SWs | Appetizers | Villa Angela |
| 7/29/2009 | 3 CEUs for nurses and SWs | Appetizers and desserts | Crown Pointe; Highbanks; Tridia Hospice |
| 6/18/2009 | CME event | Dinner; cocktails at Prime Steakhouse | Tridia Hospice |
| 5/27/2009 | CEU program | Appetizer, cocktails and dinner | Country View of Sunbury; Tridia Hospice |

| 3/19/2009 | 6 CEUs (6 for nurses, SWs, activity professionals and OTs; 3 for dieticians, PT/OT, and administrators) | Breakfast, lunch | Yorkland Park Care; Tridia Hospice |
|-----------|---------------------------------------------------------------------------------------------------------|-------------------|------------------------------------|
| 6/18/2009 | 6 CEU for nurses, SWs, administrators, registered dieticians, PT/OT and activity professionals | Breakfast and Lunch | Highbanks, Tridia Hospice and A Place for Mom |

239. Provider submits reimbursement claims on behalf of Provider Services patients to their insurers, including to government healthcare programs. Defendants offer free CEUs and entertainment to induce professionals to refer patients to Provider facilities and services. These illegal incentives violate the AKS.

240. All claims resulting from violations of the AKS are in violation of material conditions of payment by Medicaid, Medicare or other government healthcare programs, and are not covered and payable. Thus, all claims to government healthcare programs resulting from these illegal referrals are false claims.

241. By knowingly causing the submission of claims that are not covered and payable by federal healthcare programs, Defendants have caused the submission of false claims in violation of the FCA.

**K.    Facts relating to the intentional withholding of overpayments by defendants Colleran, Provider Services, Destiny and Tridia**

242. In May, 2011, when PSI purchased Destiny, Relators began to notice hospice billing irregularities. In October 2011, Relators tried to administer progressive

discipline to Destiny. Relators informed Brian Colleran that month that they found compliance problems but he told them to "stay out of Cincinnati."

243. Since at least October, 2011, Relators have made repeated efforts to correct fraudulent billing practices, only to be stymied by Provider management.

244. By way of example, in June, 2012, Relator Bourne had multiple conversations with John Krystowski. He told Ms. Bourne on June 26th to not look at anything from the past that was done incorrectly. "If we don't know about it, we don't need to report on it." Later that same day, he told her that she should limit her email trail and communicate only by phone, because the OIG could access anything with the word "Medicare" in it. On August 1, he again scolded Ms. Bourne for communicating via email. On August 10th, he stated to her "I do NOT want to be made aware of any further compliance issues- ESPECIALLY within the Tridia branch." He repeated on August 16th that he was not to be made aware of any further problems.

245. Further, Dan Parker informed Relators that he had talked with Colleran and that Colleran said there was no way he would self-report because that would "be like going home to your spouse who thinks you are happily married and tell her you have been cheating on her."

246. As a result of Relators' efforts, on information and belief Provider has undertaken to repay only $1.7 million related to Destiny's failure to perform F2F evaluations of patients who were still alive. A recently hired compliance nurse identified an additional $1.3 million related to Destiny's failure to perform F2F evaluations of patients who have since died. At the time of filing this Complaint, Provider was still

considering whether to repay this amount to Medicare. Relators are unaware of whether Provider actually repaid the initial $1.7 million that was identified as needing to be repaid.

247. The violations related to Destiny's failure to perform F2F evaluations are but a fraction of the Medicare false billings that Provider is aware of and failed to repay. For all other violations, Provider has knowingly failed to repay Medicare.

L.   **As a Result of Defendants' Illegal Schemes, Defendants Knowingly Submitted or Caused to be Submitted False Claims**

248. Defendants entered into illegal financial arrangements to secure referral streams among them, including the referral of federal healthcare program patients.

249. Defendants know they are violating the AKS by their actions to pay illegal incentives in order to influence the judgment of hospitals and other provider facilities and induce the referral of patients, including Medicare, Medicaid, and other federal program patients.

250. Defendants know that their schemes violate material conditions of payment of federal healthcare programs and render the resulting claims noncovered and nonpayable.

251. Defendants know that their offer and payment of illegal incentives have the foreseeable result of causing the submission of false claims to Medicare, Medicaid, and other federally-funded programs.

252. Defendants know that their billing for improper hospice services violates the False Claims Act and has the foreseeable result of causing the submission of false claims to Medicare, Medicaid, and other federally-funded programs.

253.  As a result, Defendants knowingly submit and cause the submission of false claims to Medicare, Medicaid and other federally-funded programs.

254.  As to each of the above factual allegations, Defendants knowingly violated the False Claims Act as that term is defined in 31 U.S.C. § 3729(b)(1)(A)(i-iii).

255.  The United States has been damaged as a result.

256.  These fraudulent schemes are on-going.

**M.    Defendants' Retaliatory Conduct towards Relator**

257.  As alleged above, Relators alerted Defendants to the illegal practices identified in this Complaint.

258.  Defendants acknowledged the practices, but refused to take sufficient action to ensure they would be stopped.

259.  As a result of their objections to these practices, Relators' were denied promotions, bonuses and had their salaries and responsibilities significantly reduced.

260.  Relators' direct supervisor, Sean Riley, asked Relator Bourne not to attend a corporate dinner for Tridia Hospice on September 20th, after he took all of the other team members to lunch but purposefully omitted inviting her.  She informed him that she felt bullied.

261.  On September 28, 2012, Riley reduced Relators' salary by 30% and offered to pay one final bonus of $12,500, even though they were owed $68,000 bonus year to date.

