UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

|  |  |  |
|---|---|---|
| PAULA BOURNE and | : | |
| LA'TASHA GOODWIN, | : | |
| | : | Civil Action No. 1:12-cv-935 |
| Plaintiffs, | : | |
| | : | Judge Timothy S. Black |
| v. | : | |
| | : | |
| PROVIDER SERVICES HOLDING, LLC; | : | |
| PROVIDER SERVICES, INC., a/k/a BCFL | : | |
| HOLDINGS, INC., n/k/a FOUNDATIONS | : | |
| HEALTH SOLUTIONS, INC.; DESTINY | : | |
| HOSPICE, LLC; TRIDIA HOSPICE CARE, INC.; | : | |
| ATLAS HEALTHCARE SOLUTIONS, INC.; and | : | |
| VIAQUEST, INC., | : | |
| | : | |
| Defendants. | : | |

**FIRST AMENDED AND SUPPLEMENTAL COMPLAINT
FOR VIOLATIONS OF THE FALSE CLAIMS ACT**

## I.    INTRODUCTION

1.      This Amended and Supplemental Complaint alleges violations of 31 U,S,C, 3730(h), which confers a damage remedy on persons who suffer retaliation on account of engaging in conduct which could result in an action under the False Claims Act.

2.      Plaintiffs filed this action under the *qui tam* provisions of the False Claims Act on December 6, 2012.  Allegations Colleran, Provider Services, Speelman, and others have been settled.  However, allegations of retaliation have not been adjudicated and are addressed in this complaint.

3.      This was the second of four *qui tam* cases filed against Provider Services, Colleran, and associated others in this Court.  These cases all alleged that the defendants submitted false or

1

fraudulent claims for Medicare reimbursement to  the United States.  The other cases are *United States ex rel. Trakhter v. Provider Services, Inc., n/k/a BCFL Holdings, Inc., et al.*, Civil Action No. 1:11-cv-217; *United States ex rel. Perry v. Provider Services, Inc., et al*., Civil Action No. 13-cv-000749; and *United States ex rel. Suwareh v. Foundations Health Solutions, Inc., et al.,* Civil Action No. 13-cv-772.  A fifth case is pending in the Northern District of Ohio, *United States ex rel. Shiroke v. Mobile Medical, Inc., et al*, Civil Action No. 10-cv-2846.

4.      This Amended and Supplemental Complaint adds facts to the retaliation claims brought in the Complaint against the Provider Services defendants, and adds a separate retaliation claim against ViaQuest, Inc., a subsequent employer of Plaintiff Bourne.  ViaQuest fired Ms. Bourne as a direct consequence of her protected conduct with respect to Colleran and Provider Services.

## II.      JURISDICTION AND VENUE

5.      This action arises under the United States False Claims Act, 31 U.S.C. § 3729, *et seq*.

6.      This Court has subject matter jurisdiction pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331, and has personal jurisdiction over the Defendants, because they do business in this District.

7.      Venue is proper in this district under 28 U.S.C. § 1391 and 31 U.S.C. §3732(a) because Defendants operate and transact business within this district, and in the Western Division, with offices or facilities in Hamilton County.

## III.     PARTIES

8.      Plaintiff Paula Bourne is an Ohio resident.  She was employed by Colleran-owned businesses for nine years, starting in April 2004 as Director of Admissions and Marketing at Rocky

Creek Health and Rehabilitation. When she received her license in Nursing Home Administration, she became the Executive Director at Highbanks Care Center and then, in 2008, the Executive Director for Defendant Tridia Hospice. Her employment at Tridia was terminated, effective April 5, 2013. From July 2015 to November 2015, Ms. Bourne worked for ViaQuest, Inc., as Vice President of Ohio Hospice Operations. ViaQuest fired her on November 16, 2015, because of the steps she took to stop Colleran's fraud. Colleran sent his agent Robert Speelman to inform ViaQuest that Provider would withhold all referrals for as long as Ms. Bourne worked there, and ViaQuest retaliated against Ms. Bourne by terminating her employment.  In addition to her nursing degree, Ms. Bourne has a Master of Science in Management, earned in 2009.

