# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | | |
|---|---|---|
| PAULA BOURNE, *et al.*, | : | Case No. 1:12-cv-935 |
| | : | |
| Plaintiffs, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| PROVIDER SERVICES HOLDINGS, LLC, *et al.*, | : | |
| | : | |
| Defendants. | : | |

### ORDER GRANTING IN PART AND DENYING IN PART THE PROVIDER DEFENDANTS' MOTION TO DISMISS (Doc. 43)

This civil case is before the Court on the Motion to Dismiss (Doc. 43) of the Provider Defendants,[1] as well as the parties' responsive memoranda (Docs. 48, 50).

### I. FACTS <u>AS ALLEGED</u> BY PLAINTIFFS[2]

### A. The Underlying Facts

Plaintiffs Paula Bourne ("Bourne") and La'Tasha Goodwin ("Goodwin") are accomplished healthcare professionals, residing in Ohio. (Doc. 32 at ¶¶ 8–9). Bourne, holding degrees relating to nursing and management, works in nursing home/hospice

---

[1] The "Provider Defendants" include Provider Services Holdings, LLC ("Provider"); Provider Services, Inc., a/k/a BCFL Holdings, Inc., n/k/a Foundations Health Solutions, Inc. ("FHS"); Atlas Healthcare Solutions, Inc. ("Atlas"); Tridia Hospice Care, Inc. ("Tridia"); and Destiny Hospice, LLC ("Destiny").

[2] For purposes of the Motion to Dismiss, the Court must: (1) view the First Amended and Supplemental Complaint (Doc. 32) (the "Complaint") in the light most favorable to Plaintiffs; and (2) take all well-pleaded factual allegations as true. *Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009).

administration. (*See id.* at ¶ 8). Goodwin, also holding degrees relating to nursing and management, works in nursing/clinical services management. (*See id.* at ¶ 9).

The Provider Defendants are companies that provide hospice, nursing, and related services to patients in Ohio. (Doc. 32 at ¶¶ 10–14). At all relevant times, Brian Colleran ("Colleran") was the key owner/president of Provider, FHS, Tridia, and Destiny (*id*. at ¶ 18); Robert Speelman ("Speelman") was the key owner/president of Atlas[3] (*id.* at ¶ 20); and Daniel Parker ("Parker") was an officer/director at FHS (*id.* at ¶ 21).

In 2008, Colleran directed Plaintiffs to start a hospice program. (Doc. 32 at ¶ 23). The hospice program—coined "Tridia"—provided services to patients throughout Ohio. (*Id.*) Bourne worked as Tridia's Executive Director, and Goodwin worked as Tridia's Director of Clinical Services. (*Id.* at ¶¶ 8–9). FHS "managed" Tridia's operations. (*Id.* at ¶ 23). In 2011, Tridia purchased another hospice program—Destiny. (*Id.*)

### B. The Alleged Retaliation

#### 1. *Billing Irregularities*

When Tridia purchased Destiny, Plaintiffs discovered "billing irregularities"—*i.e.*, "fraudulent claims for Medicare reimbursement." (Doc. 32 at ¶¶ 3, 25). Plaintiffs tried to correct the billing irregularities by, among other things, imposing "progressive discipline" on staff members whose billings were noncompliant, and initiating other procedures to prevent "medically unnecessary" care. (*Id.* at ¶ 26).

---

[3] Atlas, formed June 6, 2013, is also owned in part by Colleran. (Doc. 32 at ¶ 13).

2

Moreover, Plaintiffs "repeatedly alerted" their supervisors (including Colleran and Parker) of the billing irregularities. (Doc. 32 at ¶ 34; *see also id.* at ¶¶ 27–32). However, their warnings fell on deaf ears. (*See id.* at ¶ 35). While their supervisors "acknowledged" that the billing irregularities existed, they "refused to take sufficient action[s]" to address them. (*See id.* at ¶¶ 34–35).

Instead, Colleran directed Plaintiffs (through Parker) to "stay out of Cincinnati." (Doc. 32 at ¶ 26). And Colleran indicated to Plaintiffs (through Parker) that Colleran would not "self-report his fraud," because "that would 'be like going home to your spouse who thinks you are happily married and tell[ing] her you have been cheating on her.'" (*Id.* at ¶ 33).

