# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| | ) | |
| PAULA BOURNE, *et al.,* | ) | Case No. 1:12–cv–935 |
| | ) | |
| Plaintiffs, | ) | Judge Timothy S. Black |
| | ) | |
| v. | ) | |
| | ) | |
| PROVIDER SERVICES HOLDINGS, LLC, *et* | ) | |
| *al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

**BRIEF IN SUPPORT OF DEFENDANTS TRIDIA HOPSICE CARE, INC., DESTINY HOSPICE, LLC, and PROVIDER SERVICES, INC. a/k/a BCFL HOLDINGS, INC., n/k/a FOUNDATIONS HEALTH SOLUTIONS, INC.'S MOTION FOR SUMMARY JUDGMENT**

1

## TABLE OF CONTENTS

**INTRODUCTION**............................................................................................................ 5

**SUMMARY OF UNDISPUTED FACTS**........................................................................ 6

   **I.**   **Tridia Hospice** ............................................................................................. 6

   **II.**   **Destiny Hospice** .......................................................................................... 8

   **III.**   **The ROLF Audit** ........................................................................................ 10

   **IV.**   **The Hospice is Reorganized** ..................................................................... 11

   **V.**   **Bourne and Goodwin File the *Qui Tam* Action** .......................................... 13

   **VI.**   **Bourne and Goodwin Voluntarily Resign**.................................................. 13

   **VII.** **Bourne's Employment at ViaQuest**........................................................ 14

**LAW AND ARGUMENT**................................................................................................ 16

   **I.**   **Summary Judgment Standard**.................................................................... 16

   **II.**   **Plaintiffs Cannot Establish an FCA Retaliation Claim Against Defendants.** ............ 17

Plaintiffs cannot establish the one thing that matters for purposes of an FCA retaliation claim: a causal connection between an instance of protected FCA activity and an adverse employment action taken against them by Defendants.

     **A.**   **Plaintiffs Cannot Establish a Prima Facie Case of FCA Retaliation.** ..................... 19

      **1.**   **Generic Complaints About Unspecified Compliance Issues Do Not Constitute Protected Activity**.......................................................................................... 19

Though Plaintiffs' filing of a *qui tam* action, identification of compliance issues at Destiny in 2011, and assistance with the ROLF Audit may have constituted protected activity, their vague, generic complaints about the scope of ROLF Audit did not identify any additional fraud on the government and therefore did not constitute protected activity. *McKenzie v. BellSouth Telecomm., Inc.,* 219 F.3d 508 (6th Cir. 2000); *United States ex rel. Brown v. Aramark Corp.*, 591 F.Supp.2d 68 (D.D.C. 2008).

      **2.**   **The Only Alleged Protected Activity of Which Defendants Had Knowledge Was Activity that Defendants Specifically Directed Plaintiffs to Undertake.** .................... 22

Defendants had no knowledge of Plaintiffs' *qui tam* lawsuit until years after Plaintiffs resigned, and Plaintiffs' alleged generic complaints regarding the scope of the ROLF Audit were also insufficient to put Defendants on notice of any protected activity.

      **3.**   **The Only Potentially Adverse Employment Action Taken by Defendants Against Plaintiffs Was Their Reassignment and Reduction in Pay in Connection with the Restructuring and Sale of Tridia.**.................................................................. 22

2

Because Plaintiffs cannot maintain a constructive discharge claim against Defendants as a matter of law, and because there is no evidence to justify imputing the alleged actions of ViaQuest, Atlas, and Bob Speelman to Defendants, the only potentially adverse employment action taken by Defendants against Plaintiffs was Plaintiffs' reassignment and reduction in pay in connection with the restructuring and sale of Tridia.

**a. Defendants were not constructively discharged—they quit after finding alternative employment.** ................................................................................ **23**

Plaintiffs voluntarily resigned only after finding alternative employment, and they each gave several weeks' notice. *Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir. 1982); *O'Donnell v. Univ. Hosps. Health Sys.*, No. 1:16 CV 2480, 2018 WL 1627436 at *11 (N.D. Ohio, Apr. 4, 2018); *Henderson v. Leroy Hill Coffee Co.*, No. Civ.A. 99–1067CBS, 2001 WL 103147, *10 (S.D. Ala., Jan. 30, 2001).

**b. Any actions taken by ViaQuest, Atlas, or Bob Speelman cannot be imputed to Defendants.** ........................................................................................................ **26**

There is no evidence to substantiate Bourne's claim that Defendants had any involvement in the decisions and actions of ViaQuest, Atlas, or Bob Speelman, or that Bob Speelman was an agent of Defendants. Hearsay evidence is inadmissible and must be disregarded if submitted in opposition to a motion for summary judgment. *Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007).

**4. Plaintiffs Cannot Present Evidence to Establish Causation.** ................................ **27**

Plaintiffs cannot establish that their alleged protected activity was the "but for" cause of an adverse employment action. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009); *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013); *Johnson v. Donahoe*, 642 F. App'x 599, 605 (6th Cir. 2016).

**a. There is no direct evidence of retaliation.** ........................................................... **28**

Plaintiffs cannot point to any smoking gun which, if believed, would "require the conclusion that unlawful retaliation was a motivating factor" without any need for inference. *Spengler v. Worthington Cylinders*, 615 F.3d 481 (6th Cir. 2010).

**b. The only circumstantial evidence of retaliation Plaintiffs can present is loose temporal proximity, which on its own is insufficient to establish a prima facie case of retaliation.** .......................................................................................................... **29**

Temporal proximity alone is insufficient to establish the prima facie element of causation in this case. *Bruno v. RBS Citizens, NA*, No. 1:16-CV-245, 2017 WL 2336008 (S.D.Ohio, May 30, 2017), *appeal dismissed*, 2017 WL 6506363 (6th Cir., Sept. 6, 2017); *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008).

**c. Even if the alleged actions of ViaQuest, Atlas, or Bob Speelman could be imputed to Defendants, there is no evidence connecting those alleged actions to a retaliatory motive. ...................................................................................................... 31**

Bourne cannot establish any "but-for" causal connection between her discharge from ViaQuest and any of the protected activity she alleges.

**B. Defendants Had Legitimate, Non-Retaliatory Reasons for Reassigning Plaintiffs and Reducing Their Pay, and Plaintiffs Cannot Present Any Evidence to Demonstrate That Those Reasons Are Pretextual........................................................................... 32**

There were legitimate, non-retaliatory reasons for Plaintiffs' reassignment and reduction in pay in connection with Tridia's company-wide restructuring. *Mann v. Navicor Grp., LLC*, 488 Fed. App'x 994 (6th Cir. 2012); *Hollowell v. Michigan Consol. Gas Co.*, 18 Fed. App'x 332 (6th Cir. 2001); *Madry v. Gibraltar Nat'l Corp.,* 526 Fed. Appx. 593 (6th Cir. 2013); *Roll v. Bowling Green Metalforming, LLC,* 457 Fed. Appx. 458 (6th Cir.2012).

**C. Even If the Alleged Actions of ViaQuest, Atlas, or Bob Speelman Could Be Imputed to Defendants, Those Actions Were Taken for Legitimate, Non-Retaliatory Reasons, and Bourne Cannot Present Any Evidence to Demonstrate That Those Reasons Are Pretextual. ................................................................................................................ 34**

Bob Speelman has articulated legitimate, non-retaliatory reasons for his refusal to do business with Bourne while she was at ViaQuest.

**CONCLUSION ...................................................................................................................... 35**

## INTRODUCTION

Plaintiffs are former employees of Defendants who voluntarily quit their jobs after finding alternative employment and who are now accusing Defendants of "constructively discharging" them for engaging in protected activity under the False Claims Act ("FCA"). Plaintiffs' FCA retaliation claims cannot survive summary judgment because Plaintiffs cannot establish a causal connection between any instance of protected FCA activity on their part and any adverse employment action against them by Defendants.

This case originated as an FCA *qui tam* action filed by Plaintiffs in which they alleged the submission of false Medicare claims by Defendants. It is undisputed that Defendants had no knowledge of Plaintiffs' filing of or involvement with the *qui tam* action until years after Plaintiffs resigned their employment with Defendants. Because Plaintiffs cannot plausibly claim that Defendants retaliated against them for something about which Defendants were not even aware, Plaintiffs are accusing Defendants of retaliating against them for allegedly making various, unspecified internal reports of compliance issues.