262.  On September 28, 2012, Bourne stated to Riley that she felt they were being punished by Brian Colleran for uncovering problems in Cincinnati in October,

-79-

2011. Riley stated he was aware of the problems they uncovered in Cincinnati, and that there is no predicting Colleran.

263. Relators were discriminated against in retaliation for their objections to improper conduct in violation of government laws and regulations which resulted in false claims to the United States.

**COUNT I: VIOLATIONS OF THE FALSE CLAIMS ACT, 31 U.S.C. § 3729 *et seq.***

264. The allegations in the foregoing paragraphs are realleged as if fully set out herein.

265. The False Claims Act, 31 U.S.C. § 3729(a)(1)(A) (B), (C), and (G) imposes liability upon, inter alia, those who knowingly cause to be presented false claims for payment or approval, and those who make or use, or cause to be made or used, false records or statements material to a false claim or to an obligation to pay money to the government, or those who knowingly conceal, improperly avoid or decreases an obligation to pay to money to the government, as well as those who conspire to do so.

266. Compliance with Anti-kickback laws is a material condition of payment of Medicare, Medicaid and other federally-funded healthcare programs.

267. Claims for payment to federally-financed healthcare systems, which resulted from unlawful referrals in violation of the Anti-Kickback Statute, are false claims.

-80-

268. By offering, paying, soliciting and/or accepting remuneration for referrals Defendants violated the AKS, which in turn resulted in false claims for payment to be submitted to the United States, in violation of 31 U.S.C. §3729(a)(1)(A).

269. In the furtherance of these schemes, Defendants also caused to be made or used false records or statements material to a false claim in violation of 31 U.S.C. § 3729(a)(1)(B).

270. Defendants acted knowingly, as that term is used in the False Claims Act.

271. The Defendants conspired among and between themselves, and each of them engaged in one or more overt acts in furtherance of the conspiracy.

272. Because the United States would not have paid for services which it knew to have been the result of kickback schemes, the United States has been harmed in an amount equal to the value paid by the United States.

273. Defendants deliberately engaged in a vigorous campaign to improperly bill for hospice services to its patients.

274. The claims for payment to federally-financed healthcare systems which resulted from Defendants' fraudulent practices are false claims and violate the Act.

275. Defendants' schemes resulted in their knowing submission of false claims, in violation of 31 U.S.C. § 3729(a)(1)(A).

276. By providing false records to substantiate inflated claims, defendants made and used false records or statements material to a false claim in violation of 31 U.S.C. § 3729(a)(1)(B).

277.    Defendants violated conditions of payment for the claims submitted. Defendants also falsely certified compliance with federal laws and regulations, and such certification is material to the payment of false claims submitted by those providers.

278.    As a result of their violations, Defendants received Medicare overpayments and failed to return the money to the government in a timely manner.

279.    Defendants acted knowingly, as that term is used in the False Claims Act.

280.    Because the United States would not have paid for services that it knew to have been ineligible for payment in violation of conditions for payment for hospice services, the United States has been harmed in an amount equal to the value paid by the United States.

281.    The United States Government has been damaged as a result of the defendants' conduct in violation of the False Claims Act in an amount to be determined at trial.

## COUNT II: VIOLATIONS OF THE FALSE CLAIMS ACT'S ANTI-RETALIATION PROVISION, 31 U.S.C. § 3730(h).

282.    The allegations in the foregoing paragraphs are realleged as if fully set out herein.

283.    As alleged in above, Relators engaged in lawful acts in furtherance of efforts to stop one or more violations of 31 U.S.C. § 3729.

284.    Because of Relators' lawful acts, Relators were subjected to discrimination in the terms and conditions of their employment by Defendants, including but not limited

to their wrongful pay reduction and denial of appropriate bonuses, promotions and pay raises.

285.    The Defendants' retaliatory conduct against Relators violated 31 U.S.C. § 3730(h).

286.    As a consequence of Defendants' violation of 31 U.S.C. § 3730(h), Relators have suffered damages.

### PRAYER FOR RELIEF

WHEREFORE, Relators Paula Bourne and LaTasha Goodwin, on behalf of themselves and the United States of America, demands judgment against Defendants as follows:

A.    That this Court enter judgment against Defendants, jointly and severally, in an amount equal to three times the amount of damages the United States Government has sustained because of each Defendants' actions, plus a civil penalty of $11,000 for each claim made in violation of 31 U.S.C. § 3729 et seq., together with the costs of this action, with interest, including the cost to the United States Government for its expenses related to this action.

B.    That in the event the United States Government intervenes in this action, Relators be awarded 25% of any proceeds of the claim, and that in the event the United States Government does not intervene in this action, Relators be awarded 30% of any proceeds.

C.    That the Court enter judgment on each relator's claim pursuant to 31 U.S.C. § 3730(h) in the amount of double the sum wrongfully withheld by the Colleran

defendants in retaliation for their protected conduct, together with compensatory damages;

D.     That relators be awarded all costs and attorneys' fees incurred in the prosecution of this action.

E.     That the United States and Relators receive all relief, both in law and in equity, to which they are entitled.

Respectfully submitted,

_____
Frederick M. Morgan, Jr. (0027768)
Jennifer M. Verkamp (0067198)
Sara Vann (Georgia Bar No. 141787)
Morgan Verkamp, LLC
700 Walnut Street, Suite 400
Cincinnati, OH 45202-2015
Tel (513) 651-4400
Fax (513) 651-4405
e-mail rick.morgan@morganverkamp.com

# DO NOT SERVE