9. Plaintiff La'Tasha Goodwin, R.N. is an Ohio resident.  She was hired in 2006 as Director of Nursing with Highbanks Care Center, and since 2008 was the Director of Clinical Services for Tridia Hospice until her demotion to the title of Director of Nursing and subsequent discharge. From 1996-2010, she worked as a Staff Registered Nurse at Mt. Carmel East Hospital in Columbus, Ohio.  Prior to working for Colleran, she served as the Director of Nursing Services at Wesley Glen Health Center (2004-2006) and Forest Hills Nursing Center (2000-2003).  Ms. Goodwin earned a B.S.N. in 1998, and a Master of Science in Management, earned in 2010.

10. Defendant Provider Services Holdings, LLC is an Ohio limited liability company incorporated in 2005. Its principal shareholder is Brian Colleran. Defendant Provider Services, Inc. was an Ohio company until 2010, when it merged into Defendant BCFL Holdings, Inc., a Florida corporation.  It is registered in Ohio as a trade name of BCFL Holdings, Inc., which was renamed "Foundations Health Solutions, Inc." in 2013.  Defendant BCFL Holdings, Inc. (n/k/a Foundations Health Solutions, Inc.) is a Florida corporation whose principal owner is Brian Colleran. References to "Provider" or "Provider Services" herein relate to those entities doing

3

business as "Provider Services," "BCFL Holdings," and/or "Foundations Health Solutions" in Ohio during the relevant timeframe. Provider did business throughout Ohio.

11.     At the time of the filing of the original complaint, and at all relevant times, Defendant Destiny Hospice, LLC was a Kentucky limited liability corporation, licensed to do business in Ohio, with its principal place of business in Cincinnati.  It provided hospice care in Ohio. Provider Services purchased Destiny in May, 2011, as part of its acquisition of Carington Health Systems.

12.     Defendant Tridia Hospice Care, Inc. is an Ohio corporation incorporated in September 2008. On or about August 31, 2016, Tridia filed a fictitious name registration and currently provides hospice services with locations in Columbus, Cleveland, Akron, Ashtabula, and Holmes County, Ohio under the name Bella Care Hospice. At the time of the filing of the original complaint, and at all relevant times, Tridia was owned and/or controlled by Brian Colleran and/or Daniel Parker and was part of the Provider network of businesses.

13.     Defendant Atlas Healthcare Solutions, Inc. is an Ohio corporation formed on or about June 26, 2013. As of the filing of this Amended and Supplemented Complaint, Atlas advertises that it has 35 facilities throughout Ohio, providing skilled nursing, short-term rehabilitation, long-term care, and other similar services. At all relevant times, Brian Colleran and Robert Speelman had an ownership interest and/or exerted control over Atlas Healthcare.

14.     References herein to the "Provider Defendants" include Defendants Provider Services, Destiny, Tridia, and Atlas.

15.     Defendant ViaQuest, Inc. is an Ohio for-profit corporation that provides home health, hospice, behavioral and mental health, developmental disabilities, and care coordination services. ViaQuest operates in Ohio, Indiana, and Pennsylvania.

4

## IV.     THE FALSE CLAIMS ACT

16.     The federal False Claims Act ("FCA") imposes liability on any person who submits a false or fraudulent claim to the United States.

17.     In addition, the FCA provides that "[a]ny employee… shall be entitled to all relief necessary to make that employee… whole, if that employee… is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee… in furtherance of an action under this section or other efforts to stop 1 or more violations" of the FCA. 31 U.S.C. § 3730(h).

## V. FACTS

18.     At all relevant times, Brian Colleran was the principal owner and president of Provider Services Holding, Inc., Provider Services, Inc., BCFL Holdings, Inc. Foundations Health Solutions, Tridia Hospice, and Destiny Hospice.  He directed the retaliatory actions and eventual termination by the Provider Defendants of Plaintiffs' employment, and he caused the retaliatory termination by Defendant ViaQuest of Plaintiff Bourne's subsequent employment. Colleran settled his liability to the United States, as alleged in the original complaint, collectively with Daniel Parker for $895,830. Tridia Hospice settled its liability to the United States, as alleged in the original complaint, for $3,104,170. Foundations Health Solutions settled its liability to the United States, as alleged in the Trakhter complaint, for $15,527,844.