### 2. *Termination/Resignation*

In the fall of 2012, Plaintiffs were demoted, from director-level positions with state-wide roles, to site-specific positions with site-specific roles. (Doc. 32 at ¶ 38). Also in the fall of 2012, Plaintiffs' salaries were cut. (*Id.* at ¶¶ 41, 43). Bourne informed her supervisor that she felt like Colleran was punishing Plaintiffs "for uncovering problems in Cincinnati." (*Id.* at ¶ 42).

In January of 2013, Tridia's Human Resources Director informed Plaintiffs that "their employment was going to be terminated." (Doc. 32 at ¶ 46). Around that same time, Plaintiffs' working conditions became "impossible." (*Id.* at ¶ 49). To "avoid termination," Goodwin submitted her 30 day notice on March 22, 2013. (*Id.* at ¶ 51). However, Goodwin did not last the full 30 days. (*Id.* at ¶¶ 51, 54).

On March 28, 2013, Bourne's supervisor informed her that March 28, 2013 would be her last day at the company. (Doc. 32 at ¶ 53; *see also id.* at ¶ 8 (stating that Bourne's "employment at Tridia was terminated")). Also on March 28, 2013, Goodwin's supervisor informed her that, notwithstanding the effective date of her letter of resignation, March 28, 2013 would be her last day at the company. (*Id.* at ¶ 54).

### 3. *ViaQuest Employment*

Following her termination from Tridia, Bourne took a job as the Vice President of Ohio Hospice Operations at Defendant ViaQuest, Inc. ("ViaQuest"). (Doc. 32 at ¶¶ 8, 65). On November 6, 2015, Bourne's supervisor—Richard Johnson ("Johnson"), ViaQuest's founder and CEO—told Bourne that he had received a call from Speelman, at Atlas. (*Id.* at ¶ 67).

On the call, Speelman told Johnson that Speelman was calling ViaQuest on behalf of Colleran; Speelman informed Johnson that ViaQuest would not receive any business, from either Atlas or the rest of the Provider Defendants, so long as ViaQuest employed Bourne; and Speelman "encouraged Johnson to call Colleran" for additional information. (Doc. 32 at ¶ 68).

After the call, ViaQuest started to lose business from Atlas-associated facilities. (*See* Doc. 32 at ¶¶ 69–70, 73, 76). Further, ViaQuest was forced to cancel several events at the Provider Defendants' buildings. (*Id.* at ¶ 72). On November 16, 2015, Johnson informed Bourne that, even though she "had done nothing wrong," ViaQuest would have to terminate her employment. (*Id.* at ¶¶ 74–77).

4

### C. The Procedural History

As a result of the aforementioned experiences, Plaintiffs filed this *qui tam* action, alleging that the Provider Defendants (among others) had violated the False Claims Act (the "FCA") by (1) submitting "fraudulent claims for Medicare reimbursement to the United States," and (2) retaliating against Plaintiffs. (Doc. 32 at ¶¶ 2–3).

In 2017, the parties to Plaintiffs' *qui tam* action executed a slew of settlement agreements. (*See* Doc. 32 at ¶¶ 56–63). As a result of the settlement agreements, the only claims that remain in this lawsuit are Plaintiffs' claims for retaliation. (*Id.* at ¶ 64 (stating that the settlement agreements did not resolve Plaintiffs' retaliation claims)).

On March 28, 2018, the Provider Defendants filed the Motion to Dismiss. (Doc. 43). In the Motion to Dismiss, the Provider Defendants raise three arguments:

- First, the Provider Defendants argue that the Court should dismiss all of Goodwin's claims against them, because Goodwin has failed to allege facts sufficient to state an FCA-retaliation claim;

- Second, the Provider Defendants argue that the Court should dismiss all of Bourne's post-employment retaliation claims against them, because Bourne's post-employment retaliation claims are not allowed as a matter of law; and

- Finally, the Provider Defendants argue that the Court should dismiss all of Plaintiffs' claims against Atlas, Provider, and FHS, because Plaintiffs have failed to allege facts sufficient to establish an employment relationship with them.

(*See* Doc. 43).

## II. STANDARD OF REVIEW

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) operates to test the sufficiency of the complaint and permits dismissal of a complaint for "failure to state a claim upon which relief can be granted." To show grounds for relief, Fed. R. Civ. P. 8(a)

requires that the complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief."