While Plaintiffs' FCA retaliation claims are deficient in a number of ways, the most obvious is that Plaintiffs have no evidence that they were retaliated against or discharged <u>*because of*</u> their alleged protected activity. Quite the contrary. As a preliminary matter, neither of Plaintiffs was discharged. Both voluntarily resigned after their positions and responsibilities were modified as part of a corporate sale and restructuring. More importantly, undisputed evidence in this case makes it very clear that to the extent Plaintiffs did engage in arguably protected activity, it was solely done at Defendants' request. Indeed, in the case of the most serious instances of allegedly wrongful conduct "reported by" Plaintiffs, they had been specifically instructed by Defendants to assist an outside law firm in auditing compliance issues. Apparently, Plaintiffs are claiming that the entire company was restructured and sold just to retaliate against them for helping outside

consultants do exactly what they were hired to do. Not only is Plaintiffs' claim extremely self-aggrandizing, but it is also completely without evidentiary support. Plaintiffs' claims that they were retaliated against for reporting compliance issues that they were specifically charged with finding—compliance issues that occurred while they were in charge, no less—cannot survive summary judgment.

Plaintiff Bourne also alleges that Defendants retaliated against her years after she left their employ by instructing Bob Speelman, the owner of the Atlas chain of nursing homes, not to do business with her in her new role at ViaQuest Hospice. It is now evident, after the completion of discovery, that there is absolutely no evidence to support this allegation. To the contrary, Speelman testified that no one associated with Defendants told him not to do business with Bourne or ViaQuest, and that his refusal to do business with Bourne was solely for his own reasons. Notably, though Speelman had previously worked for some of the Defendants, he no longer had any role with any of the Defendants at this time. Likewise, none of the Defendants had any ownership or controlling interest in the Atlas nursing facilities at that time. Accordingly, there simply is no evidence to impute the alleged actions of ViaQuest, Atlas, and Speelman to any of the Defendants.

As will be discussed below, Plaintiffs cannot establish a prima facie case of FCA retaliation against Defendants, and even if they could, all actions taken by Defendants with respect to Plaintiffs were justified by legitimate, non-retaliatory reasons. There are no disputes of material facts, and Plaintiffs cannot establish the essential elements of their claims. Accordingly, Defendants are entitled to judgment as a matter of law.

## SUMMARY OF UNDISPUTED FACTS

### I.    Tridia Hospice

Defendant Tridia Hospice Care, Inc. ("Tridia") is a hospice company that provides hospice services to residents in long-term care institutional settings (*e.g.*, nursing homes and assisted living

6

facilities) throughout the state of Ohio. Tridia was originally owned by Brian Colleran ("Colleran"), who purchased the hospice license from an unrelated company in 2008. (Colleran Dep. at 12, 15). Upon forming Tridia, Colleran asked Plaintiffs Paula Bourne and La'Tasha Goodwin to help start up the company. (Bourne Dep. at 32, Goodwin Dep. at 22). They began operations in Columbus, Ohio. (Bourne Dep. at 54; Ex. 42, Goodwin Dep. at 16). Defendant Provider Services, Inc. a/k/a BCFL Holdings, Inc. n/k/a Foundations Health Solutions, Inc. ("FHS") provided back office support for Tridia, including processing payroll and third-party billing. However, day-to-day operations and personnel decisions were performed by Tridia. (Krystowski Dep. at 26-27; Colleran Dep. at 95).

Bourne and Goodwin were charged with all the major decisions regarding accreditation, compliance, marketing, and hiring and firing for Tridia. (Bourne Dep. at 35-48; Colleran 39). Bourne and Goodwin were given these responsibilities even though Bourne's hospice experience was limited to a marketing position in 2004 and Goodwin did not have hospice experience except for interacting with hospice companies at nursing home buildings in which she worked. (Bourne Dep. at 15; Goodwin Dep. at 13). Bourne and Goodwin's major task upon starting Tridia was ensuring that it was accredited. (Bourne Dep. at 40). As Director of Clinical Services, Goodwin's job responsibilities included "plan[ning] and implement[ing] inservice and continuing education programs to meet education and training needs of organization personnel," "develop[ing], recommend[ing], and administer[ing] organization policies and procedures," and "assur[ing] compliance with all local, state and federal laws regarding licensure and certification of organization personnel and, maintain[ing] compliance to the JCAHO Home Care standards." (Goodwin Dep. Ex. 77).

Soon after Tridia started in Columbus, it expanded to open branch offices in several other cities in Ohio, including Dayton, Cleveland/Akron, and Ashtabula. (Bourne Dep. at 58-60; Ex. 1). Although Bourne and Goodwin did not have an official title over the Tridia branches (other than Columbus), they naturally became the people that the other branches turned to with questions about compliance and policies. (Bourne Dep. at 54-55). Bourne and Goodwin advised the Tridia branches on compliance by setting up the branches, training the general managers, assisting with hiring, showing them the practices and requirements of accreditation and Medicare, and visiting the branch offices to conduct audits of the paperwork to ensure that they were "on the path to success in compliance." (Bourne Dep. at 50-53).

## II.      Destiny Hospice

In March of 2011, Colleran purchased another hospice in Cincinnati called Destiny Hospice, LLC ("Destiny"). (Bourne Dep. at Ex. 3; Colleran Dep. at 22). Upon purchasing Destiny, Colleran sent Bourne and Goodwin to review Destiny's operations and identify any issues of concern. (Bourne Dep. at 61, 76-82; Goodwin Dep. at 46). Specifically, Colleran asked Bourne to convert medical records to the Tridia system (Care Anywhere), evaluate staff, and provide training on hospice eligibility. (*Id.*) They also trained staff on reviewing medical records. (Bourne Dep. at 77-78).

Upon completing their review, Bourne and Goodwin discovered several compliance issues, including the provision of "crisis care" for all patients regardless of whether it was warranted. (Bourne Dep. at 95-97, see also Goodwin Dep. at 50-52). Bourne and Goodwin corrected the issues they identified in July 2011, instructed staff on the "crisis care" issue, and later disciplined one employee (Tracy Helwig) for, *inter alia*, failing to ensure that medical records were in order to the services being provided. (Bourne Dep. at 95-97; Exs. 6, 7). Bourne does not believe Destiny was

8

required to, and Bourne did not direct it to, make any repayments to Medicare or Medicaid as a result of the issues that she had identified through July 2011. (Bourne Dep. at 101).

As time went on, Bourne and Goodwin began to develop a strained relationship with the staff at Destiny because their approach was often confrontational, and staff complained that Bourne and Goodwin did not give them the help they needed to do their jobs. When she was disciplined, Helwig complained that she was subject to a hostile working environment and that she did not believe she was trained properly on CareAnywhere, which was provided by Goodwin. (Bourne Dep. at 115-116, Ex. 6). Similarly, Dan Parker, who assisted Colleran at the time in managing his companies and to whom Bourne and Goodwin reported, recalled receiving a call from another employee complaining about Bourne, and he concluded that there were "major problems to deal with between the personalities." (Parker Dep. at 51). Parker also heard similar complaints from the Cleveland/Akron branch. (Parker Dep. at 52). Bourne admits that by November 2011, the "relationships between Tridia and Destiny were strained at that time. (Bourne Dep at. 118). "[T]here was frustration on our part and there was frustration on their part and it was not easily resolved." (*Id.*)

Parker became concerned that Bourne and Goodwin were punitive managers and did not provide help when it was asked for. (Parker Dep. at 50-52, 70, 150, 153). Therefore, in November or December of 2011, Parker asked Bourne and Goodwin to stay out of Cincinnati and the other branch offices so as to resolve the personality conflicts. (Bourne Dep. at 103, 118, 128, 142, 143; Parker Dep. at 73, 74, 106). However, Bourne and Goodwin were not demoted, and no adverse employment action was taken against them. Indeed, Parker specifically asked that Bourne and Goodwin continue electronically monitoring the branches' electronic medical records, and Bourne and Goodwin continued to head up the Tridia and Destiny company-wide hospice compliance

program until the company was restructured. (Bourne Dep. at 103, 118-121; 142-143, 148-149, 152, Exs. 9, 10; Goodwin Dep. at 54, 90, 103; Parker Dep. at 119). Bourne and Goodwin each received a bonus of almost $60,000 in March 2012. (Bourne Dep. at 103, 128, 142-143; Goodwin Dep. at 90, 103).