19.     Douglas Speelman was an owner of Amber Home Care, LLC. Amber Home Care, LLC is an Ohio limited liability corporation, Charter No. 167005, incorporated in 2007.  Amber Home Care provides home health services, and was a defendant herein.  Amber settled its liability to the United States, as alleged in the original complaint, for $1,350,000.

5

20.     Robert Speelman is Douglas Speelman's brother.  During relevant times, he was the Administrator at Provider Services Holdings Co., an owner and the president of Defendant Atlas, and an agent of Brian Colleran.

21.     Daniel Parker is Colleran's nephew. At all relevant times, he was an officer and director of Foundations Health Solutions. Parker settled his liability to the United States, as alleged in the original complaint, collectively with Colleran for $895,830.

22.     Richard Johnson is the founder, president and CEO of ViaQuest, Inc.

23.     In about 2008, Colleran directed Plaintiffs to start a hospice program to serve his nursing homes.  The hospice operation began in Columbus later that year.  In 2008, Colleran formed Defendant Tridia, receiving hospice accreditation in 2009. In 2010, Tridia expanded to Akron/Cleveland and Dayton.  In 2011, Tridia expanded to Ashtabula and purchased Destiny Hospice in Cincinnati.  In 2012, Tridia expanded to Holmes County, Ohio.  At the time of the filing of the original complaint in this matter, Tridia was managed by Provider Services, Inc.

24.     Nursing homes owned and managed by Provider Services were required to refer patients to other Provider-owned companies which provided services reimbursed by federal healthcare programs, including without limitation nursing services, hospice and medical supplies. Provider-owned and managed hospices were similarly required to refer their patients to the same Provider-owned companies.  Provider-owned nursing facilities and hospices were also required to refer patients to companies in which Colleran has or has had personal investments, including a pharmacy, an ambulance provider, a home health provider, and durable medical equipment company.  Colleran routinely used his influence as an investor to steer the Provider referral stream to Colleran-owned businesses.  Colleran also encouraged the false billing of hospice and therapy services to maximize federal reimbursement.

6

A.      **Facts relating to the intentional withholding of overpayments by Provider Services, Destiny and Tridia**

25.      In May, 2011, when Provider purchased Destiny, Plaintiffs noticed hospice billing irregularities.

26.      Plaintiffs set out to correct the problems by, among other actions, attempting to impose progressive discipline on nursing staff whose documentation was not Medicare-compliant and by attempting to impose procedures to curtail noncompliant and medically unnecessary continuous care (which was being routinely billed for every patient, regardless of necessity). Parker and Colleran obstructed their attempts. First, Parker directed Ms. Bourne that she should not upset the apple cart and should seek to get along with everyone at Destiny rather than try to enforce compliance. Plaintiffs refused to simply acquiesce to the fraud and continued to try to stop the noncompliant practices. In response, in October 2011, Colleran directed Parker to instruct Plaintiffs to "stay out of Cincinnati."

27.      Plaintiffs nonetheless continued to try to stop Provider's ongoing fraud. By way of example, on June 20, 2012, Ms. Bourne informed Sean Riley, then in the position of Chief Operating Officer, that Destiny had not been doing required face-to-face evaluations in Dayton and not performing them correctly in Cincinnati for the previous year.  She informed Riley many times that Destiny was either not performing face-to-face evaluations at all, or not performing them correctly.

28.      Ms. Bourne also spoke to Colleran in June 2012, regarding the lack of face to face visits in the Cincinnati office. Ms. Bourne stated "I tried to tell you about the compliance problems in Cincinnati back in October, but you had Dan [Parker] call me and tell me to stay away from Cincinnati."  Colleran replied, "So what?  Now I need to be served my f***ing lunch."