While Fed. R. Civ. P. 8 "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). Pleadings offering mere "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id*. (citing *Twombly*, 550 U.S. at 555). In fact, in determining a motion to dismiss, "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). Further, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.*

Accordingly, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 570). A claim is plausible where a "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Plausibility "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged— but it has not 'show[n]'—'that the pleader is entitled to relief,'" and the case shall be dismissed. *Id*. at 679 (citing Fed. R. Civ. P. 8(a)(2)).

## III. ANALYSIS

**A. Goodwin's Claim for FCA-Retaliation**

The Provider Defendants argue that the Court should dismiss all of Goodwin's claims against them, because Goodwin has failed to allege facts sufficient to state an FCA-retaliation claim. (Doc. 43 at 7–12). The Court disagrees.

31 U.S.C. § 3730(h) governs FCA-retaliation claims. To state claim under 31 U.S.C. § 3730(h), an employee must allege that (1) the employee was engaged in a protected activity; (2) the employer knew that the employee was engaged in a protected activity; and (3) the employer "discharged or otherwise discriminated against the employee as a result of the protected activity." *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 566 (6th Cir. 2003). In this case, Goodwin has properly alleged each element.

### *1. Protected Activity*

First, Goodwin has properly alleged that she engaged in a protected activity under 31 U.S.C. § 3730(h).

A protected activity can include, either a "lawful act[]" undertaken in furtherance of an FCA action, or "[an]other effort[]" undertaken to stop an FCA violation. 31 U.S.C. § 3730(h). When determining whether an activity qualifies as a "protected activity," courts interpret the term broadly. *Kachaylo v. Brookfield Twp. Bd. of Trs.*, 778 F. Supp. 2d 814, 819 (N.D. Ohio 2011) (citing *United States ex rel. McKenzie v. BellSouth Telecomms., Inc.,* 123 F.3d 935, 944 (6th Cir.1997)).

As set out by the Sixth Circuit:

> [The FCA] protects not only steps taken in furtherance of a potential or actual *qui tam* action, but also steps taken to remedy the misconduct through methods such as internal reporting to a supervisor or company compliance department and refusals to participate in the misconduct that leads to the false claims, whether or not such steps are clearly in furtherance of a potential or actual *qui tam* action.

*Miller v. Abbott Labs.*, 648 F. App'x 555, 560 (6th Cir. 2016) (citation omitted); *see also United States ex rel. Elliott v. Brickman Grp. Ltd., LLC*, No. 1:10-CV-392, 2014 WL 12787978, at *12–14 (S.D. Ohio Jan. 27, 2014).

Thus, where an employee works to stop an employer's FCA-related misconduct, a protected activity exists, regardless of whether it occurs through "external means (*e.g.*, an FCA action) or . . . internal means (*e.g.*, reporting violations up a company's chain of command in an effort to effectuate institutional course correction)." *Jones-McNamara v. Holzer Health Sys., Inc.*, No. 2:13-CV-616, 2014 WL 1671495, at *4 (S.D. Ohio Apr. 28, 2014); *see also Miller*, 648 F. App'x at 560.

In this case, Plaintiffs allege that Goodwin (and Bourne) identified irregular (*i.e.*, "fraudulent") billing practices, imposed "progressive discipline" on staff members whose billings were noncompliant, and initiated other procedures to prevent "medically unnecessary" care. (Doc. 32 at ¶¶ 3, 25–26). Plaintiffs also allege that Goodwin (and Bourne) "repeatedly alerted" their supervisors of the irregular billing practices. (*Id.* at ¶ 34; *see also id.* at ¶¶ 27–32).

These actions qualify as protected activity, because these actions constitute "internal" efforts to stop FCA-related misconduct. *See Jones-McNamara*, 2014 WL 1671495, at *4; *see also United States ex rel. Elliott*, 2014 WL 12787978, at *14 (finding

protected activity where an employee informed his supervisors of allegedly "fraudulent billing practices"). As a result, Goodwin has alleged facts sufficient to state the first element of her FCA-retaliation claim.[5]

### 2. *Notice*

Second, Goodwin has properly alleged that the Provider Defendants were on notice of her protected activity.

In *Yuhasz*, the Sixth Circuit held that when a protected activity falls within an employee's normal "employment obligations," a heightened notice standard can apply. *See Yuhasz*, 341 F.3d at 568 (holding that employees charged with investigating fraud "must make clear their intentions of bringing or assisting in an FCA action in order to overcome the presumption that they are merely acting in accordance with their employment obligations").