### III. The ROLF Audit

In April 2012, Colleran, who had no prior experience owning a hospice company, decided to hire the law firm Rolf Goffman Martin Lang LLP ("ROLF") to review Tridia and Destiny's hospice operations and ensure that they were being run in a legally compliant manner. (Colleran 23; Bourne Ex. 11). Bourne had previously assured Colleran that everything in the hospice was fine, but Colleran wanted to verify. (Krystowski Dep. at 35-36). ROLF hired an auditor, Denise Harris, to visit each hospice office, interview staff, and audit records. (Bourne Dep. at 154-155; Colleran Dep. at 23). Once ROLF was involved, any potential compliance issues were to be sent to the attorneys for review and to determine if repayment was required. (Krystowski Dep. at 36, 75). Because Bourne largely ran the hospice companies, she was asked to assist with the ROLF audit. (Krystowski Dep. at 91-92).

On Thursday, June 21, 2012, during the course of its audit, ROLF found that face-to-face certifications were not being completed at Destiny, and the Director of Nursing, Tracy Helwig, had indicated on medical records that they were, which improperly moved patients forward in the billing process. (Bourne Dep at. 165, 166, 173). These were serious issues that Bourne and Goodwin had failed to identify previously. (Bourne Dep. at 166; Parker 50). Colleran directed that Tracy Helwig be terminated based on the findings of ROLF the day it was discovered, and Julie Hrybiniak, the General Manager for Cincinnati, was terminated a couple of weeks later because she knew that the face-to-faces were not being completed and did not report that information.

(Bourne Dep. at 173, 175, Ex. 13). ROLF identified a number of issues state-wide, not just the lack of face-to-face certifications at Destiny. (Krystowski Dep. at 51-52).

As soon as the face-to-face issue was discovered, Destiny stopped all admissions and all billing to ensure that no services were billed until the company could confirm they were in compliance. (Krystowski Dep at 52-55; 89). After stopping all billing and ensuring that no bills were being submitted without face-to face encounters, Tridia began reviewing past services to determine exactly how long Destiny had been billing without face-to-face encounters, and to determine if claims needed to be repaid. (Krystowksi Dep. at 52-55). Bourne was asked to help look for missing information and to assist with responding to Additional Development Requests ("ADRs") that the Centers for Medicare and Medicaid Services ("CMS") had issued to Destiny in August and September 2012, but she did not find any supporting records.

Bourne claims that she complained that the ROLF audit was not going far enough. However, Bourne admits that she did not identify any specific records, other than those already identified by the ROLF audit, that she believed were evidence of fraud. (Bourne Dep. At 396-397). She told Harris about her generic concerns about the scope of the review, and Harris took it to the attorneys to determine how to handle the issue. *Id.* Bourne did not know what happened as a result of her concerns. *Id.*

IV.    **The Hospice is Reorganized**

In July 2012, Colleran decided to get out of hospice operations and gave Dan Parker control of the hospice companies moving forward. (Bourne Dep. at 256, Ex. 22). Upon taking over, Dan Parker decided to restructure the hospices. (Parker Dep. at 53, 111-114). He disagreed with the de-centralized approach the company had previously operated under and thought it should have a centralized operations and compliance. (Parker Dep. at 98). Destiny was dissolved and did not

11

maintain its own license, and Tridia took over operations, implementing the centralized compliance model. (Parker Dep. at 98).

Parker, who was scrambling at the time to try and address the issues identified in the ROLF audit, made Sean Riley the Director of Operations for the new combined hospice company. (Parker Dep. at 53, 100; Bourne Dep. at 244, 261). Parker chose Riley to be the state-wide Director of Operations for Tridia. Riley had experience overseeing the operations for two much larger entities, Provider Services and Manor Care (ManorCare), which operated business in multiple locations across the state (and country). (Colleran 148). Riley advertised for a Director of Compliance, and while Goodwin applied for the position, Riley decided to hire Kelly Perry, who had national experience whereas Goodwin did not. (Bourne Dep. at 294; Parker Dep. at 58; Riley Dep. at 54; Colleran Dep at 150). Bourne admits that Perry was qualified for that job. (Bourne Dep. at 294-95).

Riley soon became concerned that company bonuses were not consistent. (Bourne Dep. at 272, Ex. 23; Colleran Dep. at 147-48, Ex. 126). On September 4, 2012, Riley halted all bonuses in Tridia at every branch company-wide, explaining "At this time due to lack of uniformity and cohesion, all current plans should be discontinued effective immediately." (Bourne Dep. at 280-281, Ex. 25). Parker agreed to the bonuses being halted because Tridia was in the process of repaying millions of dollars to the government related to the face-to-face issues. (Parker Dep. at 115). Notably, Parker cut Riley's salary from $210,000 to $150,000, and then later agreed to $180,000 (Riley Dep at. 112, Ex. 168; Parker Dec, ¶ 5).

In September 2012, Riley met with Bourne and informed her that her role moving forward would be as Executive Director/General Manager of Columbus and her salary was going to be reduced to $100,000. Riley also informed Bourne that she could decide what Goodwin's salary

would be going forward – up to $100,000. (Bourne Dep. at 264). From that time until Bourne resigned in March 2013, she was the highest paid person in the General Manager position in Tridia. (Drass Dep. at 129, Ex. 157). Furthermore, despite bonuses being halted company-wide, Riley and Bourne engaged in back and forth negotiations, and he agreed to pay both Bourne and Goodwin a one-time bonus of $12,500 on November 1, 2012. (Bourne Dep. at 291, Ex. 27).

Parker made the decision for Bourne to focus on Columbus. (Parker Dep. at 149). He did not think she was good leader statewide, and a number of employees had complained about her management style. (Parker Dep. at 152-154). Parker did think Bourne had done a good job in Columbus and decided to keep her as the executive director there. (Parker Dep. at 150).

## V.    Bourne and Goodwin File the *Qui Tam* Action

On or around December 7, 2012, Bourne and Goodwin filed their *qui tam* lawsuit. *See* Dkt. Entry 1. Bourne did not tell anyone at Provider Services or Tridia that she was preparing to file or had filed a *qui tam* action. (Bourne Dep. at 340). Defendants did not know that a *qui tam* lawsuit had been filed related to the hospices until the Department of Justice informed their attorneys at a meeting held in January, 2015.

## VI.    Bourne and Goodwin Voluntarily Resign

Bourne and Goodwin allege that the Human Resource director in Columbus, Chris Zeek, said that they were going to be fired. (Bourne Dep. at 312; Goodwin Dep. at 160). However, when Bourne asked both Kelly Drass (who had replaced Sean Riley as Director of Operations) and Parker—the only people who had the authority to terminate her from Tridia—if her job was in jeopardy, they assured her that her position was not being eliminated and that she would not be terminated. (Bourne Dep. at 313-315; Parker Dep. at 129, Ex. 136; Drass Dep. at 93-94).

In February 2013, Goodwin was contacted by Methodist ElderCare (n/k/a Wesley Hospice) about a job, and at some point, she received an offer to work there. (Goodwin Dep. at 13-15). On

March 21, 2013, Goodwin gave 30 days' notice to Tridia indicating that she was quitting. (Goodwin Dep. 161-162, Ex. 96). Goodwin still works at Wesley Hospice. (Goodwin Dep. at 11).

Bourne likewise pursued alternative employment. She took several medical leaves in the first quarter of 2013, and three days after returning from medical leave on March 28, 2013, she gave Tridia her notice of resignation with her last day at work being April 19. (Bourne Dep. at 320-321; Ex. 33). Bourne received a written offer of employment from National Church Residences on March 29, 2013—the day after she resigned. (Bourne Dep. at 315-317, 322, Ex. 34). The new position paid her $115,000, or $15,000 more than her salary at Tridia, and her scheduled start date was close in time to the date she identified as her last day in her resignation notice to Tridia. (Bourne Dep. at 323, Ex. 34).