7

29.     Later that month, Ms. Bourne told Colleran that she was trying to get the programs back in compliance and was worried about keeping Colleran out of jail.  Colleran hung up on Ms. Bourne and the two did not speak again, after having talked routinely for years.

30.     Also in June 2012, Ms. Bourne discussed hospice non-compliance with Provider's then-CFO John Krystowski.  He told Ms. Bourne on June 26, 2012 to not look at anything from the past that was done incorrectly, saying, "If we don't know about it, we don't need to report on it."

31.     Krystowski also directed Ms. Bourne to limit her email trail and communicate only by phone or fax. Krystowski said that if the government ever seized their computers, the Inspector General would do a search for certain words, including "Medicare."

32.     On August 1, 2012, Krystowski scolded Ms. Bourne for communicating via email. On August 10th, he stated to her "I do NOT want to be made aware of any further compliance issues—ESPECIALLY within the Tridia branch."  He repeated on August 16, 2012 that he was not to be made aware of any further problems.

33.     Dan Parker informed Plaintiffs that he had talked with Colleran and that Colleran said there was no way Colleran would self-report his fraud because that would "be like going home to your spouse who thinks you are happily married and tell her you have been cheating on her."

**B.     Provider Defendants' retaliatory conduct towards Plaintiffs**

34.     Plaintiffs repeatedly alerted Provider Defendants to the illegal practices identified in the original complaint.

35.     Provider Defendants acknowledged the practices, but refused to take sufficient action to ensure they would be stopped.

36.     As a result of their objections to these practices, Plaintiffs were denied promotions and bonuses; their salaries and responsibilities were reduced; and they were discharged.

37.     In or around August 2012, Ms. Bourne was informed by Sean Riley that he was being promoted over her to the position of Director of Operations for Hospice. Ms. Bourne told him that he would then need to stop asking her basic questions about how hospices are run, since people would be looking to him for that leadership. He simply scoffed in response.

38.     In the fall of 2012, Provider brought in a new clinical and administrative team to oversee hospice services, and Plaintiffs' responsibilities were slashed. They had held director-level positions with statewide responsibilities—Ms. Bourne as Provider's Executive Director of Hospice Services and Ms. Goodwin as Director of Clinical Services—but after they repeatedly tried to stop Provider's ongoing fraud, they were demoted to a site-specific role. Ms. Bourne's responsibilities became the same as any other branch manager, with responsibility only for the Columbus site. Ms. Goodwin was demoted to clinical manager for the Columbus hospice.

39.     Ms. Goodwin interviewed for the position of regional compliance nurse for Tridia. She was told by the interviewer that she was the best person for the job. Tridia hired someone else.

40.     In or around September 2012, at a statewide home care and hospice conference, Riley took his team to lunch and excluded Plaintiffs. He also took his team to dinner; while he invited Ms. Bourne to attend that meal, he refused to allow Ms. Goodwin to attend.

41.     At that same conference, Riley informed Ms. Bourne that she and Ms. Goodwin were going to have their salaries cut and their bonuses for 2012 would not be paid, and he would know later how much they would be paid.

42. Ms. Bourne stated to Riley that she felt she and Ms. Goodwin were being punished by Brian Colleran for uncovering problems in Cincinnati in October, 2011. Riley stated he was aware of the problems they uncovered in Cincinnati, and that there is "no predicting" Colleran.

43. On September 28, 2012, Sean Riley—on behalf of Provider Defendants—reduced Plaintiffs' salaries and offered to pay one final bonus of $10,000, though they each were owed a bonus nearly seven times that based on the work they had done that year to date. On October 1, 2012, he agreed to increase the bonus, but only to $12,500.

44. Though it was clear they were being forced out, Plaintiffs continued to work for Provider—they had to complete the year in order to collect the albeit-greatly-reduced bonus, and they continued to take steps to stop Provider's fraud.