However, a recent line of cases (including at least two from courts in the Sixth Circuit) has held that *Yuhasz*'s heightened notice standard did not survive the FCA's 2009 amendment. *Jones-McNamara*, 2014 WL 1671495, at *4 (stating that "*Yuhasz*'s requirement that the employer knew that the employee was doing more than her job by bringing or furthering an FCA case" does "not remain correct"); *see also Mikhaeil v.*

---

[5] Two additional points are notable. First, the Provider Defendants argue that "Bourne is the only individual" to have complained about FCA-related misconduct. (Doc. 50 at 3, 5). Upon review of the complaint, the Court disagrees. (*See, e.g.*, Doc. 32 at ¶ 34 ("<u>Plaintiffs</u> repeatedly alerted [the] Provider Defendants to the illegal practices identified in the original complaint.") (emphasis added)). Second, the Provider Defendants argue that Goodwin failed to engage in protected activity, because Goodwin merely performed her job duties. (Doc. 43 at 7–9). This argument goes to notice (the second element of Goodwin's FCA-retaliation claim), not to protected activity (the first element of the same). .

9

*Walgreens Inc.*, No. 2:13-CV-14107, 2015 WL 778179, at *9 (E.D. Mich. Feb. 24, 2015).

The *Mikhaeil* court explains why:

> *Yuhasz* no longer appears to be correct in light of the [FCA's 2009] amendment . . . . [T]he FCA no longer requires that conduct be "in furtherance of an action under this section" to be protected. Rather, the FCA protects any "effort to stop 1 or more violations of this subsection." 31 U.S.C. 3730(h)(1). . . . If an employee does not need to take steps clearly in furtherance of a potential or actual *qui tam* action to engage in protected activity, the employee, even if charged with investigating potential fraud, also does not need to "make clear their intentions of bringing or assisting in an FCA action," *Yuhasz*, 341 F.3d at 568, to satisfy the notice requirement. . . . <u>By reporting [his/]her concerns directly to [his/her supervisor], [a] Plaintiff satisfie[s] the notice element of [his/]her . . . case</u>.

*Mikhaeil*, 2015 WL 778179, at *9 (italics and emphasis added).

In this case, Plaintiffs allege that Goodwin (and Bourne) "repeatedly alerted" their supervisors of irregular (*i.e.*, "fraudulent") billing practices. (Doc. 32 at ¶ 34; *see also id.* at ¶¶ 27–32). Absent *Yuhasz*'s heightened notice requirement, this act of reporting—alone—satisfies the second element of Goodwin's FCA-retaliation claim. But, even if *Yuhasz*'s heightened notice requirement survives, Plaintiffs have alleged facts sufficient to indicate that Goodwin's employer knew about her protected activity.

Plaintiffs allege that, after Goodwin (and Bourne) reported the irregular billing practices, Goodwin (and Bourne) experienced a demotion, a salary cut, and "impossible" working conditions. (Doc. 32 at ¶¶ 38, 41, 49). Plaintiffs also allege that Colleran told Goodwin (and Bourne) to "stay out of Cincinnati." (*Id.* at ¶ 26). This conduct indicates that Goodwin's employer was privy (and opposed) to her protected activity. Goodwin

has alleged facts sufficient to state the second element of her FCA-retaliation claim.[6]

### 3. *Discharge*

Finally, Goodwin has properly alleged that she was discharged as a result of her protected activity.

Constructive discharge exists when working conditions are so "'unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" *Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir. 1982) (citing *Bourque v. Powell Elec. Mfg.*, 617 F.2d 61, 65 (5th Cir. 1980)). The elements of constructive discharge are (1) intolerable working conditions, and (2) an intent (by the employer) to force the employee to quit. *Smith v. LHC Grp., Inc.*, 727 F. App'x 100, 105 (6th Cir. 2018).

Intolerable working conditions exist where an employer's alleged participation in "illegal and unethical" activities threatens an employee's professional reputation, and exposes the employee to "the threat of prosecution." *Smith*, 727 F. App'x at 103–05 (reversing a district court's decision that no constructive discharge existed, as a matter of law, where a plaintiff alleged that a former employer ignored her complaints of fraud and "required her to continue working" while it "defraud[ed] the government").