### VII. Bourne's Employment at ViaQuest

In summer of 2015, more than two (2) years after quitting her job at Tridia and over a year after she agreed to leave her position at National Church Residences due to performance issues, Bourne applied to work for co-defendant ViaQuest Hospice and received an offer to start working there in July 2015. (Bourne Dep. at Ex. 42). ViaQuest was getting referrals from a facility owned by Atlas Healthcare, a chain of nursing homes owned by Bob Speelman, who formerly worked as a regional director for Colleran and had bought the nursing homes from Colleran. (Speelman Dep. at 21, 77). Speelman no longer had any role with any of the Defendants, and none of the Defendants retained any ownership or controlling interest in the Atlas nursing facilities. (Speelman Dep. at 21, 24; Colleran Dep. at 169, 175).

Speelman had been trying to reduce the number of vendor contracts at Atlas, such as hospice and home health companies, because he felt the number of different vendors operating in different buildings posed a compliance and quality control issue. (Speelman Dep. at 72-73; 77-79; 82). In reviewing the vendor contracts, he came across the ViaQuest contract and noted that he

14

had not approved ViaQuest as a hospice vendor. (Speelman Dep. at 77). Speelman looked up the company and found out Bourne worked there. (Speelman Dep. at 77). Speelman remembered Bourne from his time at Provider Services and that she had acted entitled to the business instead of putting the residents first. (Speelman Dep. at 47-49, 83, 94-95). He also remembered feeling and nursing-home administrators complaining that Bourne and Goodwin were defensive and not nice. (Speelman Dep. at 62, Exs. 143, 144). Speelman had added Bourne to his personal "do not do business with list," which he kept handwritten for years (Speelman Dep. at 47-49, 83, 94-95). The do not do business with list included all sorts of people Speelman did not want to do business with, including his own brother and the current President of Tridia (Speelman Dep. at 101-102).

Speelman investigated why ViaQuest, an unapproved vendor, was servicing his nursing facilities and found out that ViaQuest had taken Atlas staff out for food and drinks. (Speelman Dep. at 78, 84). Speelman was furious; he was upset that outside vendors entertaining staff and that a company that was not approved was getting numerous referrals. (Speelman Dep. at 110, 113). Speelman looked up and called Rich Johnson, the President of ViaQuest, and told him that Atlas had preferred contracts, ViaQuest was not an approved vendor, and he did not want Bourne in the Atlas buildings (Speelman Dep. at 83, 90, 91, 115). Speelman did not give Johnson any reason, except maybe to say the "she's entitled as hell". (Speelman Dep. at 90-91; Johnson Dep. at 51).

Speelman did not talk to anyone about Bourne before he called Johnson. (Speelman Dep. at 83). He testified that neither Colleran, Parker, nor anyone associated with the Defendants told him not to do business with Bourne and/or ViaQuest. *Id.* Speelman does not recall mentioning Provider Services or Colleran to Johnson, and if he did, it would have only been to explain that his Atlas facilities were no longer associated with Provider Services. (Speelman Dep. at 89, 109).

Speelman did not tell Johnson he should fire Bourne and did not tell Johnson ViaQuest could get Atlas' business if he did so. (Speelman 90-92). It was not unusual for Johnson to get a call from a provider that said they were not going to do business if a certain person works there. (Johnson Dep. at 57-58). Often this occurred when people did not think and individual met their required levels of service. *Id.* Johnson did not call Colleran. (Johnson Dep. at 60). Until this lawsuit, Speelman did not know if Bourne continued to work for Via Quest after his call or not. (Speelman Dep. at 92).

**LAW AND ARGUMENT**

## I.     Summary Judgment Standard

On a motion for summary judgment, the moving party has the burden of showing that there are no genuine issues of material fact, and that the evidence, together with all inferences that can permissibly be drawn therefrom, does not support the plaintiff's claims, and that judgment is appropriate as a matter of law. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87 (1986). The moving party may support a motion for summary judgment with affidavits or other proof, or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings, but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 257 (1986). The nonmoving party "must set forth specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Only "genuine" disputes over "material" facts can preclude entry of summary judgment, as distinguished from disputes over irrelevant or unnecessary facts. *Anderson* at 247-48. Further, even as to material facts, a dispute is "genuine" only where a reasonable jury could return a verdict for the non-moving party. *Id.* at 248.

16

## II.     Plaintiffs Cannot Establish an FCA Retaliation Claim Against Defendants.

Plaintiffs have taken a kitchen-sink approach to their FCA retaliation claims, presenting a motley assemblance of grievances in the hope that something will stick. However, now that the dust has settled and discovery is complete, it is clear that despite their various allegations, Plaintiffs cannot establish the one thing that matters for purposes of an FCA retaliation claim: a causal connection between an instance of protected FCA activity and an adverse employment action taken against them by Defendants. Indeed, the only alleged protected activity of which Defendants had any knowledge was activity that Defendants specifically directed Plaintiffs to undertake. Putting aside the absurdity of the notion that Defendants would retaliate against Plaintiffs for doing precisely what Defendants directed them to do, Plaintiffs cannot present any direct or circumstantial evidence to demonstrate that Defendants took any adverse employment action against them as a result of any protected activity. Taking into account all the undisputed facts in this case, Plaintiffs simply cannot establish an FCA retaliation claim against Defendants as a matter of law.

Plaintiffs make two FCA retaliation claims under 31 U.S.C §3730(h). That section provides:

> Any employee…shall be entitled to all relief necessary to make that employee…whole, if that employee…is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee…in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

*Id.* In order to state a claim for retaliation under Section 3730(h), Plaintiffs must establish four elements:

(1) That they engaged in protected activity under the FCA;

(2) That Defendants had knowledge of their protected activity;

(3) That Defendants took an adverse employment action against them; and

(4) That there was a causal connection between the protected activity and the adverse employment action.

*Scott v. Metropolitan Health Corp.*, 234 Fed. Appx. 341, 346 (6th Cir. 2007).

"Retaliatory discharge claims under the FCA proceed under the same rules applicable to other employment-related retaliation claims." *Jones-McNamara v. Holzer Health Systems*, 630 Fed. Appx. 394, 397–98 (6th Cir. 2015). "The plaintiff may establish a case of retaliation by presenting either direct or circumstantial evidence of a retaliatory motive." *Id.* at 398. "Direct evidence is 'evidence, which if believed, does not require an inference that unlawful retaliation motivated an employer's action.'" *Id.*, quoting *Spengler v. Worthington Cylinders*, 615 F.3d 481, 491 (6th Cir. 2010). "Instead, direct evidence '*requires the conclusion* that unlawful retaliation was a motivating factor in the employer's action.'" *Spengler* at 491, quoting *Abbott v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2003) (emphasis added). For example, a facially discriminatory employment policy or a corporate decision maker's express statement of a desire to remove employees because they engaged in protected activity is direct evidence of discriminatory intent. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). On the other hand, isolated and ambiguous comments are insufficient to support a finding of direct discrimination, and comments made by individuals who are not involved in the decision-making process regarding the plaintiff's employment do not constitute direct evidence of discrimination. *White v. Columbus Metropolitan Hous. Auth.*, 429 F.3d 232, 239 (6th Cir. 2005); *Carter v. Univ. of Toledo*, 349 F.3d 269, 273 (6th Cir. 2003).

Where a plaintiff proceeds with circumstantial evidence of retaliation, the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 (1973) applies. *Jones-McNamara* at 398. Under the *McDonnell–Douglas* test, the plaintiff bears the initial burden

18

to demonstrate a prima facie case of retaliation. *Id.*, citing *Fuhr v. Hazel Park Sch. Dist.,* 710 F.3d 668, 674 (6th Cir. 2013). Once the plaintiff establishes this prima facie case, the defendant bears the burden of producing a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* At that point, the burden again shifts to the plaintiff to demonstrate that the defendant's proffered reason represents a mere pretext for unlawful discrimination. *Id.*

Considering the undisputed facts, Plaintiffs cannot establish the elements of an FCA retaliation claim against Defendants by either direct evidence or circumstantial evidence. Furthermore, even if they could present evidence to establish the elements of an FCA retaliation claim, Defendants had legitimate, non-discriminatory reasons for any allegedly adverse employment actions they took against Plaintiffs, and Plaintiffs cannot present any evidence to demonstrate that those reasons are pretextual. As explained below, Defendants are entitled to summary judgment as a matter of law.