45. Acting pursuant to the *qui tam* provisions of the False Claims Act, Ms. Bourne and Ms. Goodwin, acting on behalf of the United States and themselves, filed this action on December 6, 2017. Plaintiffs alleged, *inter alia*, that Colleran and others solicited and received kickbacks in exchange for providing referrals of patients from skilled nursing facilities, and that Defendant Tridia Hospice, Inc. submitted or caused the submission of false claims for hospice services provided to Medicare Part A patients for whom Tridia Hospice, Inc. failed to conduct proper certifications and/or medical examinations necessary to certify those patients either for initial or continuing eligibility for hospice. Plaintiffs also alleged that they suffered retaliation in violation of 31 U.S.C. § 3730(h).

46. On or about January 16, 2013, Plaintiffs were informed by Tridia's human resources director that their employment was going to be terminated. While they were not given a date for the termination, they expected it would be January 31, 2013, because Provider's Corporate Operational Director Kelly Drass had scheduled a meeting with Ms. Bourne for that date. They

10

were informed that a newly hired home-health director at the Columbus site would take over Ms. Bourne's hospice responsibilities. Ms. Bourne was subsequently ordered by Drass to train that new director—essentially her replacement—in hospice management.

47. Provider proceeded to terminate at least three other employees who were known to have objected to its fraud.

48. Despite knowing that their termination was going to happen at any moment, Plaintiffs continued to take efforts to stop Provider's fraud. For example, on or about January 31, 2013, Ms. Bourne reported to Provider's Corporate Operational Director Kelly Drass that, during the course of chart audits she had been directed to do, she had identified charts with material errors that would require that Provider return payments to the government. As before, Plaintiffs' efforts were rebuffed.

49. Knowing that their termination was simply a matter of time, and having suffered demotions and reductions in salary and bonuses, working conditions became impossible for both Plaintiffs.

50. In or about February 2013, Ms. Bourne discovered that a hospice patient had written her several letters, indicating that he wanted to go into business with her, among other things. Ms. Bourne did exactly what she had always instructed her nurses to do when anything occurred that was outside the parameters of normal: she was transparent and reported the incident to her supervisor, Kelly Drass. Ms. Bourne explained the patient's medical issues and personality to provide context for the letters and expressed her desire to self-report and be transparent because the letters could be misconstrued without that knowledge. In response, Ms. Drass laughed about the letters and asked what Ms. Bourne wanted her to do with them. Ms. Bourne responded that she would scan copies to the appropriate social worker and business manager, reminding them that

11

Ms. Bourne did not have any financial authority over the patient's account. Ms. Drass expressed no concern about the letters, and agreed with that plan.

51.     Plaintiff Goodwin resigned on or about March 22, 2013 to avoid termination, giving Provider 30-days' notice. Her resignation was accepted without question, and she worked approximately one week without incident.

52.     On or about March 28, 2013, Ms. Drass questioned Ms. Bourne about the letters Bourne had discussed with her weeks earlier, implying through the line of questioning that she believed there to be an improper relationship, specifically asking Ms. Bourne why she visited male patients, and how she decided which male patients to visit.

53.     Deeply disturbed by the line of questioning, the implications, and the fabricated concerns about propriety, Ms. Bourne wrote out her resignation that day, March 28, 2013. Shortly after noon that day, Ms. Drass went to Ms. Bourne's office and informed Ms. Bourne that March 28 would be her last day as a Provider employee. Ms. Bourne left immediately.

54.     Ms. Drass then approached Ms. Goodwin and informed her that, notwithstanding Ms. Goodwin's 30-day notice, March 28, 2013 would also be her last day as a Provider employee. Ms. Goodwin was told to touch nothing and was escorted off the premises.

55.     Plaintiffs were demoted, had their pay and bonuses slashed, and were forced out of their employment in retaliation for their reporting of improper conduct in violation of government laws and regulations, which resulted in false claims to the United States.