Intent exists where an "'employee's resignation was a reasonably foreseeable

---

[6] Moreover, it is not clear that Goodwin's job involved the protected activity alleged. Goodwin was a clinician, not a compliance officer. (Doc. 32 at ¶ 9). At the very least, fact development is needed to establish (1) the duties associated with Goodwin's role, and (2) whether Goodwin's protected activity fell within those duties. *See Swanson v. Battery Park City Auth.*, No. 1:15-CV-6938, 2016 WL 3198309, at *6 (S.D.N.Y. June 8, 2016) (refusing to dismiss an FCA-retaliation case for lack of notice, when fact development was needed to establish whether a protected activity was within an employee's job duties).

consequence of [an] employer's actions.'" *King v. Cincinnati Pub. Sch.*, No. 1:17-CV-794, 2019 WL 1167949, at *4 (S.D. Ohio Mar. 13, 2019) (citing *Smith*, 727 F. App'x at 106); *see also Dieckmann v. Care Connection of Cincinnati, LLC*, No. 1:17-CV-73, 2018 WL 6675491, at *6 (S.D. Ohio Dec. 19, 2018) (noting that a plaintiff need not prove "subjective" intent to establish constructive discharge).

In this case, Plaintiffs allege that their employer engaged in irregular (*i.e.*, "fraudulent") billing practices (Doc. 32 at ¶¶ 3, 25–26); that they "repeatedly alerted" their employer of the irregular billing practices (*id.* at ¶¶ 27–32, 34); and that, instead of heeding their warnings, their employer continued the conduct (*id*. at ¶ 33 (alleging Colleran refused to self-report "his fraud")). Taking these allegations as true, a reasonable employee in Goodwin's shoes could have felt compelled to resign.

Moreover, based on the facts alleged—including Plaintiffs' instruction to "stay out of Cincinnati," Plaintiffs' demotion, and Plaintiffs' pay cuts—Plaintiffs' employer should reasonably have foreseen Goodwin's resignation. (Doc. 32 at ¶¶ 26, 38, 41). This is especially true given the fact that Goodwin was terminated before her 30 days' notice had expired. (*Id*. at ¶ 54). For all these reasons, Goodwin has alleged facts sufficient to state an FCA-retaliation claim.[7]

---

[7] One additional point is notable. The Provider Defendants argue that Goodwin did not experience a constructive discharge, because she did not have to "participate in [the] fraud" after the Provider Defendants "removed" her from Cincinnati. (Doc. 50 at 7–8). This argument is not well-taken. The Court will not hold—especially as a matter of law—that an employer can escape a claim for constructive discharge by demoting an employee.

**B. Bourne's Claim for Post-Employment Retaliation**

Next, the Provider Defendants argue that the Court should dismiss all of Bourne's post-employment retaliation claims against them, because Bourne's post-employment retaliation claims are not allowed as a matter of law. (Doc. 43 at 13–15). At this point in the lawsuit, the Court disagrees.

The FCA affords relief to an "employee, contractor, or agent" who is "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment." 31 U.S.C. § 3730(h). The FCA does not define the term "employee." *See id.* However, the FCA's legislative history provides that "the definition[] of 'employee'" should include "[t]emporary, blacklisted[,] or discharged workers." S. Rep. 99-345, at 34 (1986).

Citing the FCA's legislative history, the Sixth Circuit has reasoned that the definition of "'employee' extends to former employees, as well as present employees." *Vander Boegh v. EnergySolutions, Inc.*, 772 F.3d 1056, 1063 (6th Cir. 2014) (explaining that "the phrase '[t]emporary, blacklisted[,] or discharged workers'" suggests that the definition of "'employee' extends to former employees, as well as present employees") (citing S. Rep. 99-345, at 34 (1986)).

In line with the Sixth Circuit's definition, at least one Ohio court has held that, under the FCA, a plaintiff can file suit against his/her former employer, for causing his/her termination from his/her current employer, using the following illustration:

> Suppose that plaintiff A.B. was employed by X Corp. and filed a *qui tam* action against Y Corp. An executive with Y Corp. telephones his friend and counterpart at X Corp., explains the situation, and asks him to fire A.B. for making trouble for Y Corp. Suppose further that the executive at X Corp. agrees. A.B. has been fired because he exercised his rights under the False Claims Act. . . . Surely, given Congress's intent to encourage employees to bring *qui tam* actions by protecting them from retaliation, Congress did not mean to deny relief to relators in such circumstances.

*Nguyen v. City of Cleveland*, 121 F. Supp. 2d 643, 648–49 (N.D. Ohio 2000); *see also Ortino v. Sch. Bd. of Collier Cty.*, No. 2:14-CV-693, 2015 WL 1579460, at *4 (M.D. Fla. Apr. 9, 2015) (The "Court is persuaded by the analysis in *Vander Boegh* . . . and likewise holds that the FCA's anti-retaliation provision extends to former employees.").