### A. Plaintiffs Cannot Establish a Prima Facie Case of FCA Retaliation.

#### 1. Generic Complaints About Unspecified Compliance Issues Do Not Constitute Protected Activity.

Based upon the allegations in the Amended Complaint and information obtained in discovery, it appears that Plaintiffs allege they engaged protected activity in four ways:

(1) Plaintiffs filed a *qui tam* lawsuit;

(2) Plaintiffs identified crisis care and other issues at the newly purchased Destiny Hospice in 2011;

(3) Bourne assisted with the ROLF Audit; and

(4) Plaintiffs generically complained that the ROLF Audit was not going far enough and that there were additional unspecified compliance issues that the ROLF Audit had not identified.

For purposes of this summary judgment motion, Defendants do not dispute that Plaintiffs' filing of their *qui tam* lawsuit was protected activity (though Defendants dispute the merits of that

19

lawsuit). Nor do Defendants dispute that Plaintiffs engaged in protected activity when they identified compliance issues at Destiny in 2011 or when Bourne assisted with the ROLF Audit. Indeed, Plaintiffs _were expected_ to look for compliance issues and to help stop potential false claims _as part of their jobs_. Defendants do, however, dispute that Plaintiffs' alleged generic complaints about the ROLF Audit and about other unspecified compliance issues constituted protected activity.

The FCA requires that, for a retaliation plaintiff to be considered to have engaged in protected activity, her actions must have been "in furtherance of" a _qui tam_ action or "other efforts to stop" false claims. 31 U.S.C. § 3730(h). Internal complaints regarding compliance issues can constitute protected activity _only if_ they establish a "nexus" to the FCA. _McKenzie v. BellSouth Telecomm., Inc.,_ 219 F.3d 508, 517 (6th Cir. 2000).[1] "Although internal reporting may constitute protected activity, _the internal reports must allege fraud on the government_." _Id._ at 516. Protected activity does not extend to "an employee's investigation of nothing more than his employer's non-compliance with federal or state regulations." _United States ex rel. Brown v. Aramark Corp._, 591 F.Supp.2d 68, 77 (D.D.C. 2008), quoting _United States ex rel. Yesudian v. Howard Univ._, 153 F.3d 731, 740 (D.C. Cir. 1998)). "Merely grumbling to the employer about job dissatisfaction or regulatory violations…does not constitute protected activity." _McKenzie_ at 518.

Plaintiffs claim they repeatedly complained that there were "more" issues than what the ROLF Audit had found and that the ROLF Audits were not going far enough. However, the undisputed facts now reveal that Plaintiffs _did not actually identify any additional violations that were not already identified by the ROLF Audit_. Kuhn Decl. ¶ 9, Ex. D. Any complaints they made

---

[1] _See also Jones-McNamara_, 630 Fed. Appx. at 399, clarifying that under the 2009 amendments to 31 U.S.C. § 3730(h), a plaintiff does not necessarily need to show that internal reports were in furtherance of an FCA action; rather, it is sufficient to show that internal reports were in furtherance of efforts to stop FCA violations.

(if they made them at all) were completely vague: Plaintiffs could not give the 'who,' 'what,' 'when,' or 'where' to identify any alleged issues with any specificity or to connect them to any potential FCA violation. Bourne Dep. 396-39.7 Bourne acknowledges that she never specifically identified _any_ additional violations; indeed, when specifically asked about it at the time, she was unable to identify a single specific compliance issue that she reported that was different from what was reported by the ROLF Auditors. Kuhn Decl. ¶ 9, Ex. D, pp. 5-6. Simply put, Plaintiffs' alleged internal complaints regarding the scope of the ROLF Audit never actually alleged any fraud on the government, which is _required_ in order to constitute protected activity. *McKenzie* at 516. Plaintiffs' vague complaints about the ROLF Audit, absent any specific allegations, are insufficient to rise to the level of protected activity under the FCA. *See Brown*, 591 F.Supp.2d at 77.

Plaintiffs also imply that they engaged in protected activity by refraining from falsifying records to support claims for payment that were already under review by Medicare Additional Development Requests ("ADRs"). (Bourne Dep. at 381). However, Plaintiffs acknowledge that no one ever told them to falsify a record. *Id.* The mere fact that Plaintiffs did not falsify records that they were not asked to falsify is not protected activity because it does not demonstrate any intent to pursue or assist in an FCA action or any effort to "stop" FCA violations. If they were not asked to falsify documents, then there was nothing to "stop." If simply complying with the law in performance of one's job were sufficient to constitute protected activity under the FCA, then every law-abiding employee in the country could satisfy this element of an FCA retaliation claim, effectively rendering it meaningless.

     **2.**   **The Only Alleged Protected Activity of Which Defendants Had Knowledge Was Activity that Defendants Specifically Directed Plaintiffs to Undertake.**

The second element that Plaintiffs must establish is that Defendants had knowledge of Plaintiffs' alleged protected activity. *See, e.g., Miller v. Abbott Labs.*, 648 Fed.Appx. 555, 558-59 (6th Cir. 2016). Accordingly, for each of the four (4) alleged courses of protected activity that Plaintiffs allege, they must also demonstrate that Defendants had knowledge of that protected activity at the time Defendants took an adverse employment action against Plaintiffs.

It is undisputed that Defendants had no knowledge that Plaintiffs had filed or were in any way involved in a *qui tam* complaint until years after Plaintiffs' reassignment, reduction in pay, and voluntary resignation. Plaintiffs did not tell *anyone* that they were investigating, preparing, and filing their *qui tam* lawsuit, and Defendants did not know Plaintiffs were relators until years after Plaintiffs voluntarily quit their jobs. (Bourne Dep. at 340). Accordingly, Plaintiffs' filing of the *qui tam* lawsuit cannot serve as the basis of Plaintiffs' retaliation claims against Defendants.

Plaintiffs' alleged generic complaints regarding the ROLF Audit were also insufficient to put Defendants on notice of any protected activity because they did not identify any additional instances of potential fraud (indeed, such vague complaints were insufficient to constitute protected activity at all). Therefore, the only alleged protected activity of which Defendants had any knowledge was activity that Defendants specifically directed Plaintiffs to undertake: the identification of potential compliance issues at Destiny Hospice in 2011, and Bourne's assistance with the ROLF Audit.

     **3.**   **The Only Potentially Adverse Employment Action Taken by Defendants Against Plaintiffs Was Their Reassignment and Reduction in Pay in Connection with the Restructuring and Sale of Tridia.**

Plaintiffs generally allege three adverse employment actions:

(1) Their reassignment and reduction in pay in connection with the restructuring and sale of Tridia;

(2) Their alleged "constructive discharge;" and

(3) The alleged actions of ViaQuest, Atlas, and Bob Speelman that led to Bourne's discharge by ViaQuest.

Based upon the undisputed facts, Plaintiffs cannot maintain a constructive discharge claim against Defendants as a matter of law. Furthermore, there is absolutely no evidence to justify imputing the alleged actions of ViaQuest, Atlas, and Bob Speelman to Defendants. Accordingly, the only potentially adverse employment action taken by Defendants against Plaintiffs was their reassignment and reduction in pay in connection with the restructuring and sale of Tridia, which, as explained below, Plaintiffs cannot show had anything to do with any alleged protected activity.

### a. Defendants were not constructively discharged—they quit after finding alternative employment.

Plaintiffs claim that when they submitted their voluntary resignations at the end of March 2013, they were actually constructively discharged because a lower-level employee told them they would be fired in January 2013 and because they were concerned that Defendants' alleged ongoing misconduct might endanger their licenses. However, the evidence shows that Plaintiffs were repeatedly reassured by the only two people with the power to terminate them, Kelly Drass and Dan Parker, that they would not be terminated. (Bourne Dep. at 313-315; Parker Dep. at 129; Drass Dep. at 93-94). Furthermore, Plaintiffs have not identified any conduct by Defendants that might have endangered their licenses. Most tellingly, Plaintiffs stayed in their jobs until they found alternative, better paying employment. (Goodwin Dep. at 173-174; Bourne Dep. at 315-317). Simply put, the contention that their resignations constituted constructive discharge is completely without merit.