56.     On or about February 2017, Amber Home Care, LLC, the United States, and Plaintiffs entered into a settlement agreement, which covered Plaintiffs' allegations that Amber knowingly submitted or caused the submission of false and fraudulent claims to Medicare between January 1, 2010 and December 31, 2012, for home health services that Amber provided to patients

who were referred by skilled nursing facilities owned by or affiliated with Brian Colleran and Daniel Parker, because Colleran and Parker solicited and received remuneration from Amber's management company, Edwin Stuart LLC, in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).

57.     Pursuant to that agreement, Amber Home Care, LLC paid the United States $1,350,000.

58.     Pursuant to a May 2017 settlement agreement with the United States, which covered Plaintiffs' allegations that Colleran and Omnicare, Inc. engaged in kickbacks in violation of the Anti-Kickback Statute and caused the submission of false claims to Medicare, Omnicare paid the United States $1,500,000.

59.     On June 28, 2017, Foundations Health Solutions, Inc., Olympia Therapy, Inc., Tridia Hospice Care, Inc., Brian Colleran, and Daniel Parker, the United States, Plaintiffs, and Vladimir Trakhter entered into a settlement agreement (the "June 2017 Settlement Agreement"). The June 2017 Settlement Agreement also addressed and resolved the allegations set forth by Vladimir Trakhter in an action he had filed in the United States District Court for the Southern District of Ohio captioned *United States ex rel. Trakhter v. Provider Services, Inc., n/k/a BCFL Holdings, Inc. et al.*, Case Number 1:11-cv-217, pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3730(b).

60.     The June 2017 Settlement Agreement covered the following conduct:

- That, as alleged by Mr. Trakhter, Foundations Health Solutions, Inc., and Olympia Therapy, Inc. knowingly submitted or caused the submission of false and fraudulent claims to Medicare from January 1, 2008 through December 31, 2012 for medically unnecessary rehabilitation therapy services;

- That, as alleged by Plaintiffs, Brian Colleran and Daniel Parker knowingly caused the submission of false and fraudulent claims to Medicare, from January 1, 2008 through December 31, 2012 for home health services that were provided by Amber Home Care LLC to patients who were referred to Amber by certain skilled nursing facilities owned by or affiliated with Colleran and Parker, because Colleran and Parker solicited and received remuneration from Amber's management company, Edwin Stuart, LLC, in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b); and

- That, as alleged by Plaintiffs, Defendant Tridia Hospice, Inc. knowingly submitted or caused the submission of false and fraudulent claims to Medicare, from April 1, 2011 through December 31, 2013, for hospice services provided to Medicare Part A patients who were ineligible for the hospice benefit because Tridia Hospice, Inc. failed to conduct proper certifications and/or medical examinations necessary to certify those patients either for initial or continuing eligibility for hospice.

61. Pursuant to the June 2017 Settlement Agreement, Foundations Health Solutions, Inc. and Olympia Therapy, Inc. paid the United States $15,527,844.

62. Pursuant to the June 2017 Settlement Agreement, Colleran and Parker paid the United States $895,830.

63. Pursuant to the June 2017 Settlement Agreement, Tridia Hospice Care, Inc. paid the United States $3,104,170.

14

64.     The settlement agreements resolved the qui tam allegations set forth in Plaintiffs' 2012 lawsuit. None of the settlement agreements addressed, resolved, or released Plaintiffs' retaliation claim.

### C.     ViaQuest and Provider's retaliatory conduct towards Ms. Bourne

65.     Ms. Bourne was hired by ViaQuest in July 2015 as its Vice President of Ohio Hospice Operations.

66.     She was consistently told by her supervisor, Richard Johnson, founder and CEO of ViaQuest, that she was doing a great job.

67.     On or about November 6, 2015, Mr. Johnson summoned Ms. Bourne to his office, where he told  her that he had received a phone call from Robert Speelman, representing Defendant Atlas Healthcare and Provider Services.