In this case, Plaintiffs allege that Colleran (Bourne's old boss) had his friend (Speelman) call up Johnson (Bourne's current boss) and demand Bourne's termination. (Doc. 32 at ¶ 68). Moreover, Plaintiffs allege that Colleran exerted his influence to deny ViaQuest (Bourne's new employer) referrals until Johnson acquiesced to his demand. (*Id.* at ¶¶ 68–73, 76). Taking these allegations as true, Bourne has stated a claim for post-employment retaliation under the above-cited precedent.

The Provider Defendants argue that the "majority of federal courts" have concluded that post-employment claims are not allowed under the FCA. (Doc. 43 at 14-15). On review, it appears that the Provider Defendants are correct. *See Potts v. Ctr. for Excellence in Higher Educ., Inc.*, 244 F. Supp. 3d 1138, 1143 (D. Colo. 2017), *aff'd*, 908 F.3d 610 (10th Cir. 2018) (stating that the "majority of [federal] courts" have found that the FCA "does not apply to post-employment retaliation" and collecting cases).

Nonetheless, three points convince the Court that it is not proper to dismiss Bourne's claim at this point in the lawsuit.

First, many of the Provider Defendants' cases involve a distinguishable issue: whether a post-employment lawsuit (or similar action), by an employer against a former employee, constitutes retaliation. *Potts*, 244 F. Supp. 3d at 1140–43 (post-employment lawsuit did not affect the "terms and conditions of employment"); *United States ex rel. Tran v. Computer Scis. Corp.*, 53 F. Supp. 3d 104, 138 (D.D.C. 2014) (same); *Poffinbarger v. Priority Health*, No. 1:11-CV-993, 2011 WL 6180464, at *1 (W.D. Mich. Dec. 13, 2011) (same). This issue is not relevant here.

Second, to the extent that the cases cited by the Provider Defendants are analogous to this one, this Court is bound to follow the Sixth Circuit's precedent, and, as that precedent indicates that the definition of "'employee' extends to former employees," the Court is disinclined to reach the opposite result here—as a matter of law. *See Vander Boegh*, 772 F.3d at 1063; *United States v. Huerta*, 247 F. Supp. 2d 902, 911 n.15 (S.D. Ohio 2002) (confirming that "this Court follows the Sixth Circuit's precedent").

Finally, given the complexities of this case, the Court notes that it would make more sense to test Bourne's post-employment retaliation claims on a motion for summary judgment, where a better developed factual record would help the Court better consider their merits. *Fitzsimmons v. Cardiology Assocs. of Fredericksburg, Ltd.*, No. 3:15-CV-72, 2015 WL 4937461, at *7 (E.D. Va. Aug. 18, 2015) (refusing to hold, on a motion to dismiss, that a post-employment retaliation claim was barred).

As a result, and at this stage in the lawsuit, Bourne has properly alleged her post-employment retaliation claims.

### C. Plaintiffs' Claims Against Atlas, Provider, and FHS

Finally, the Provider Defendants argue that the Court should dismiss all of Plaintiffs' claims against Atlas, Provider, and FHS, because Plaintiffs have failed to allege facts sufficient to establish an employment relationship with them. (Doc. 43 at 16–18). The Court agrees with respect to Atlas and Provider.

As stated *supra*, the FCA affords relief to an "employee, contractor, or agent" who is "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment." 31 U.S.C. § 3730(h). Interpreting this language, the Sixth Circuit has held that a plaintiff can only recover against a defendant, under the FCA, where there exists an "employment-like relationship[]" between them. *Vander Boegh*, 772 F.3d at 1064.

Under limited circumstances, an employment-like relationship can arise between an employee and his/her employer's affiliate via the "single employer" test. As the Sixth Circuit explains:

> [T]wo companies may be . . . so interrelated that they constitute a single employer . . . . In determining whether to treat two entities as a single employer, courts examine the following four factors: (1) interrelation of operations, *i.e.*, common offices, common record keeping, shared bank accounts and equipment; (2) common management, common directors and boards; (3) centralized control of labor relations and personnel; and (4) common ownership and financial control.

*Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 993–94 (6th Cir. 1997); *see Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 428 (6th Cir. 2014).[8]

Courts in the Sixth Circuit have refused to hold that bare bones allegations of interrelation meet the "single employer" test. *Compare Merritt*, 96 F. Supp. 3d at 810, 818–19 (companies, which were "part of" the same group, were not a single employer despite allegations of a personal connection and a "free labor" relationship between them), *and Thompson*, 2007 WL 2815972, at *2–3 (companies were not a single employer despite allegations that one company "owned and managed" the other), *with Demyanovich*, 747 F.3d at 428 (companies, which shared "several" managers/investors, which maintained the same "business address," and whose employees contacted the same HR personnel, could reasonably be construed as single employer).

These cases align with the common-sense proposition that an employment-like relationship does not exist simply because two or more companies act as conspirators. As multiple courts have held, Congress knows how to draft a provision that holds conspirators liable, and 31 U.S.C. § 3730(h) contains no such provision. *See, e.g.*, *Mruz v. Caring, Inc.*, 991 F. Supp. 701, 709 (D.N.J. 1998) (stating that "liability under [§] 3730(h) cannot be extended on the basis of a conspiracy; the hallmark of liability under [§] 3730(h) is an 'employment[-like] relationship' and for this, the Court must search").

---

[8] While neither *Swallows* nor *Demyanovich* analyzed the "single employer" test in the context of an FCA claim, multiple other courts in the Sixth Circuit have done so. *See, e.g.*, *Merritt v. Mountain Laurel Chalets, Inc.*, 96 F. Supp. 3d 801, 817–18 (E.D. Tenn. 2015); *see also Thompson v. Quorum Health Res., LLC*, No. 1:06-CV-168-R, 2007 WL 2815972, at *2–3 (W.D. Ky. Sept. 27, 2007).

In this case, Plaintiffs allege that Colleran held ownership interests in Atlas, Provider, and FHS (Doc. 32 at ¶¶ 13, 18); Plaintiffs allege that Colleran exerted some level of control over Atlas, Provider, and FHS (*id.* at ¶¶ 13, 18); and Plaintiffs allege that FHS "managed" Tridia (*id.* at ¶ 23). Additionally, Plaintiffs allege that Parker—the supervisor to whom Plaintiffs reported numerous of their FCA-related concerns—worked as an officer and director at FHS. (*Id.* at ¶ 21).

With regard to Atlas and Provider, Plaintiffs allegations fail to withstand the Motion to Dismiss. While such allegations indicate that Atlas, Provider, and Tridia shared common owners (the second factor) and common directors (the fourth factor), such allegations fail to indicate that Atlas, Provider, and Tridia shared common operations (the first factor) or common control of labor relations (the third factor). Indeed, by Plaintiffs' own admission, Atlas did not even exist when Plaintiffs worked at Tridia. (Doc. 32 at ¶ 13; *see also* Doc. 48 at 4 n.2).

With regard to FHS, Plaintiffs allegations withstand the Motion to Dismiss—if barely. Like the analysis above, such allegations indicate that FHS and Tridia shared common owners (the second factor) and common directors (the fourth factor). However, unlike the analysis above, such allegations also indicate that FHS exerted at least some level of control over Tridia's labor relations (the third factor)—through integrated management and reporting practices (the first factor). (*See* Doc. 32 at ¶¶ 21, 23, 26, 33).

In light of this analysis, the Court holds that while Plaintiffs' claims against Atlas and Provider warrant dismissal, Plaintiffs' claims against FHS survive.[9]

## IV. CONCLUSION

Based upon the foregoing, the Motion to Dismiss (Doc. 43) is **GRANTED IN PART AND DENIED IN PART**. Plaintiffs' claims against Provider and Atlas are **DISMISSED**. In all other respects, the Motion to Dismiss is **DENIED**.

**IT IS SO ORDERED.**

Date: 5/7/19

Timothy S. Black
United States District Judge

---

[9] One last point is notable. Plaintiffs appear to concede that Atlas was never Plaintiffs' employer in 2011. (Doc. 48 at 4 n.2). Nonetheless, Plaintiffs argue, in a footnote, that Atlas is liable for Bourne's discharge from ViaQuest. (*Id.*) The Court disagrees. As stated *supra*, the FCA only allows a plaintiff to bring a retaliation claim against a defendant when there exists an employment-like relationship between them. The Court fails to see how Atlas's alleged participation in the events leading up to Bourne's 2015 termination from ViaQuest gives rise to an employment-like relationship.