23

Constructive discharge occurs only when "the employer permitted conditions so unpleasant or difficult that a reasonable person would have felt compelled to resign," or when "working conditions [became] so intolerable that the employee [had] no other choice but to quit." *DiFiore v. CSL Behring, LLC*, 879 F.3d 71, 78-79 (3d. Cir. 2018), citing *Wiest v. Tyco Electronics Corp.*, 812 F.3d 319, 331 (3d. Cir. 2016); *U.S. ex rel. Coffman v. City of Leavenworth, Kansas*, 303 F. Supp. 3d 1101, 1128 (D. Kan. 2018), *aff'd*, 770 F. App'x 417 (10th Cir. 2019); *see also Bourne v. Provider Services Holdings, LLC*, S.D. Ohio No. 1:12-CV-935, 2019 WL 2010596, *6 ("Constructive discharge exists when working conditions are so 'unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'"), quoting *Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir. 1982). This standard uses an objective reasonable person standard to determine whether the working conditions were unbearable or intolerable. *Id*. The threshold for that objective standard is high, requiring a plaintiff to show that there was "no other choice but to quit." *Id*. ("If an employee resigns of her own free will, even as a result of the employer's actions, that employee will not be held to have been constructively discharged.") (internal quotations and citations omitted). An employee cannot show that she had no option left but to resign when she fails to sufficiently explore alternative solutions or means of improving the situation or if she prematurely abandoned attempts to do so. *DiFiore*, 879 F.3d at 78-79.

"The fact that an employee remains on the job or on leave with his employer while looking for alternate employment negates any claim that the employment situation was so intolerable as to constitute a constructive discharge." *O'Donnell v. Univ. Hosps. Health Sys.*, No. 1:16 CV 2480, 2018 WL 1627436 at *11 (N.D. Ohio, Apr. 4, 2018), citing *Guyton v. Novo Nordisk, Inc.*, 151 F.Supp.3d 1057, 1090–1091 (C.D.Cal. 2015) (granting summary judgment in favor of employer on plaintiff's constructive discharge claim is appropriate where employee, who was on leave after

24

complaining of discrimination by employer, did not resign until he secured new employment demonstrating that employment was not so intolerable as to amount to constructive discharge); *Regis v. Metropolitan Jewish Geriatric Center*, 2000 WL 264336 at \*12 (E.D. N.Y. January 11, 2000); and *Wagner v. Sanders Assoc. Inc.*, 638 F.Supp. 742, 745–46 (CD. Cal. 1993). Moreover, the fact that an employee who claims constructive discharge gives her employer several weeks' notice before resigning "strongly suggest that the conditions to which she allegedly was subjected were not intolerable." *Henderson v. Leroy Hill Coffee Co.*, No. Civ.A. 99–1067CBS, 2001 WL 103147, \*10 (S.D. Ala., Jan. 30, 2001), citing *Johnson v. Wal–Mart Stores, Inc.,* 987 F.Supp. 1376, 1394 (M.D. Ala.1997); *see also Shelar v. Ameripride Servs. Inc.,* No. 03–4205–SAC, 2006 WL 1877010, at \*9 (D.Kan., July 6, 2006); *Dabney v. Kershaw Cty.*, No. 3:11–666–JFA–PJG, 2013 WL 1206284, \*5 (D.S.C., Jan. 15, 2013), *report and recommendation adopted*, 2013 WL 1206203 (D.S.C., Mar. 25, 2013); *Silberman v. Atlantic Dialysis Mgt. Services, LLC*, No. 17cv7019, 2018 WL 4335510, \*4 (S.D.N.Y., Sept. 11, 2018)

Neither of the Plaintiffs can establish that she was constructively discharged by Tridia. Both Plaintiffs voluntarily resigned their positions with Tridia. Goodwin submitted her resignation on March 23, 2013 and provided a thirty-day notice. (Goodwin Dep. Ex. 96). At the time she submitted her notice, Goodwin already had secured a new position with Methodist ElderCare (nka Wesley Hospice) at an annual salary of $130,000. (Goodwin Dep. at 173-74). Similarly, Bourne submitted her resignation, also with several weeks' notice, on March 28, 2018. (Bourne Dep. Ex. 33). Although she claims she had not been looking for work at the time, Bourne conveniently received a job offer from National Church Residences that day that had an anticipated start date that corresponded with Bourne's anticipated last day (Bourne Dep. Ex. 33, 34). In the end, Tridia

opted to accept both Plaintiffs' resignation and told them that the extended notice was not necessary (Drass Dep. at 100).

The undisputed facts in this case belie any allegation of constructive discharge. After their positions were changed as part of Tridia's restructuring in September 2012, both Plaintiffs remained employed earning six-figure salaries. _Notably, both Plaintiffs continued working at Tridia until they secured alternative employment, and both provided several weeks' notice upon resigning._ In line with the extensive case law cited above, the fact that Plaintiffs waited to resign until they secured new jobs and then provided lengthy notice periods during which they would continue working at Tridia demonstrates that their employment situation was not intolerable. There is simply no evidence of any issues during their employment that were so intolerable as to rise to the level of constructive discharge. Based upon these undisputed facts, Plaintiffs cannot sustain a constructive discharge claim as a matter of law.

### b. Any actions taken by ViaQuest, Atlas, or Bob Speelman cannot be imputed to Defendants.

Bourne has also included the allegation that her termination from ViaQuest was the result of unlawful retaliation against her by Defendants. Now that discovery is complete, it is clear that there is no evidence whatsoever to substantiate Bourne's claim that Defendants had any involvement in the decisions and actions of ViaQuest, Atlas, or Bob Speelman. Bourne's claim that one or more of the remaining Defendants somehow convinced Speelman to take retaliatory action against Bourne is demonstrably false, and Bourne cannot present any admissible evidence to support it. The undisputed facts demonstrate that:

- The _only_ nursing facilities that told ViaQuest they refused to do business with Bourne were the Atlas nursing facilities—not any nursing facilities or entities owned or operated by any of the Defendants (Johnson Dep. at 56-58, 60);

- None of the Defendants had any ownership or controlling interest in the Atlas nursing facilities at the time (Colleran Dep. at 169, 175);

26

- The refusal to do business with Bourne while she was at ViaQuest came solely from Bob Speelman, who owned the Atlas nursing facilities (Colleran 169, 175; Speelman 21, 24);

- Though Bob Speelman had previously worked for some of the Defendants, he no longer had any role with any of the Defendants at this time, *Id.*; and

- Bob Speelman testified that neither Colleran, Parker, nor anyone associated with the Defendants told him not to do business with Bourne and/or ViaQuest; rather, that refusal came solely from Speelman (Speelman Dep. at 83).

Bourne cannot present any evidence to dispute these facts (except perhaps her own double- and triple-hearsay, which does not constitute competent, admissible evidence for purposes of a summary judgment motion). *See Alpert v. United States,* 481 F.3d 404, 409 (6th Cir. 2007) ("'[E]vidence submitted in opposition to a motion for summary judgment must be admissible. Hearsay evidence ... must be disregarded.'"). Given the undisputed facts, Bourne's claim that Defendants were somehow involved in her termination from ViaQuest is entirely unsubstantiated and therefore cannot survive summary judgment.