68.     Johnson informed Ms. Bourne of the following: Speelman called him on behalf of Colleran, and Speelman informed Johnson that ViaQuest would not receive any business from Defendants Atlas Healthcare or Provider as long as ViaQuest employed Ms. Bourne; Speelman said that Atlas had received great service from ViaQuest in the past and that the decision to withhold future business was based solely on Ms. Bourne's affiliation with ViaQuest; and Speelman told Johnson that Colleran wanted to discuss the matter further and encouraged Johnson to call Colleran. Johnson implied that Speelman told him about Ms. Bourne's role in the 2012 qui tam action, but he did not say so directly.

69.     On or about November 9, 2015, ViaQuest received notification from a social worker at Crown Pointe Care Center. She informed ViaQuest that she had to cancel all pending referrals to ViaQuest and that all Atlas facilities were prohibited from doing business with ViaQuest under any service line.

70.     Crown Pointe Care Center is one of Defendant Atlas Healthcare's nursing and rehabilitation facilities in Columbus, Ohio. As of the filing of this Amended and Supplemented Complaint, Robert Speelman describes Crown Pointe on his blog on Defendant Atlas's website:

> [T]here's a few things you need to know about Crown Pointe. This was my first building working as the Nursing Home Administrator for Brian Colleran and Provider Services… Thanks to [Colleran's] vision, and our incredible employees, Provider Services went from two buildings in the Columbus Market to the largest Nursing Home Operator in Ohio. Brian's passion for care and doing the right thing has never changed. He is my mentor and my friend and I am proud to continue to learn from him.

71.     On or about November 9, 2015, Ms. Bourne met with Johnson about the notification from the Crown Pointe social worker and asked whether Speelman gave Johnson any reason for his and Colleran's anger. Johnson responded that Speelman had told him that Ms. Bourne had personally put Provider and Atlas through hell for the past few years and that was the basis for their decision to stop sending referrals to ViaQuest. Johnson told her that Speelman said that Colleran had directed him to tell Johnson to call Colleran. Johnson told Ms. Bourne that he had no intention of doing so because he knew Colleran was not a good guy.

72.     Shortly thereafter, ViaQuest's Veterans Division was forced to cancel several Veterans' Pinning Services they had previously scheduled in Provider buildings.

73.     On or about November 10, 2015, ViaQuest received a phone call from Mark Hale, a nephew of a patient residing at an Atlas facility (McNaughten Pointe Nursing and Rehabilitation Center). Mr. Hale said that he had received a call from Defendant Tridia, trying to get Mr. Hale to switch his uncle's service from ViaQuest to Tridia. Mr. Hale informed ViaQuest that he did not want to make that switch and instead opted to remove his uncle from McNaughten and take him home to keep him in ViaQuest's care.

74.     On or about November 16, 2015, Johnson summoned Ms. Bourne to his office, saying that he had to have an unfortunate conversation with her. Ms. Bourne responded by informing Mr. Johnson that she had cooperated with the United States when she was asked questions regarding Provider and the people associated with Provider. It appeared to Ms. Bourne that Johnson already knew this fact.

75.     Mr. Johnson asked why Ms. Bourne told him that, and she responded that she thought ViaQuest was about to fire her and she wanted to reiterate that she had done nothing wrong to deserve termination, that Speelman's comments about her were false and retaliatory, and that she suspected Provider knew she cooperated in an investigation against them.

76.     Mr. Johnson told her she was right.  He also said that he believed her and that this was all on Provider but that ViaQuest had also been contacted by another referral source saying they, too, would withhold referrals because of Ms. Bourne. That referral source was not a Provider company but was closely associated with Provider, and Ms. Bourne understood that Provider was tarnishing her reputation with false accusations statewide.

77.     Mr. Johnson expressed his sympathy, reiterating that he thought Ms. Bourne had done nothing wrong and did not deserve the treatment she was getting, that she was one of his favorite employees, that she was well-liked, and that she worked hard and was accomplishing the goals they had set. But, he said, being associated with Ms. Bourne was having a negative impact on ViaQuest because of how much money the program was losing in withheld referrals.

78.     When Ms. Bourne suggested that ViaQuest could employ her instead in a less visible role or change her status to contractor rather than terminate her employment, Mr. Johnson said that he had considered all other options, thought they could look at this in the future, and he would not hesitate to bring her back on if there was a way to do so.