### 4. Plaintiffs Cannot Present Evidence to Establish Causation.

Perhaps the most palpable defect of Plaintiffs' retaliation claims is their inability to establish the fourth element—a causal relationship between some instance of protected activity and some adverse employment action. The causation element requires Plaintiffs to establish that their alleged protected activity was the "but for" cause of an adverse employment action. *See, e.g.*, *Smith v. LHC Group, Inc.*, 727 Fed.Appx. 100, 109-10 (6th Cir. 2018) (Bush, J., concurring) (noting that, "The Supreme Court has interpreted identical language, in the context of the ADEA and Title VII, to require a showing of 'but for' causation."), citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009) and *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013). Put another way, a retaliation plaintiff under the FCA must show that the alleged retaliatory action was motivated _solely_ by the protected activity. *See, e.g.*, *United States ex rel. Strubbe v. Crawford*

*County Mem'l Hosp.*, 915 F.3d 1158, 1167 (8th Cir. 2019), *quoting Schuhardt v. Washington Univ.*, 390 F.3d 563, 566 (8th Cir. 2004); *see also DiFiore*, 879 F.3d at 78 (holding that "retaliation claims under the FCA require proof of 'but-for' causation"). Notably, the Sixth Circuit has previously found that a plaintiff's prior protected activity was not a but-for cause of her reassignment where the record demonstrated that the reassignment was part of a station-wide reorganization. *Johnson v. Donahoe*, 642 F. App'x 599, 605 (6th Cir. 2016).

As explained above, the only alleged protected activity of which Defendants had any knowledge was activity that Defendants specifically directed Plaintiffs to undertake: the identification of potential compliance issues at Destiny Hospice in 2011, and Bourne's assistance with the ROLF Audit. Now that discovery is complete, it is apparent that Plaintiffs cannot present any evidence, direct or indirect, sufficient to link any adverse employment action to either of those instances of alleged protected activity. The only evidence Plaintiffs can muster is loose temporal proximity, which this Court and others have held to be insufficient to establish causation.

### a. There is no direct evidence of retaliation.

As a preliminary matter, Plaintiffs have no direct evidence that any of the complained-of actions against them were taken in retaliation for protected activity under the FCA. Nobody has ever told Plaintiffs that their positions were changed or that their salaries were reduced because of any alleged protected activity. Rather, it is undisputed that Tridia was restructured, and that was explained to Plaintiffs (Kuhn Decl. ¶ Ex. A p. 7). Similarly, Plaintiffs admit that nobody ever told them that they were going to be discharged because they engaged in protected activity. (Bourne Dep. at 313-315; Drass Dep. at 93-94; Parker Dep. at 129). In other words, Plaintiffs cannot point to any smoking gun which, if believed, would "require the conclusion that unlawful retaliation was a motivating factor" without any need for inference. *Spengler*, 615 F.3d at 491. The only evidence

of causation (if any) that Plaintiffs can present is circumstantial, and therefore the *McDonnell-Douglas* test applies.

> ### b. The only circumstantial evidence of retaliation Plaintiffs can present is loose temporal proximity, which on its own is insufficient to establish a prima facie case of retaliation.

It is expected that in the absence of any material evidence of retaliation, Plaintiffs will argue that retaliatory intent should be inferred because their reassignment and salary reduction came after their involvement in protected activity. We expect they will argue that this "temporal proximity" is evidence of retaliation. However, it is well-established that "temporal proximity, standing alone, is insufficient to establish a causal connection for a retaliation claim." *See, e.g., Tuttle v. Metropolitan Gov't of Nashville*, 474 F.3d 307, 321 (6th Cir. 2007) citing *Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 363-64 (6th Cir. 2001); *Nguyen v. City of Cleveland*, 229 F.3d 559, 566 (6th Cir. 2000).

The cases in which temporal proximity alone can establish the causation element are limited to those in which the time between the protected activity and the alleged retaliatory conduct is "very close." *Bruno v. RBS Citizens, NA*, No. 1:16-CV-245, 2017 WL 2336008 at *9–10 (S.D.Ohio, May 30, 2017), *appeal dismissed*, 2017 WL 6506363 (6th Cir., Sept. 6, 2017), citing *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) (employee was fired on the same day the boss found out about the protected conduct). The Sixth Circuit explained in *Mickey* that the issue is whether enough time has passed between the employer's knowledge of the protected activity and the adverse employment action to allow the employee to produce other evidence of retaliatory conduct:

> Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation. But where some time elapses between when the employer learns of a protected activity and the subsequent adverse

employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality. *See Little,* 265 F.3d at 365 ("[T]emporal proximity, when considered with the other evidence of retaliatory conduct, is sufficient to create a genuine issue of material fact as to" a causal connection.).

The reason for this distinction is simple: if an employer immediately retaliates against an employee upon learning of his protected activity, the employee would be unable to couple temporal proximity with any such other evidence of retaliation because the two actions happened consecutively, and little other than the protected activity could motivate the retaliation. Thus, employers who retaliate swiftly and immediately upon learning of protected activity would ironically have a stronger defense than those who delay in taking adverse retaliatory action.

*Mickey* at 525. Notably, this Court held in *Bruno* that a period of three (3) months between the

protected activity and subsequent adverse employment action is too long to infer a causal

connection based upon temporal proximity alone. *Bruno* at *10, citing *Basch v. Knoll, Inc.*, 619

Fed.Appx. 457, 461 (6th Cir. 2015).

Here, the only adverse employment action *by Defendants* that Plaintiffs identify is

Defendants' decision to reassign them and reduce their bonuses and salaries effective November

1, 2012 (given that it serves as the basis for their constructive discharge claim and given that

Defendants had nothing to do with ViaQuest's termination of Bourne, as explained above).

Plaintiffs rely exclusively upon temporal proximity in their attempt to establish a causal connection

between this alleged adverse employment action and their alleged protected activity. However,

this is insufficient because 1) the actions were not close enough in time to create an inference of

temporal proximity, and 2) because there is no other evidence of retaliation. Plaintiffs claim that

they first started reporting compliance irregularities relating to the operations at Destiny in

Cincinnati in 2011. There was no immediate—or even arguably proximate—adverse action after

this alleged protected conduct. Plaintiffs remained in their positions and specifically remained in

charge of compliance. (Bourne Dep. at 103, 128, 142-143 Goodwin Dep. at 90, 103). Plaintiffs

also received raises in July 2011 bringing their salaries to $130,000 per year and received bonuses

of over $45,000 in July 2011 and nearly $60,000 in March/April 2012. (Bourne Dep. at 142-143, Goodwin Dep. at 90, 103). It was nearly *one year later* that Tridia was restructured and Plaintiffs were reassigned to regional, albeit still highly compensated, positions. (Bourne Dep. at 291). Based upon the case law cited above, such a long period of time cannot support a claim for causation based upon temporal proximity alone.

Similarly, Plaintiffs were involved in the ROLF Audit in June of 2012. On this point, it is again important to note that Plaintiffs' involvement in these audits was specifically directed by Defendants. (Bourne Dep. at 159-59). The audits uncovered unlawful activities, but Bourne admits that she did not independently discover or identify any additional issues. (Kuhn Decl. ¶ 9, Ex. C). Approximately *four months* later, in September 2012, Plaintiffs were reassigned. (Bourne Dep. at 291). Again, based upon the case law cited above, the alleged retaliatory conduct does not follow closely enough in time to support an inference of retaliation. It is also telling that the employees who were involved in committing potential fraud (Tracy Helwig) or were aware of potential fraud and failed to report it (Julie Hrybiniak) were terminated, whereas Plaintiffs were not. (Bourne Dep. at 173, 175). Given the undisputed fact that it was the ROLF Auditor—not Plaintiffs—who discovered and reported the potential fraud, and that the decision to reassign Plaintiffs and reduce their pay was not made consecutively with any alleged protected activity, Plaintiffs cannot present sufficient evidence to establish the requisite causation element.

### c. *Even if the alleged actions of ViaQuest, Atlas, or Bob Speelman could be imputed to Defendants, there is no evidence connecting those alleged actions to a retaliatory motive.*

Even if for some reason the actions of ViaQuest, Atlas, or Bob Speelman could be imputed to Defendants, there is no evidence that Speelman's opinions of Bourne were in any way related to her allegedly protected activity. Indeed, the evidence demonstrates quite the opposite to be true: Speelman testified that he had no knowledge whatsoever that Bourne had engaged in any protected

31

activity. (Speelman Dep. at 85-86). He also testified that neither Colleran, Parker, nor anyone associated with Defendants told him not to do business with Bourne and/or ViaQuest. Rather, his refusal to do business with Bourne stemmed solely from his own concerns that he developed during the time he worked with her. (Speelman Dep. at 47-49, 83, 94-95) Given the complete lack of evidence that Speelman's refusal to do business with Bourne had anything to do with her protected activity or that Defendants had anything to do with his refusal, Bourne cannot establish any "but-for" causal connection between her discharge from ViaQuest and any of the protected activity she alleges.