17

79.    Ms. Bourne said that the fact that ViaQuest was terminating her employment under those circumstances led her to think she was un-employable.  Mr. Johnson agreed, saying that maybe in the long-term care community that was true.  He suggested she could switch careers to work in a hospital system.

80.    Mr. Johnson reiterated that he knew Ms. Bourne had done nothing wrong, and that Provider was in the wrong.

81.    Ms. Bourne asked if Johnson could give him any more information about what Speelman had told him.  Johnson replied that he doesn't know Speelman and had never met him but that Speelman simply told him that they would not do any business with ViaQuest as long as Ms. Bourne was associated with the company.

82.    Johnson offered twelve weeks of severance pay, noting that ViaQuest typically does not pay severance.

83.    At that, the meeting concluded.  Ms. Bourne turned in her company property and left.

84.    Ms. Bourne did not accept ViaQuest's severance.

## COUNT I

### AGAINST PROVIDER DEFENDANTS

**Retaliation in Violation of the
False Claims Act, 31 U.S.C. § 3730(h)**

85.    Paragraphs 1-84 are realleged as if fully set forth herein.

86.    As alleged above, Plaintiffs engaged in lawful acts in furtherance of efforts to stop one or more violations of 31 U.S.C. § 3729.

87.     Because of their lawful acts, they were subjected to discrimination in the terms and conditions of their employment by Provider Defendants, including but not limited to their wrongful termination.

88.     Provider Defendants' discrimination against Plaintiffs was a violation of 31 U.S.C. § 3730(h).

89.     As a consequence of Provider Defendants' violation of 31 U.S.C. § 3730(h), Plaintiffs suffered damages.

90.     In addition, Provider Defendants retaliated against Plaintiff Bourne by withholding their referrals to her subsequent employer for as long as Ms. Bourne was associated with that employer. Such conduct led to the termination of Ms. Bourne's subsequent employment, in retaliation for the steps she had taken to stop the Provider Defendants' violations of the False Claims Act, to include the filing of the original complaint in this matter.

91.     As a consequence of Provider Defendants' further violations of 31 U.S.C. § 3730(h), Plaintiff Bourne suffered additional damages.

### COUNT II

### AGAINST ALL DEFENDANTS

### Retaliation in Violation of the
### False Claims Act, 31 U.S.C. § 3730(h)

92.     Paragraphs 1-91 are realleged as if fully set forth herein.

93.     As alleged above, Ms. Bourne engaged in lawful acts in furtherance of efforts to stop one or more violations of 31 U.S.C. § 3729.

94.     Because of Ms. Bourne's lawful acts, she was subjected to discrimination in the terms and conditions of her employment by Defendants, including but not limited to the wrongful termination of her ViaQuest employment.

19

95.     ViaQuest's termination of Ms. Bourne was because of her whistleblowing against Colleran and his companies, and violated 31 U.S.C. § 3730(h).

96.     As a consequence of Defendants' violation of 31 U.S.C. § 3730(h), Ms. Bourne suffered damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request:

A.      That the Court enter judgment against Defendants.

B.      That Plaintiffs be awarded all damages caused by Defendants' retaliation and wrongful termination of them, including but not limited to two times the amount of back pay owed to them, interest on such back pay, lost benefits, compensatory damages, and prejudgment interest;

C.      That Plaintiffs be awarded all costs, attorneys' fees, and litigation expenses; and

D.      That Plaintiffs receive all relief, both at law and in equity, to which they may reasonably appear entitled.

Dated:  January 3, 2018

Respectfully submitted,

 /s/ Frederick M. Morgan, Jr.
Frederick M. Morgan, Jr. (0027687)
Jennifer M. Verkamp (0067198)
Chandra Napora (0092886)
Morgan Verkamp LLC
35 E. 7th St., Ste. 600
Cincinnati, OH 45202
Tel : (513) 651-4400
Fax : (513) 651-4500
Email: rmorgan@morganverkamp.com

*Counsel for Plaintiffs*