### B. Defendants Had Legitimate, Non-Retaliatory Reasons for Reassigning Plaintiffs and Reducing Their Pay, and Plaintiffs Cannot Present Any Evidence to Demonstrate That Those Reasons Are Pretextual.

Even if Plaintiffs were able to establish a prima facie case of FCA retaliation, Defendants can easily meet their burden to produce legitimate, non-retaliatory reasons for Plaintiffs' reassignment and reduction in pay. An employer's burden of articulating a legitimate, non-retaliatory reason is not heavy—it is merely a burden of production, and not a burden of proof. *See St. Mary's Honor Center v. Hicks,* 509 U.S.502, 506-08 (1993) (explaining that, in discrimination cases, the burden of proof remains with the plaintiff at all times; the plaintiff's prima facie proof of unlawful discrimination shifts the burden of production to the defense to offer a legitimate reason for the adverse action taken against the plaintiff, and that production requires the plaintiff to resume the burden of proof that the defendant's proffered nondiscriminatory rationale was merely pretextual). Notably, the Sixth Circuit has repeatedly found instances of company-wide restructuring to constitute legitimate, non-retaliatory reasons sufficient to satisfy defendants' burden of production. *See, e.g., Mann v. Navicor Grp., LLC*, 488 Fed. App'x 994, 999 (6th Cir. 2012) (finding that plaintiff's termination was not a pretext for gender discrimination where termination was part of departmental restructuring); *Hollowell v. Michigan Consol. Gas Co.*, 18

Fed. App'x 332, 340 (6th Cir. 2001) ("While we are cognizant that the combination of multiple assessment programs, company-wide reclassifications, and formal evaluations could easily function as a subterfuge for discrimination by an employer, an aggrieved employee must come forward with more than a mere assertion that his employer acted with discriminatory motive."); *Madry v. Gibraltar Nat'l Corp.,* 526 Fed. Appx. 593, 597 (6th Cir. 2013) ("We have previously found that the restructuring of a business was a legitimate, nondiscriminatory reason for terminating an employee who had incidentally taken FMLA leave."), citing *Skrjanc v. Great Lakes Power Serv. Co.,* 272 F.3d 309, 315 (6th Cir.2001); *Roll v. Bowling Green Metalforming, LLC,* 457 Fed. Appx. 458, 461–62 (6th Cir.2012) (holding in FMLA that decision to terminate employee as part of a companywide reduction-in-force was not pretextual under the FMLA).

Here, Defendants have articulated numerous legitimate business reasons as to why Plaintiffs were reassigned and their pay was reduced:

- Tridia and Destiny were taken over by Dan Parker, who sought to centralize and coordinate all of the hospice programs under a single person (Parker Dep. at 53, 111-114);

- When Parker took over, the company stopped all billing and admissions in order to ensure that it was in compliance moving forward and was in the process of identifying and repaying millions of dollars to the federal government in connection with the ROLF Audit (Colleran Dep. at 120-21; Krystowski Dep. at 52-55);

- Bourne and Goodwin had played a role in establishing the policies and procedures at the branches and, when they were in the Cincinnati branch in 2011, they failed to identify the critical face-to-face (F2F) issues that the ROLF Audit later identified (Bourne Dep. at 166);

- Parker had previously been disappointed in Bourne's attempts to manage the hospice company outside of Columbus due to personality conflicts with managers and staff at other offices and nursing homes (Parker Dep. at 50-52, 70, 150, 153);

- Parker chose Sean Riley to be the state-wide Director of Operations for Tridia, who had experience overseeing the operations of a much larger entity with multiple locations across the state—a skill with which Bourne had struggled (Colleran Dep. at148);

33

- Riley advertised for a Director of Compliance, and while Goodwin applied for the position, Riley decided to hire Kelly Perry, who had national experience whereas Goodwin did not (Bourne Dep. at 294-95);

- *All bonuses* across the company were stopped, effective September 7, 2012, because there was no consistency across the organization and because the hospice was incurring massive losses (Parker Dep. at 115); and

- Also because of the massive losses being incurred by Tridia at the time, Plaintiffs' salaries were reduced to align with the market and their positions in the company, although they still were the highest paid people in the company in their respective positions (Drass Dep. at 129).

All of these reasons, which clearly reveal a struggling company that was taken over by a new owner and substantially restructured, are legitimate, non-retaliatory reasons for Plaintiffs' reassignment and reduction in pay, and Plaintiffs cannot present any evidence to prove that these reasons are pretextual.

> **C. Even If the Alleged Actions of ViaQuest, Atlas, or Bob Speelman Could Be Imputed to Defendants, Those Actions Were Taken for Legitimate, Non-Retaliatory Reasons, and Bourne Cannot Present Any Evidence to Demonstrate That Those Reasons Are Pretextual.**

Though Bob Speelman's actions on behalf of Atlas cannot possibly be imputed to Defendants, as explained above, he too has articulated legitimate, non-retaliatory reasons for his refusal to do business with Bourne while she was at ViaQuest. Speelman testified that he was trying to reduce the number of companies with which Atlas was doing business, and that when he was reviewing Atlas's contractors, he saw ViaQuest Hospice (Speelman Dep. at 72-72; 77-79). Speelman discovered that Bourne worked at ViaQuest (Speelman Dep. at 77). When Speelman previously worked for Provider Services, he observed that Bourne (who as at Tridia at the time) approached nursing home staff as if she was entitled to hospice referrals from their facilities (Speelman Dep. at 47-49, 94-95). Speelman was turned off by this attitude because he believed that even if the nursing-home and hospice companies were related, Tridia Hospice should still work hard to earn referrals. Bourne's entitled attitude had so seriously bothered Speelman that he

placed her on a personal "do not do business with" list that he maintained (Speelman Dep. at 101-102). Bourne was not alone on Speelman's list; it included a number of others including Speelman's own brother and the current head of Tridia. *Id.*

Given his recollection of Bourne's entitled approach to referrals, Speelman contacted ViaQuest's owner, Richard Johnson, and told him that he did not want Bourne in any of Atlas's buildings (Speelman Dep. at 83). Speelman did not direct Johnson to fire Bourne, and he never suggested that he do so (Speelman Dep. at 90-92). Bourne cannot present any evidence that Speelman even was aware of her allegedly protected conduct, let alone that he was motivated by that conduct. Accordingly, even if Speelman's actions could be imputed to Defendants, Bourne cannot show that any of Speelman's legitimate, non-retaliatory reasons for refusing to do business with her were pretextual.

## CONCLUSION

For the foregoing reasons, no genuine issues of material fact remain, and Defendants are entitled to judgment as a matter of law on Plaintiffs' remaining retaliation claims against them.

Respectfully submitted,

*/s/ Christopher G. Kuhn*
Aric D. Martin (0065765)
Christopher G. Kuhn (0082822)
**Rolf Goffman Martin Lang LLP**
30100 Chagrin Blvd., Ste. 350
Cleveland, OH 44124
Phone (216) 514-1100
Fax: (216) 682-2100
Martin@RolfLaw.com
Kuhn@RolfLaw.com

*Counsel for Defendants*

35

**CERTIFICATE OF SERVICE**

I hereby certify that on November 8, 2019, I filed the foregoing Motion for Summary Judgment by electronic means in compliance with S.D. Ohio Civ. R. 5.1 and 5.2. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's system.:

**Electronic Mail Notice List**

- Frederick M. Morgan, Jr., counsel for Plaintiffs, at morgan@morganverkamp.com

- Chandra Napora, counsel for Plaintiffs at cnapora@morganverkamp.com

- William M. Mattes, counsel for ViaQuest, Inc., at bill.mattes@dinsmore.com

- Justin Burns, Counsel for ViaQuest, Inc., at Justin.Burns@dinsmore.com

*/s/Christopher G. Kuhn*
Christopher G. Kuhn (0082822)