**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| PAULA BOURNE, *et al.*, | : |
| *Plaintiff*, | : Case No. 1:12-cv-935 |
| v. | : Judge Jeffery P. Hopkins |
| PROVIDER SERVICES HOLDINGS, LLC, *et al.*, | : |
| *Defendants*. | : |

---

**AMENDED OPINION AND ORDER**

---

Plaintiffs Paula Bourne and La'Tasha Goodwin (collectively, "Plaintiffs") filed a *qui tam* action in 2012 against their former employer, related entities, and several individuals alleging violations of the False Claims Act, 31 U.S.C. § 3729 *et seq.*, and the False Claims Act's anti-retaliation provision, 31 U.S.C. § 3730(h). Doc. 1. Pursuant to a partial stipulation in 2017, the United States reached a settlement agreement and recovered an undisclosed sum from Defendants. Doc. 30.

Following the 2017 stipulation of partial dismissal, the only claims that remain in the lawsuit are those as alleged in the 2018 First Amended and Supplemental Complaint (the "Amended Complaint"). Doc. 32. In Count One of the Amended Complaint, Bourne and Goodwin maintain claims of retaliation in violation of the False Claims Act, 31 U.S.C. § 3730(h), against Tridia Hospice Care, Inc. ("Tridia"), Destiny Hospice, LLC ("Destiny"), and Provider Services, Inc. a/k/a BCFL Holdings, Inc. n/k/a Foundations Health Solutions, Inc., ("Provider Services") (Tridia, Destiny, and Provider Services will be referred to collectively as the "Provider Defendants"). *Id.* at PageID 198–99. In Count Two of the Amended Complaint, Bourne alleges retaliation in violation of the False Claims Act, 31

U.S.C. § 3730(h), against Provider Defendants and an additional Defendant, ViaQuest, Inc. ("ViaQuest"). *Id.* at PageID 199–200. Provider Defendants and ViaQuest separately moved for Summary Judgment (the "Motions") on November 8, 2019. Docs. 64, 66. The Motions are fully briefed and ripe for adjudication.

For the reasons stated below, the Court **GRANTS** Provider Defendants' Motion for Summary Judgment as to Count One but **DENIES** the Motion as to Count Two. Doc. 66. The Court **GRANTS** Defendant ViaQuest's Motion for Summary Judgment as to Count Two. Doc. 64. The only claim that survives the Motions is Bourne's post-employment retaliation claim against Provider Defendants, which culminated in her wrongful termination from her employment at ViaQuest. In all other respects, the Motions are **GRANTED**. Plaintiffs' claims of FCA retaliation during their employments at Tridia and against Defendant ViaQuest specifically are hereby **DISMISSED WITH PREJUDICE**.

## I. BACKGROUND[1]

---

[1] At the time the Motions were briefed, this case was assigned to the docket of the Honorable Timothy Black. Judge Black's Standing Order Governing Civil Motions for Summary Judgment ("Standing Order") requires movants to attach a document entitled "Proposed Undisputed Facts," ("PUF") which sets forth in separately numbered paragraphs a concise statement of each material fact as to which the moving party contends there is no genuine issue to be tried. Every brief in opposition to a motion for summary judgment must attach a response to the PUF, which states, in separately numbered paragraphs corresponding to the PUF, whether each of the facts asserted by the moving party is admitted or denied. Each statement of material fact in a PUF or response thereto "must be followed by a specific citation or citations to (1) the affidavit of a witness competent to testify as to the facts at trial, (2) a sworn deposition, and/or (3) other evidence, including documentary evidence, that would be admissible at trial." Standing Order § A.3; *see also* Fed. R. Civ. P. 56(c).

Defendants each attached a document of proposed undisputed facts to their Motions for Summary Judgment. Docs. 64-1, 66-2. While Plaintiffs' responses to the PUFs (Docs. 70-1, 71-1) are largely compliant with the requirements of the Standing Order, Plaintiffs deny several of Defendants' asserted material facts without including a citation to the record. Similarly, Plaintiffs' responses include a number of factual assertions without any citation to the record. In reaching its findings of fact, the Court will disregard any such unsupported denial or factual assertion. *See Parsons v. FedEx Corp.*, 360 F. App'x 642, 646 (6th Cir. 2010) ("A district court has no duty to sift through the record in search of evidence to support a party's opposition to summary judgment.") (citations omitted).

### a. Plaintiffs' Employment at Tridia.

Plaintiffs Paula Bourne and La'Tasha Goodwin are both healthcare professionals. They were previously employed at various healthcare services companies that were, at one time, owned and operated by Brian Colleran. Those companies include Provider Defendants: Tridia Hospice Care, Inc., Destiny Hospice, LLC, and Provider Services, Inc.[2] Doc. 32, ¶¶ 8, 9. In 2008, Bourne and Goodwin worked as an administrator and a director of nursing, respectively, at one of the nursing homes owned by Colleran and operated by Provider Services. Doc. 71-1, ¶¶ 3–5. Later that year, Colleran asked Bourne and Goodwin to help him start up his newly acquired hospice business, Tridia. *Id.* ¶¶ 1–2, 6–7. Tridia provides hospice services to residents in long-term care institutional settings (*e.g.*, nursing homes and assisted living facilities) throughout the state of Ohio. *Id.* ¶ 1. In 2009, Bourne was officially hired as Tridia's Executive Director, and Goodwin was officially employed as the Director of Clinical Services at Tridia. *Id.* ¶ 7.

At the time of Plaintiffs' hire, Tridia's operations were in Columbus, Ohio. *Id.* ¶ 7. Shortly after Tridia was acquired, however, it expanded operations into other cities in Ohio, including Dayton, Cleveland/Akron, and Ashtabula by opening branch offices. *Id.* ¶ 16. While Bourne and Goodwin did not have official responsibilities for conducting any of Tridia's operations other than in Columbus, they nonetheless became the point-people for other branches to turn to with questions about compliance and policies. *Id.* ¶ 17. Plaintiffs assisted other branches with compliance in various ways, including training general

---

[2] Provider Services provided back-office support for Tridia, which included payroll processing and third-party billing. Doc. 66-1, PageID 697. Aside from those services, however, the managers and staff at Tridia oversaw each of that company's other day-to-day operations and made all personnel decisions associated with its business activities. *Id.*

managers, assisting with hiring, and visiting other branch offices to conduct audits of paperwork to ensure that the branches were "on the path to success in compliance." *Id.* ¶ 18.

### b. Problems Uncovered in 2011.

In the spring of 2011, Colleran purchased Defendant Destiny, a Cincinnati-area hospice. *Id.* ¶ 9. Colleran sent Plaintiffs to Destiny to review operations, provide training, and increase efficiencies at the newly acquired operation. *Id.* ¶¶ 20–21. During their review of Destiny's operations, Plaintiffs noted not only staffing inefficiencies but operational illegalities as well. Specifically, Plaintiffs discovered that the staff was also providing crisis care for all terminally ill patients, including when that level of care was not warranted or when patients did not meet medical criteria for being placed under that level of care. *Id.* ¶ 22. Alarmed by this revelation, Bourne and Goodwin informed the staff that this was a violation of Medicare guidelines and later took steps to correct the compliance issues they identified at Destiny. *Id.* ¶ 23.

After this incident and throughout the rest of 2011, the relationship between Plaintiffs (working with Tridia) and the staff at Destiny soured due to Plaintiffs' attempts to bring Destiny into compliance. *Id.* ¶ 28. Eventually, in November or December 2011, Bourne and Goodwin were instructed to "stay out of Cincinnati" in order to resolve these conflicts. *Id.* ¶ 34. This directive came from Colleran's nephew, Dan Parker, who at the time assisted Colleran with operating Tridia and Destiny. *Id.* ¶ 32. Although Bourne and Goodwin were instructed to stay out of Cincinnati, and eventually were asked to stay out of all of the branch offices, Parker did request to Plaintiffs that they continue monitoring the electronic medical records of branches outside of Columbus. *Id.* ¶ 35. Parker's request to "stay out of Cincinnati"

did not impact Bourne or Goodwin's salary or bonus for 2011. *Id.* ¶ 37. In fact, they each received a bonus of almost $60,000 in March 2012. *Id.*

### c. The 2012 ROLF Audit.

In April 2012, Colleran engaged the law firm Rolf Goffman Martin Lang LLP ("ROLF") to conduct a compliance audit (the "ROLF Audit") of his various business interests, including the hospice companies. *Id.* ¶ 42. Bourne assisted with the hospice audit by helping to locate files and to coordinate visits. *Id.* ¶¶ 45–46.

The ROLF auditors identified a number of issues at multiple hospice locations, including the Destiny and Tridia branches outside of Columbus. *Id.* ¶¶ 47, 52. The auditors discovered that face-to-face certifications were not being completed at Destiny even while the Director of Nursing routinely indicated that the certifications had been completed, which improperly moved patients forward in the billing process. *Id.* ¶ 47. The Destiny Director of Nursing was fired at Bourne's recommendation on the day that the face-to-face certification issue was discovered. *Id.* ¶ 48. Colleran and Parker also directed Destiny and Tridia to halt all new hospice admissions until the compliance problems identified could be addressed. *Id.* ¶ 50. Tridia then began reviewing past services to determine exactly how long Destiny had been billing without face-to-face encounters and to determine if any Medicare claims needed to be repaid. *Id.* ¶ 56.

The parties' accounts of Bourne's involvement in the audit differ significantly. John Krystowski, an employee at Tridia during the events in question, testified that once the face-to-face problem was discovered, he had then asked Bourne to track down missing documentation to substantiate the claims of the identified problems. *Id.* ¶ 57. Krystowski testified that Bourne did not locate any such supporting records and expressed disappointment

5

by what he perceived was a lack of effort on Bourne's part because he did not believe that Bourne had looked through more than a handful of files. *Id.* Bourne, on the other hand, testified that Krystowski implied through his tone of voice that she should create false documentation for the identified claims, and she was unwilling to do so. *Id.* ¶ 60.

Despite their differing accounts, the parties agree that Bourne complained generally that the audit was not going far enough and that there were additional, non-specific issues she found in her review of documentation that were not being addressed by the auditors. *Id.* ¶ 61. Bourne testified that she did not tell anybody about specific records that she identified as problematic, but generally "told them that the problem was more far reaching and that we needed to expand [the] scope of investigation." *Id.*

Krystowski testified that he told Bourne that additional issues would be looked at after the issues they had already identified were addressed. *Id.* ¶ 62. In phone call recorded by Bourne, Krystowski told Bourne that they need to speak to ROLF about anything that Bourne uncovered during an independent audit of charts in Akron that Bourne had previously suggested she would conduct. Doc. 66-3, PageID 1014. Bourne responded that she did not conduct an independent audit because she had understood that Krystowski had instructed her to confine her review to the claims that the auditor identified, and that the only problems she had identified in Akron were "pretty similar" to the problems already identified by the auditor. *Id.* at PageID 1014–15.

As a result of the issues uncovered during the ROLF audit, Tridia withheld a significant number of claims in 2013 and 2014 based on a lack of proper documentation for other issues identified by ROLF, amounting to millions of dollars of unbilled claims. Doc. 71-1, ¶ 65.

### d. Restructuring of Provider Services.

In July of 2012, Colleran gave control of the hospice operations to his nephew, Dan Parker. *Id.* ¶ 69. And on January 1, 2013, Parker became the official owner of Tridia. *Id.* ¶ 86. Parker decided to restructure the hospice operations, dissolved Destiny, had Tridia take over operations, and implemented a centralized operations and compliance model. *Id.* ¶ 70; Doc. 66-1, PageID 701–02. Parker appointed Sean Riley to the role of Chief Operating Officer, where Riley proceeded to evaluate the incentives and bonuses offered at the various branch offices. Doc. 71-1, ¶¶ 72, 78. As part of the reorganization, Riley halted all bonuses in Tridia at every branch company-wide, explaining "[a]t this time, due to lack of uniformity and cohesion, all current [bonus] plans should be discontinued effective immediately." *Id.* ¶ 79.

In September of 2012, Riley informed Bourne that her role moving forward would be the Executive Director/General Manager of the Columbus branch and that her salary would be reduced to $100,000. *Id.* ¶ 81. Bourne was then the highest paid General Manager at Tridia. *Id.*; Doc. 73-5, PageID 2362–63. After back-and-forth negotiations, Riley agreed to pay both Bourne and Goodwin a one-time bonus of $12,500 on November 1, 2012. Doc. 71-1, ¶ 82. Parker provided mixed reviews on his opinion of Bourne. Parker testified that he made the decision to demote Bourne as part of the company-wide restructuring because he did not like her personally and did not think she was a good choice for state-wide leadership. *Id.* ¶ 83. However, Parker also claimed that he thought Bourne had done a good job in Columbus and ultimately decided to keep her as executive director there. *Id.*

### e. Plaintiffs File The *Qui Tam* Action.

On December 6, 2012, Plaintiffs filed this *qui tam* action, alleging that the Provider Defendants, Colleran, and others "submitted and caused the submission of false claims for

payment to federally-funded government healthcare programs for patient care." Doc. 1, ¶ 1. Plaintiffs further averred that Defendants retaliated against them vis-à-vis the terms and conditions of their employment as a result of Plaintiffs' objections to Defendants' illegal practices they had uncovered and reported. *Id.* ¶¶ 282–84. Specifically, Plaintiffs alleged that they were denied promotions and bonuses, had their salaries and responsibilities significantly reduced, and were being excluded from company events. *Id.* ¶¶ 259–61. Plaintiffs did not tell anybody at Provider Services or Tridia that they were preparing to file or had filed a *qui tam* action. Doc. 71-1, ¶ 84; Doc. 70-1, ¶ 9. The Provider Defendants did not learn of the *qui tam* until 2015.[3]

### f.  Plaintiffs Leave Tridia.

On March 21, 2013, Goodwin gave 30 days' notice to Tridia indicating that she was quitting her employment there. Doc. 71-1, ¶ 93. Bourne had previously taken several medical leaves in the first quarter of 2013. *Id.* ¶ 94. Upon returning from her last period of medical leave on March 25, 2013, Kelly Drass, who had replaced Sean Riley as the head of the hospice operations at Tridia, asked Bourne some follow-up questions regarding a nursing home client who had written letters indicating he wished to go into business with Bourne. *Id.* Before Drass' investigation was completed, on March 28, 2013, Bourne gave Drass personal notice of her upcoming resignation. *Id.* ¶ 95. Although Bourne's letter stated that she was willing to

---

[3] The parties disagree about when in 2015 the Defendants were made aware of the *qui tam.* Plaintiffs offer a declaration from their counsel, which asserts that his understanding is that the Court partially unsealed the *qui tam* action for the purposes of exploring resolution in May or June of 2015, and the complaint was provided to counsel for the Provider Defendants "on or about June 15, 2015." Doc. 80-1, ¶ 5. Defendants object to this evidence pursuant to Rule 3.7 of the Ohio Rules of Professional Conduct, which prohibits an attorney acting as both an advocate and fact witness. Doc. 81, PageID 2909. However, the Provider Defendants concede in their Motion for Summary Judgment that they learned of the *qui tam* in January 2015. Doc. 66-1, PageID 703 ("Defendants did not know that a *qui tam* lawsuit had been filed related to the hospices until the Department of Justice informed their attorneys at a meeting held in January, 2015.").

continue working until April 19, 2013, Bourne testified that Drass asked her to terminate her employment on the day she tendered her notice of resignation. Doc. 72-2, PageID 2020. After receiving Bourne's resignation, Drass told both Bourne and Goodwin that they did not need to serve out the remainder of their notice period. Doc 71-1, ¶ 98. Their employment was therefore terminated effective March 28, 2013. *Id.*

### g. Atlas Healthcare and Bob Speelman.

In July of 2013, Colleran sold the nursing homes formerly operated by Provider Services' umbrella into separate companies. Doc. 71-1, ¶ 101. But Colleran retained a buy-back option in many of the facilities, and the parties dispute the degree of control that he exercised over the facilities after the sale. *Id.* Several of the nursing home facilities in Columbus were sold to Bob Speelman, who was formerly a regional director for Provider Services. *Id.* ¶ 102. Speelman formed a company called Atlas Healthcare ("Atlas") to own and manage the facilities. *Id.* Speelman's brother, Douglas Speelman, owned Amber Home Care, LLC ("Amber Home Care"). Doc. 1, ¶ 24; Dep. of Bob Speelman, Doc. 70-5, 101:16–23. Douglas Speelman and Amber Home Care were named as defendants in the original *qui tam* complaint, which alleged that Speelman paid Colleran kickbacks in exchange for patient referrals from Provider Services to Amber Home Care. Doc. 1, ¶¶ 181–83.

### h. Bourne's Employment at ViaQuest.

On July 15, 2015, Bourne applied to work at ViaQuest, a company that provided healthcare services similar to those provided by Provider Services. Doc. 70-1, ¶ 21. During the hiring process, Bourne interviewed with Richard Johnson, ViaQuest's president and chief executive officer. *Id.* ¶¶ 14, 26.

Though Johnson and Colleran were not personal friends and did not have a close professional relationship, Johnson was familiar with Colleran and Provider Defendants. Johnson and Colleran met in 1999 as part of an unrelated financial transaction while Colleran was then working as a financial advisor for Key Bank. *Id.* ¶¶ 16, 17. Johnson and Colleran crossed paths on occasion over the years at various conferences but had not engaged in much conversation. *Id.* ¶ 17. ViaQuest and Provider Services became competing businesses between 2011 and 2012, although they often cooperated with each other. *Id.* ¶ 18. Around that time, and continuing through Bourne's eventual employment with ViaQuest, ViaQuest began directing marketing efforts to Provider Services in an effort to increase the census count for hospice, home health, and behavioral health services. *Id.* ¶ 33. In June of 2013, Johnson had learned through reading a media article that Provider Services' offices were raided by the Federal Bureau of Investigation. *Id.* ¶ 19. However, Johnson never asked anybody at Provider Services about the raid and never learned why Provider Services had been the subject of a raid by the FBI. *Id.* ¶ 20.

Bourne submitted an application for employment at ViaQuest on July 15, 2015. *Id.* ¶ 21. She stated on her employment application that she had previously worked for Provider Services and that she had left the company because there was "no room for advancement." *Id.* ¶ 22. At this point in time, Bourne did not tell Johnson that she had been a whistleblower or had engaged in whistleblowing activity while at Provider Services. *Id.* ¶ 29. However, Bourne testified that she specifically asked Johnson about ViaQuest's compliance program, and he responded that he knew Provider Services "were bad guys and did not do things by the book" and assured her that was not how ViaQuest operated. Dep. of Paula Bourne, Doc.

72-3, 452:7–16. Bourne was hired and started her position at ViaQuest on July 20, 2015. Doc. 70-1, ¶ 31.

In support of their Opposition to ViaQuest's Motion for Summary Judgment, Plaintiffs filed the declaration of Ed Francis, who worked as a community liaison for ViaQuest from approximately September 2014 until early 2016. Doc. 70-3, ¶ 1. Francis stated that in his role as community liaison, he managed relationships with referral sources and potential referral sources for ViaQuest. *Id.* ¶ 3. Before November 2015, his largest source of referrals was from McNaughten Pointe, a facility owned by Atlas. *Id.* ¶ 10; Doc. 71-1, ¶ 106. In or around the fall of 2015, Francis took Dan Parker of Tridia and the administrator of McNaughten Point out for drinks and dinner. Doc. 70-3, ¶ 11. During that dinner, Francis and Parker discussed ViaQuest. *Id.* Shortly after their meeting took place, Francis stated that Parker called him to discuss Paula Bourne. *Id.* ¶¶ 12–13. During that call, Parker asked Francis whether Bourne worked for ViaQuest, for how long she had worked there, and in what employment capacity. *Id.* Francis answered the questions and relayed the conversation to Rich Johnson and others at ViaQuest. *Id.*

Around the same time, the administrator at McNaughten Pointe told Francis that "it did not make sense for" McNaughten Pointe to continue to work together with ViaQuest. *Id.* ¶ 14. This conversation was relayed to Johnson, who, in turn, called Bob Speelman. Doc. 70-1, ¶ 37. This phone conversation was the first interaction Johnson had with Speelman. *Id.* ¶ 38.

The evidence submitted by the parties contains varying accounts of the substance of the phone call between Speelman and Johnson. However, all parties agree that during the conversation, Speelman communicated to Johnson that Paula Bourne was "not welcome in

[his] building" and that "Atlas would not provide ViaQuest business as long as Ms. Bourne was associated with ViaQuest." Doc. 70-1, ¶¶ 41–44; Doc. 71-1, ¶¶ 112–114. All parties also agree that Speelman did not explicitly tell Johnson that Bourne had initiated a *qui tam*, participated in a federal investigation, or otherwise engaged in protected activity. *Id.* Rather, Johnson testified that Speelman told him vaguely that Bourne "put us through hell," and refused to provide more specific details. Dep. of Richard Johnson, Doc. 70-4, 57:3–6. Speelman denies making this statement. Speelman Dep., Doc. 70-5, 90:7–13.

After the Speelman phone call, Johnson had at least two meetings with Bourne regarding his conversation with Speelman. Doc. 70-1, ¶¶ 48, 49. Although at that point, the *qui tam* had been partially unsealed and provided to the then-named Defendants, Bourne did not disclose the existence of the *qui tam* action to Johnson. Bourne Dep. 468:24–469:15. Instead, Bourne testified that she told Johnson that Provider Services was "retaliating against [her] as a former employee." *Id.* Johnson testified that Bourne gave no further explanation regarding the circumstances surrounding Speelman's call and that she told him that she did not know why Speelman would have shared the information he did with Johnson. Doc. 70-1, ¶¶ 49, 50.

After twice meeting with Bourne to discuss the circumstances surrounding his conversation with Speelman, Johnson met with human resources and ultimately decided to terminate Bourne from her employment at ViaQuest. Doc. 70-1, ¶¶ 51, 52. After Johnson decided to terminate Bourne, Johnson and Bourne had yet another meeting, during which he shared that the pair was about to have "one of those conversations that he hated to have." *Id.* ¶ 56. After Johnson made this statement, Bourne, for the first time, stated that she felt she was being retaliated against by Provider Services because she cooperated with the government

during an investigation. *Id.* ¶ 57. Johnson asked Bourne why she shared that information, and she stated that it was because she felt she was about to be terminated. *Id.* ¶ 58. Bourne was terminated nonetheless and was offered a generous severance package. *Id.* ¶ 61. Bourne subsequently amended her complaint to add retaliation claims against both ViaQuest and the Provider Defendants for the events that led to her termination from ViaQuest. Doc. 32, ¶ 4.

## II. STANDARD OF REVIEW

Provider Defendants and Defendant ViaQuest seek summary judgment on all claims. Docs. 64, 66. "The 'part[ies] seeking summary judgment always bear[] the initial responsibility of informing the district court of the basis for [their] motion and identifying those portions' of the record which demonstrate 'the absence of a genuine issue of material fact.'" *Rudolph v. Allstate Ins. Co.*, No. 2:18-cv-1743, 2020 WL 4530600, at *3 (S.D. Ohio Aug. 6, 2020) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

But the non-moving party cannot defeat summary judgment merely by pointing to any factual dispute. Indeed, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Int'l Outdoor, Inc. v. City of Troy*, 974 F.3d 690, 697 (6th Cir. 2020) (bracket and emphases omitted) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)). In other words, the dispute must be "genuine" (*i.e.*, supported by evidence) and go to a "material fact" (*i.e.*, a fact that could be dispositive towards the outcome). Furthermore, even as to material facts, a dispute is "genuine" only where a reasonable jury could return a verdict for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

13

In sum, after reviewing the cited evidence, the Court must determine whether there is some "sufficient disagreement" that necessitates submitting the matter to a jury. *Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251–52). In making that determination, the Court must view the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) ("In arriving at a resolution, the court must afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party.").

## III.     LAW AND ANALYSIS

The FCA's retaliation provision protects employees, contractors, or agents from being discharged or discriminated against because of lawful acts done either in furtherance of an action under the FCA or in effort to stop FCA violations. 31 U.S.C. § 3730(h).

As with other employment-related retaliation claims, retaliatory discharge claims under § 3730(h) proceed under the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Jones-McNamara v. Holzer Health Systems*, 630 F. App'x 394, 396–97 (6th Cir. 2015). Where, as here, a plaintiff aims to establish a retaliation claim by presenting circumstantial evidence, the plaintiff bears the initial burden to demonstrate a prima-facie case of retaliation. *Jones-McNamara*, 630 F. App'x at 397–98. Once plaintiff makes a prima facie showing, the defendant then bears the burden of producing a "legitimate, nondiscriminatory reason for the adverse employment action." *Id.* at 398. If the defendant meets that burden, the plaintiff ultimately must show that the proffered reason is pretextual. *Id.*

14

To make a prima-facie case of retaliation, the plaintiff must demonstrate that: "(1) she was engaged in a protected activity; (2) her employer knew that she engaged in the protected activity; and (3) her employer discharged or otherwise discriminated against the employee as a result of the protected activity." *Id.* (citing *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 566 (6th Cir. 2003)).

The first and second element have a somewhat convoluted history in this Circuit after the 2009 amendment to the FCA, especially where a plaintiff's alleged protected activity consists of internal efforts to stop fraud. Prior to the 2009 amendment, plaintiffs seeking redress for retaliatory discharge under the FCA had "'the burden of pleading facts which would demonstrate that defendants had been put on notice that [the] plaintiff was either taking action in furtherance of a private *qui tam* action or assisting in an FCA action brought by the government.'" *Yuhasz*, 341 F.3d at 567 (quoting *United States ex. rel. Ramseyer v. Century Healthcare Corp.*, 90 F.3d 1514, 1522 (10th Cir. 1996)). However, § 3730(h) was amended in 2009 to expand protections beyond activities undertaken in furtherance of a *qui tam* action. The amended language explicitly protects "other efforts to stop" violations of the FCA. 31 U.S.C. § 3730(h). In light of this change, the Sixth Circuit held in *Miller v. Abbott Lab'ys* that "pre-amendment case law holding that activity is protected only if it is in furtherance of a potential or actual qui tam action is no longer applicable." 648 F. App'x 555, 560 (6th Cir. 2016).

Applying the same line of reasoning, courts in this circuit have frequently held that the Sixth Circuit's notice standard articulated in *Yuhasz*, which required plaintiffs to show that their employers "had been put on notice that plaintiff was either taking action in furtherance of a private *qui tam* action or assisting in an FCA action brought by the government

15

employees," was abrogated by the 2009 amendment. *See Cephas-Hill v. Linden Med. Ctr./Mid-Ohio Fam. Prac. Assocs.*, No. 2:20-cv-4281, 2022 WL 5177771 *3–4 (S.D. Ohio Aug. 2, 2022) (collecting cases). Put another way, after the 2009 amendment, courts assumed that the notice element no longer required plaintiffs to show that they had made clear to their employer that they intended to bring or assist in an FCA action. *See Mikhaeil v. Walgreens Inc.*, No. 13-14107, 2015 WL 778179, at *9 (E.D. Mich. Feb. 24, 2015) ("If an employee does not need to take steps clearly in furtherance of a potential or actual *qui tam* action to engage in protected activity, the employee, even if charged with investigating potential fraud, also does not need to 'make clear their intentions of bringing or assisting in an FCA action' . . . to satisfy the notice requirement.") (quoting *Yuhasz*, 341 F.3d at 568).

The Sixth Circuit's decision in *Miller* seems to confirm this interpretation, though *Miller* only addressed the first element of an FCA retaliation claim because the plaintiff in that case failed to demonstrate that she engaged in a protected activity. *Miller*, 648 F. App'x at 563; *see also Cephas-Hill*, 2022 WL 5177771 at *4 ("[B]uilding on *Miller*, if the first prong views actions other than a *qui tam* action as 'protected activity,' then the second prong should also allow for notice of non-*qui-tam*-action activities.").

However, the Sixth Circuit's decision in *United States v. Wal-Mart Stores E., LP,* 858 F. App'x 876 (6th Cir. 2021) seems to mandate that district courts apply a pre-amendment notice standard. *See Cephas-Hill*, 2022 WL 5177771, at *4 (discussing *Wal-Mart*). In *Wal-Mart*, the court affirmed the dismissal of an FCA retaliation claim brought by a plaintiff who made internal reports of suspected fraud. *Wal-Mart*, 858 F. App'x at 880. The court reasoned that this internal reporting was insufficient to satisfy the notice requirement, because "[e]mployees must make clear their intentions of *bringing or assisting in an FCA action* to show retaliation."

16

*Id.* (cleaned up) (emphasis added). The court specifically emphasized that even when "an employee tells their employer that they have witnessed illegal conduct and that other companies have incurred FCA liability for similar conduct, that fails to establish that an employee is pursuing an FCA action." *Id.* (citing *Yuhasz*, 341 F.3d at 567).

Importantly, even under the pre-amendment statutory scheme, the Sixth Circuit did not require that an employee explicitly inform their employer that they were cooperating with the government or planning to file a *qui tam* action. *See, e.g.*, *U.S. ex rel. Marlar v. BWXT Y-12, L.L.C.*, 525 F.3d 439, 449–50 (6th Cir. 2008). *In Marlar,* the court clarified that "a plaintiff must only allege activities 'that would have given [the defendant] reason to believe that she was contemplating a *qui tam* action.'" *Id.* (quoting *United States ex rel. McKenzie v. BellSouth Telecomms., Inc. (McKenzie I),* 123 F.3d 935, 944 (6th Cir. 1997)). This test would include employees making internal complaints if the complaints "characterize the plaintiff's concerns as involving illegal, unlawful or false-claims against the government." *Id.* (cleaned up).

### A. Claims Relating to Plaintiffs' Employment at Tridia (Count One)

Plaintiffs both allege that they were subject to retaliation during their employment with the Provider Defendants as a result of their efforts to stop one or more violations of the False Claims Act. In support of this claim, Plaintiffs assert that they engaged in a "veritable cornucopia of protected activity," (Doc. 71, PageID 1702), but provide scant citations to evidence in the record of specific acts taken either in furtherance of a *qui tam* action or in effort to stop FCA violations. As best this Court can tell, Plaintiffs' purported protected activity can be grouped into three distinct categories, each of which the Court will address in turn: (1) the identification of problems related to the provision of crisis care at Destiny in 2011; (2) the

voicing of concerns about the scope of the ROLF compliance audit conducted in 2012, and
(3) the filing of a *qui tam* action in secret in 2012.

### i. Destiny Crisis Care Problems

The undisputed facts show that while conducting a compliance review of Brian
Colleran's newly acquired Destiny hospice in 2011, Plaintiffs discovered violations of
Medicare guidelines where staff provided crisis care for patients who did not meet medical
criteria. Doc. 71-1, ¶ 22. Plaintiffs informed staff of the uncovered violations and sought to
bring staff into compliance. *Id.* ¶ 23. This activity is clearly protected by 31 U.S.C. § 3730(h)
as "efforts to stop" violations of the False Claims Act. Defendants do not dispute this. Doc.
66-1, PageID 710. However, Plaintiffs' claims fail on the third element of causation because
the undisputed evidence establishes that Defendants did not discharge or otherwise
discriminate against Plaintiffs *because* of this protected activity. *Jones-McNamara*, 630 F. App'x
at 398.

*First*, Plaintiffs have not identified any adverse employment action that resulted from
their identification of crisis care issues at Destiny. Plaintiffs simply contend that their attempts
to induce compliance at Destiny "led to tensions." Doc. 71, PageID 1696. But tensions
between an employer and employee are not, without more, enough to satisfy adverse
employment action. Again, to establish any of their claims, Plaintiffs must show that they
suffered an *adverse* employment action. *See Laster v. City of Kalamazoo*, 746 F.3d 714, 731 (6th
Cir. 2014) ("To establish the third element of the prima facie Title VII retaliation claim, 'a
plaintiff must show that a reasonable employee would have found the challenged action
materially adverse, which in this context means it well might have dissuaded a reasonable
worker from making or supporting a charge of discrimination.'") (quoting *Burlington N. &*

*Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). In other words, Plaintiffs must demonstrate that there was a "materially adverse change in the terms and conditions of [their] employment[s]." *Deleon v. Kalamazoo Cnty. Rd. Comm'n*, 739 F.3d 914, 918 (6th Cir. 2014) (quoting *White v. Burlington N. & Santa Fe R. Co.*, 364 F.3d 789, 795 (6th Cir. 2004) (en banc)). In the employment discrimination context, such an action usually "inflicts direct economic harm," *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 762 (1998), and must be more than a "mere inconvenience or an alteration of job responsibilities," *Deleon*, 739 F.3d at 918 (citation omitted); *see Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68 (holding that "petty slights, minor annoyances, and simple lack of good manners" are not enough to constitute retaliation in the work place).

The only potentially adverse employment action that the Court can connect (if only temporally) to the Plaintiffs' protected activity is Dan Parker's directive that Plaintiffs "stay out of Cincinnati" in late 2011. Doc. 71-1, ¶ 34. However, the undisputed facts establish that this directive did not impact Plaintiff's role or job duties, as Plaintiffs did not have any direct operational responsibility for Cincinnati, and they were specifically asked to continue monitoring the branches' electronic medical records. *Id.* ¶¶ 16, 35. Moreover, this request did not impact Plaintiffs' salaries or bonuses. *Id.* ¶ 37. At bottom, Parker's directive that Plaintiffs stay out of Cincinnati does not amount to an "adverse employment action" sufficient to create a cognizable claim for retaliation. *See U.S. ex rel. Howard v. Lockheed Martin Corp.*, 14 F. Supp. 3d 982, 1021–22 (S.D. Ohio 2014) ("Employment decisions are only materially adverse if they are reasonably likely to deter employees from engaging in activity protected by the False Claims Act .... [A]nti-retaliation statutes are not intended to protect against trivial harms and

are not intended to impose a general civility code for the American workplace.") (citations omitted).

*Second*, Plaintiffs do not deny that Parker's request that they "stay out of Cincinnati" was motivated by a desire to resolve personality conflicts between Plaintiffs and Destiny staff in Cincinnati, rather than a desire to prevent Plaintiffs from identifying compliance issues or otherwise punish them for the issues they had already identified. *See* Doc. 71-1, ¶ 34 (Plaintiffs admitting that "Parker first asked Bourne and Goodwin to stay out of Cincinnati, and then asked that they stay out of all the branch offices *so as to resolve the personality conflicts*.") (emphasis added).

In sum, even when the Court views the evidence in a light most preferential to Plaintiffs and draws all reasonable inferences in their favor, they still fail to establish the causal nexus necessary to succeed in their case. Simply put, no reasonable jury could return a verdict for them based on the evidence proffered. Provider Defendants are therefore entitled to summary judgment on Plaintiffs' claim of allegedly suffering retaliation as a result of identifying Destiny's crisis care problems.

### ii. Concerns about Scope of ROLF Audit

The next category of alleged protected activity that Plaintiffs appear to rely upon relates to their participation in the audit conducted by the law firm Rolf Goffman Martin Lang LLP (the "ROLF Audit"). As noted, in April of 2012, Colleran hired ROLF to conduct a compliance audit of his various business interests, with a particular focus on the hospice businesses. *Id.* ¶ 42. Bourne was instructed to assist with the audit, including by locating files and coordinating visits to branches. *Id.* ¶ 46. The auditors discovered a number of compliance issues, including the lack of face-to-face certifications, which improperly moved patients

forward in the billing process. *Id.* ¶ 47. Nonetheless, Plaintiffs felt that there were additional compliance violations that were not addressed by the ROLF Audit. Doc. 71, PageID 1716. Plaintiffs did, in fact, eventually file a *qui tam* complaint alleging various, specific violations of hospice requirements. But Plaintiffs have not produced evidence demonstrating that they articulated specific concerns to their employer that Destiny was committing fraud against the federal government or that their complaints regarding the scope of the ROLF Audit were reasonable efforts undertaken to stop FCA violations.

To prove protected activity on this claim, a plaintiff must demonstrate that she engaged in "conduct directed at stopping what [she] reasonably believed to be fraud committed against the federal government." *Fakorede v. Mid-S. Heart Ctr., P.C.*, 709 F. App'x 787, 789 (6th Cir. 2017). Instead, the testimony cited by Plaintiffs in support of this claim shows only that they had general, nonspecific conversations about needing to expand the scope of the ROLF Audit that they felt were not taken seriously. *See, e.g.*, Bourne Dep. 396:4-9, 397:4-6 ("I didn't tell anybody about the specific [patient] records. I told them that the problem was more far reaching and that we needed to expand our scope of our investigation."); *see also* Doc. 71, PageID 1704, fn. 4 ("Ms. Bourne was not focused on a reporting of specific patient records but rather on raising the alarm that 'the problem was more far reaching and that [Defendants] needed to expand [the] scope of [the] investigation.'") (citing to Bourne Dep. at 396:6–9) (alterations in original).

Plaintiffs suggest that their failure to identify specific compliance problems was the result of Defendants' alleged repeated instructions *not* to investigate additional compliance issues outside the scope of the audit. Doc. 71, PageID 1712; *but see* Doc. 71-1, ¶ 66 (Plaintiffs admitting that Riley "specifically said" that the ROLF Audit "[was] only the beginning" and

that "Bourne would continue to 'take the lead' on a regulatory/program compliance."). Even if true, Plaintiffs' failure(s) to identify any *specific* concerns they made to their employer—which would demonstrate a nexus between their employer's allegedly non-compliant actions and Plaintiffs' own conduct aimed at stopping what they perceived to be fraud against the federal government—is fatal to their claim. *See McKenzie v. BellSouth Telecomms., Inc. (McKenzie II)*, 219 F.3d 508, 516 (6th Cir. 2000) (holding that to be protected by the FCA when confronting an employer, the employee "must sufficiently allege activity with a nexus to a *qui tam* action, or fraud against the United States government").

While an employee need not complete an investigation into potential fraud or uncover an actual FCA violation to undertake protected activity, "a plaintiff's activities must reasonably embody 'efforts to stop' FCA violations." *Jones-McNamara v. Holzer Health Sys.*, 630 F. App'x 394, 399 (6th Cir. 2015) (quoting 31 U.S.C. § 3730(h)). To satisfy this reasonableness requirement, a plaintiff "must show that her allegations of fraud grew out of a reasonable belief in such fraud." *Jones-McNamara*, 630 F. App'x at 400. Here, there is simply no evidence from which the Court can conclude a genuine issue of material fact exists that Plaintiffs' generic complaints about the limited scope of the ROLF Audit, or their single statement on a phone call that they were "trying to keep [Colleran] out of jail," (Doc. 71, PageID 1696–97), "grew out of a reasonable belief" that their employer was purposefully defrauding the federal government. *Jones-McNamara*, 630 F. App'x at 399. Likewise, the Court is unable to conclude that Plaintiffs' previous assertions to their employer that "the problem was more far reaching" and that Defendants "needed to expand [the] scope of" the ROLF Audit, (Doc. 71, PageID 1704), "reasonably embody efforts to stop FCA violations." *Jones-*

*McNamara*, 630 F. App'x at 399 (cleaned up). Thus, summary judgment is appropriate for Provider Defendants as to this claim.

### iii.    Participation in *Qui Tam* Action

Finally, Plaintiffs' cooperation with law enforcement and their eventual filing of a *qui tam* action are clearly protected activity. *See McKenzie*, 219 F.3d at 513 ("The FCA protects 'whistleblowers' who pursue or investigate or otherwise contribute to a *qui tam* action, exposing fraud against the United States government."). But the question remains whether Defendants *knew* that Plaintiffs had actually engaged in this protected activity. On this element do Plaintiffs' claims fail. Plaintiffs admit that Defendants did not have knowledge of the *qui tam* action until long after Plaintiffs left their jobs at Tridia. Doc. 71-1, ¶¶ 84, 108. Defendants maintain that they "did not know that a *qui tam* lawsuit had been filed related to the hospices until the Department of Justice informed their attorneys at a meeting held in January, 2015." Doc. 66-1, PageID 703. Thus, no genuine dispute exists as to whether employer-Defendants "knew" of the protected activity (*i.e.*, the actual or contemplated filing a *qui tam* action) such that Plaintiffs were adversely impacted "as a result" of their employer acting on the knowledge of such protected activity. *Jones-McNamara*, 630 F. App'x at 398. Therefore, summary judgment is appropriate.

### B.  Claims Relating to Bourne's Termination from ViaQuest (Count Two)

Paula Bourne (or "Plaintiff")[4] alleges that she was subject to retaliation during her employment with Defendant ViaQuest. Doc. 70, PageID 1100. In summer of 2015, more

---

[4] As Plaintiffs state in their response in opposition to Defendant ViaQuest, Inc.'s Motion for Summary Judgment, (Doc. 64), Plaintiff La'Tasha Goodwin "has no clams against Defendant ViaQuest." Doc. 70, PageID 1100. Therefore, the Court will assess the merits of ViaQuest's Motion for Summary Judgment *solely* as it relates to the alleged actions taken against and the retaliation suffered by Plaintiff Paula Bourne.

than two (2) years after quitting her job at Tridia, Bourne applied to and received an offer to work for ViaQuest. Doc. 71-1, PageID 1757. But Bourne contends that, "right after the Provider Defendants found out that she had sued them," Provider Defendants "advis[ed] ViaQuest it would never send another referral to ViaQuest as long as Ms. Bourne worked for it." Doc. 70, PageID 1100. And according to Bourne, "ViaQuest fired her as a result" of this ultimatum on or about November 16, 2015. *Id.* at PageID 1101, 1105. Bourne now seeks redress through the FCA against all Defendants for Provider Defendants' role in ViaQuest's allegedly retaliatory termination of her employment.

### i.  Provider Defendants

Bourne alleges that Provider Defendants are "jointly responsible with ViaQuest for [her] termination there." Doc. 71, PageID 1721. Bourne asserts that her termination from ViaQuest can ultimately "be imputed" to Provider Defendants because the record supports a finding that Bob Speelman, formerly the owner of Atlas Healthcare, "was acting Defendants' [*sic*] agent when he threatened ViaQuest's business" because of Bourne's association with ViaQuest. *Id.* Plaintiff contends that, following the partial unsealing of the *qui tam* complaint in 2015, Defendants "connect[ed] Ms. Bourne to ViaQuest" and decided that they would "send no referral of any kind to ViaQuest while Ms. Bourne was there." *Id.* at PageID 1699; *see also* Doc. 71-3, PageID 1890, Ed Francis Decl. at ¶ 15 ("I remember thinking at the time that I was being let in on behind-the-scenes discussions . . . [that] centered on Provider's refusal to make referrals [to ViaQuest] once they learned that Ms. Bourne was working for ViaQuest."). Thus, Bourne claims are: (1) that Parker, Speelman, Colleran, and Provider Defendants became aware of her protected activity vis-à-vis the partial unsealing of the *qui tam* action in January 2015, (Doc. 66-1, PageID 703); (2) that in November 2015, Parker

24

called ViaQuest to confirm "whether [Bourne] worked for ViaQuest, for how long, and in what role," (Doc. 71-3, PageID 1889); and (3) that around the same time, Speelman called Rich Johnson at ViaQuest to stop referrals in an attempt to retaliate against Ms. Bourne as a result of her protected activity. Doc. 71, PageID 1722.

Defendants argue that summary judgment is appropriate here because the alleged actions of ViaQuest, Atlas, or Bob Speelman cannot "be imputed" to Provider Defendants, and even if they were, such actions were taken for "legitimate, non-retaliatory reasons." Doc. 66-1, PageID 724. Provider Defendants maintain that "Speelman was acting on behalf of Atlas" and "not on behalf of Defendants" when he refused to do business with ViaQuest and Bourne. Doc. 78, PageID 2866.

However, Bourne has identified evidence, which, when drawing all reasonable inferences in her favor, creates a material dispute as to this point. In July of 2013, Colleran sold off several of his former Columbus area facilities to his former regional director, Bob Speelman. Doc. 71-1, ¶ 101. Under the terms of the July 2013 sale, Colleran and Speelman entered into a five-year agreement wherein Colleran retained a buy-back option in the Atlas Healthcare facilities he sold to Speelman. Speelman Dep., Doc. 70-5, 21:8–20. At the end of the five years, "[Colleran] offered to buy [Atlas] back," and Speelman executed the offer and "sold it" to Colleran around July of 2018. *Id.* at 25:11–26:17. This transaction was seller-financed, with Speelman still paying Colleran "per month for the deal," and thus with Colleran still retaining some financial interest in the Atlas facilities throughout the five-year term. *Id.* at 24:10–17, PageID 1471. Under these circumstances, the Court finds that a genuine dispute of material fact exists as to whether the actions of Bob Speelman, in calling Johnson and in refusing to send referrals to ViaQuest so long as Bourne worked there, establishes that

25

he "was acting on behalf of Atlas" and "not on behalf of Defendants" when he refused to do business with ViaQuest and its then-employee, Bourne. Doc. 78, PageID 2866.

Though this is not conclusive evidence that Colleran was *controlling* the company ("calling the shots" so to speak), it could nevertheless support a reasonable inference that Colleran stayed *involved* in Atlas, and thus that the company took actions at Colleran's behest. In fact, during his own deposition testimony, Colleran routinely called the Atlas nursing facilities "us" and "we" and referred to them generally as "my nursing homes." *See, e.g.*, Colleran Dep. Doc. 72-1, 166:18–167:2 When discussing a 2015 e-mail from an Atlas employee regarding the decision not to do business with ViaQuest, Colleran stated that:

> [T]he nursing homes definitely gets [*sic*] to chose [*sic*] who *we* are going to contract with. And whether it's ViaQuest or – I can name 20 other hospice companies . . . it was shocking to *us* that *we* could get a – have a contract put it, after all we'd been through in 2015, that a company called ViaQuest Hospice was providing services in *my* nursing homes without having a corporate contract."

*Id.* (emphasis added).

Additionally, Ed Francis, a community liaison for ViaQuest, testified that McNaughten Pointe, which was his largest referral source, was commonly referred to during his time at ViaQuest as a "'Provider' building" and never as an "'Atlas' building." Doc. 70-3, ¶ 8; *see also* Speelman Dep., Doc. 70-5, 89:21–25 ("I don't recall Brian's name being brought up [during the phone conversation with Rich Johnson regarding Paula Bourne]. But if it was it was, I guess, to try to help [Johnson] understand that -- he thought McNaughten [Pointe] was a Provider building and it's not. It's an Atlas facility."). Drawing all reasonable inferences in Bourne's favor, this evidence casts serious doubt on Defendant's assertion that the actions of Atlas or Speelman categorically cannot "be imputed" to Colleran or Provider Defendants. Doc. 66-1, PageID 724.

26

Perhaps the most compelling evidence that supports a reasonable inference that Colleran directed Speelman to make the subject phone call is Johnson's own deposition testimony. Johnson testified that Speelman stated on the phone call that is the subject of this claim that Bourne "put us through hell." Johnson Dep., Doc. 70-4, 57:5. Johnson testified that Speelman said to him during the same subject phone call that "[i]f you want any other information[,] contact Brian [Colleran]."[5] *Id*. at 57:6. It takes very little imagination to draw a reasonable inference that Speelman's instruction to Johnson that he specifically "contact Brian [Colleran]" indicates that Speelman contacted ViaQuest—ultimately terminating the business relationship "as long as Paula Bourne [was] leading [Johnson's] hospice"—on behalf of Colleran and Provider Defendants. *Id*. at 57:1–2. Though Defendants reject this and assert that "neither Colleran, Parker, nor anyone associated with Defendants told [Speelman] not to do business with Bourne and/or ViaQuest," (Doc. 66-1, PageID 722), this dispute serves as the very essence of a genuine issue of material fact that is dispositive towards the outcome of this claim. As such, this factual dispute is within the province of the jury to decide.

---

[5] Defendants lodge generalized and unspecific objections to Plaintiff's proffered evidence, including deposition testimony, as inadmissible hearsay. *See* Doc. 66-1, PageID 717 ("Bourne cannot present any evidence to dispute these facts (except perhaps her own double- and triple-hearsay, which does not constitute competent, admissible evidence for purposes of a summary judgment motion)."). But Federal Rule of Evidence 103(a)(1) requires an objecting party to make "specific" objections detailing the specific evidence or statements the party wishes to have stricken and stating the specific grounds upon which each piece of evidence should be stricken. *See United States v. Avants*, 367 F.3d 433, 445–46 (5th Cir. 2004); *see also Wilson v. Budco*, 762 F. Supp. 2d 1047, 1058 (E.D. Mich. 2011) (finding that it is the objecting party's "obligation to specifically identify which statements in the affidavits should be [stricken].").

This Defendants fail to do. And this Court will not—nor is it required to—sift through "the proverbial haystack, in search of the needle of hearsay on hearsay." *Cardington Rd. Site Coal. v. Snyder Properties, Inc.*, No. C-3-88-632, 1994 WL 1631033, at *2 (S.D. Ohio Aug. 31, 1994). Both Defendants and Plaintiff had the opportunity to raise evidentiary objections as part of these Motions for Summary Judgement and continue to have the opportunity to raise evidentiary objections throughout this litigation. But this Court will not unilaterally strike statements from the record without a corresponding and specific objection from a party, and especially where both parties copiously rely on deposition testimony as part of their claims and defenses throughout the instant Motions.

Having established that she was engaged in protected activity and that Provider Defendants knew about her protected activity, the last essential element for Bourne's claim to withstand summary judgment is a showing of retaliation, which requires a demonstration of causation and an adverse employment action. *Jones-McNamara*, 630 F. App'x at 398. As stated above, an adverse employment action is one that "well might have dissuaded a reasonable worker" from engaging in the protected activity. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). And on this element, Plaintiff has also satisfied her burden.

The adverse employment action taken here is Bourne's November 16, 2015 termination from ViaQuest—something that might well have dissuaded a reasonable worker from filing a *qui tam* action or cooperating with a federal investigation and something which Bourne contends was caused, at least in part, by Provider Defendants' actions. Indeed, on this score, Bourne has produced sufficient evidence from which a reasonable inference could be drawn that Speelman's call to Johnson was at least *a* reason, though admittedly not the *only* reason, for her termination from ViaQuest. *See* Johnson Dep., Doc. 70-4, 100:11–17 ("Q. So you [Johnson] stated earlier that you didn't fire [Bourne] because of -- because of Bob Speelman's call. So why did you fire her? A. So it wasn't in -- I mean, that's not the entire reason….").[6] Thus, Bourne has stated a cognizable claim for retaliation, and the burden now shifts to Defendants.

---

[6] Provider Defendants seek to undercut causation by maintaining that Johnson's reasons for Bourne's termination was *not* a result of Speelman's phone call. Doc. 70-1, ¶ 53; *see also* Johnson Dep., 70:7–8 ("I did not fire Paula [Bourne] in response to Bob Speelman's conversation."). Defendants point to Bourne's underperformance at ViaQuest and that she allegedly "made untrue statements during the interview process" as reasons for her November 16, 2015 termination from ViaQuest. Doc. 70-1, ¶ 53. But these assertions may be rendered specious by Johnson's own admissions that, following Bourne's termination, Johnson wanted to "help her . . . with some of the contacts [he] ha[d], search for another job or get another position." Johnson Dep., Doc. 70-4, 99:16–19. If indeed Bourne was terminated because of her underperformance and misrepresentations, it begs the question *why* Johnson felt compelled to advocate for her—and put his own

Defendants argue that Speelman—and Provider Defendants, by extension—"articulated legitimate, non-retaliatory reasons for his refusal to do business with Bourne." *Id.* at PageID 724–25. Under the *McDonnell Douglas* burden-shifting framework, the plaintiff bears the initial burden to demonstrate a prima facie case of retaliation. *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 674 (6th Cir. 2013). Once the plaintiff establishes this prima facie case, the defendant bears the burden of producing a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* This means the defendant-employer "cannot merely present vague, generalized, nebulous, or unclear reasons for its decision." *Lewis v. City of Detroit*, 702 F. App'x 274, 283 (6th Cir. 2017). Rather, the proffered reason must be both "clear" and "reasonably specific." *Id.* (citing Tex. *Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254–55 (1981)). Assuming that a clear and reasonably specific response is made, "the employee then bears the burden of rebutting this proffered reason by proving that it was" pretextual. *Lewis*, 702 F.App'x at 283. "Pretext is established by demonstrating that the proffered reason either (1) had no basis in fact, (2) did not actually motivate the adverse employment action, or (3) was insufficient to warrant the adverse action." *Ladd v. Grand Trunk W. R.R., Inc.*, 552 F.3d 495, 502 (6th Cir. 2009).

Here, Defendants contend that Speelman was simply "trying to reduce the number of companies with which Atlas was doing business," (Doc. 66-1, PageID 724), and that Speelman placed Bourne on a "do not do business list," among others, because he took

---

reputation at risk—to help her find other positions through his personal and professional contacts. The Court declines to resolve this question but raises it because it casts doubt on Provider Defendants' argument that Bourne was unequivocally not terminated because of Speelman's phone call. One could draw a reasonable inference that a former colleague's phone call disparaging an employee could foreseeably result in that employee's termination. That this uncertainty exists necessitates this claim's submission to a jury and not its disposition on a motion for summary judgment.

personal issue with Bourne's allegedly "entitled attitude." *Id.*; Speelman Dep., Doc. 70-5, 94: 4–7, 101–02. Colleran expounded upon Bourne's placement on the "do not do business list," stating that "once somebody . . . left our employ in a high role we would, of course, not want to do business with them." Colleran Dep., Doc. 72-1, 170:2–12. Colleran clarified that the list included those "with an ability to hurt [his] business, by slander or whatever other means you can come up with." *Id.* at 170:18–20.

The Court finds that Defendants' proffered reasons do not categorically satisfy *Burdine*'s "clear and reasonably specific basis" requirement and further finds that these reasons are arguably pretextual. For Defendants to stop *all* referrals to ViaQuest simply because of *one* former employee's allegedly "entitled attitude" and her *potential* ability in her new role at ViaQuest to "hurt [Colleran's] business, by slander, or whatever other means" are motivations that call into question whether Defendants have actually proffered "legitimate, nondiscriminatory reason[s]" under the *McDonnell Douglas* burden-shifting framework. For Parker to call ViaQuest specifically to inquire about the employment status of one employee, and then for Speelman to condition *all* Atlas referrals to ViaQuest on the employment status of that one employee, appears to be a scorched-earth tactic that supports an inference that Defendants' proffered reasons are pretextual. As this evidence creates a "genuine issue of material fact," *Int'l Outdoor, Inc. v. City of Troy*, 974 F.3d 690, 697 (6th Cir. 2020), and as it is ultimately the province of the jury to decide the credibility of the proffered evidence, summary judgment is improper on this claim.

### ii. ViaQuest

Unlike Provider Defendants, Johnson denies having any knowledge of Bourne's protected activity before making the decision to fire her. Doc. 64, PageID 536. Summary

judgment is appropriate here because there is no evidence that ViaQuest or Johnson had knowledge of Bourne's protected activity before Johnson made the decision to fire her—even if Johnson did indeed fire Bourne because of Speelman's call.

"The decisionmaker's knowledge of the protected activity is an essential element of the prima facie case of unlawful retaliation." *Vander Boegh v. Energy Solutions, Inc.*, 536 F. App'x 522, 530 (6th Cir. 2013). A plaintiff can survive a motion for summary judgment by offering circumstantial evidence that is sufficient to support a reasonable inference of knowledge of protected activity, if such evidence is "comprised of 'specific facts' and not merely 'conspiratorial theories,' 'flights of fancy, speculations, hunches, intuitions, or rumors.'" *Evans v. Pro. Transp., Inc.*, 614 F. App'x 297, 300–01 (6th Cir. 2015) (quoting *Mulhall v. Ashcroft*, 287 F.3d 543, 552 (6th Cir. 2002)). The key question in this inquiry is "whether, under the particular facts and context of the case at hand, the plaintiff has presented sufficient evidence to permit a reasonable jury to conclude that he or she suffered an adverse employment action under circumstances giving rise to an inference of unlawful discrimination." *Brewer v. New Era, Inc.*, 564 F. App'x 834, 840 (6th Cir. 2014) (citing *Burdine*, 450 U.S. at 253).

For example, a reasonable inference of protected activity is supported "in situations where the decisionmaker 'took an action with respect to the plaintiff, other than the challenged adverse action, from which it could be inferred that the [decisionmaker] was aware of the plaintiff's' protected activity." *Evans,* 614 F. App'x at 300 (quoting *Mulhull,* 287 F.3d at 552–53). Furthermore, a reasonable inference could be drawn where information about the protected activity was readily available to the decisionmaker, who could be expected to discover the information through mere due diligence. *Vander Boegh v. Energy Solutions, Inc.*, 536 F. App'x 522, 531 (6th Cir. 2013). A plaintiff's "subjective beliefs, without more . . . are

patently deficient to withstand [a] motion for summary judgment." *Martin v. AutoZone, Inc.*, 411 F. Supp. 2d 872, 878 (S.D. Ohio 2005); *see also Daugherty v. Cmty. Health Sys., Inc.*, No. 3:17-cv-196, 2018 WL 3673169, at *6 (E.D. Tenn. Aug. 2, 2018) ("A need for evidence that amounts to more than mere conjecture is particularly necessary . . . .").

ViaQuest denies having any knowledge that Bourne engaged in protected activity while working at Tridia. Doc. 64, PageID 536. Bourne has offered no direct evidence to rebut this assertion. Rather, she concedes by way of circumstantial evidence that Johnson and ViaQuest's denial of knowledge that she had filed a *qui tam* action *may* be true. Bourne testified that she did not divulge to Johnson that she suspected that Speelman's call was in retaliation against her protected activity because the *qui tam* action was still under seal. Bourne Dep., Doc. 72-3, 468:24–469:15. Instead, Bourne testified that she told Johnson that Provider Services was retaliating against her due simply due to her being a former employee. *Id.* Bourne also testified that during her meeting with Johnson, in the mere moments before she was terminated, she informed Johnson that she had cooperated with a government investigation of Provider Services. Doc. 70-1, ¶ 57. But her decision that she needed to divulge this information in the mere seconds before she was fired is strong evidence that she did not believe Johnson was aware of her protected activity before the moment of her termination.

Unfortunately for Bourne, Johnson had already made the decision to fire her. Doc. 64, PageID 542–43. And that this decision was made to terminate Bourne *before* she divulged to him that she had participated in protected activity is fatal to her claim. *See Haji v. Columbus City Sch.*, 621 F. App'x 309, 313 (6th Cir. 2015) ("The relevant date of the adverse employment action is not when [plaintiff] was officially terminated but when the [d]efendants became motivated to terminate him."); *see also Bruno v. RBS Citizens, NA*, No. 1:16-cv-245,

2017 WL 2336008, at *10 (S.D. Ohio May 30, 2017) (holding that "the relevant period of time is the date [the defendant] became motivated to terminate [plaintiff]").

Here, Defendant ViaQuest asserts—and the evidence shows—that "Ms. Bourne was not terminated because of her protected activity." Doc. 64, PageID 539. "ViaQuest did not know of Ms. Bourne's prior protected activity," and Ms. Bourne has proffered "no evidence that Mr. Johnson knew of any prior protected activity when he decided to terminate [Bourne]." *Id.* at PageID 540.

In the absence of any direct evidence that Johnson was aware of her protected activity, Bourne asks the Court to speculate that Johnson would have concluded that Bourne must have been involved in protected activity based on the limited information that was available to him. Namely, Bourne suggests that Johnson should have come to this conclusion on his own because "Johnson knew Provider's history with the FBI, knew Colleran's business tactics, knew Ms. Bourne's concerns about Provider's lack of compliance and ethics, and was on the receiving end of an out-of-the-blue attack on his business pegged to Provider's learning of Ms. Bourne's association with ViaQuest." *Id.* at PageID 1105. Indeed, the evidence shows that Johnson knew only that Provider Services had previously been raided by the FBI shortly after Bourne's employment there had ended. Johnson Dep., 47:17–48:5; *but see id.* at 49:5–11 ("Q: Did you at any point, sort of contemporaneously with reading that article [of the FBI raid], learn what happened or why? A: I did not. Q: Did you at any point at all learn what happened or why? A: No.").

But even if Johnson knew that Provider Services had been raided by the FBI, and even though he had a business relationship with Colleran for more than a decade before the events in question, these facts still do not support a reasonable inference, as Bourne contends, that

Johnson *knew* of Bourne's protected activity and subsequently terminated her employment with ViaQuest *because* of it. The circumstantial evidence that Bourne offers is no more than "'flights of fancy, speculations, hunches, intuitions, or rumors.'" *Evans v. Pro. Transp., Inc.*, 614 F. App'x 297, 300–01 (6th Cir. 2015) (quoting *Mulhall v. Ashcroft*, 287 F.3d 543, 552 (6th Cir. 2002)). Thus, Bourne has not satisfied the elements to state a cognizable claim of retaliation in order to withstand ViaQuest's Motion for Summary Judgment (Doc. 64) as to Count Two.[7]

Taken as a whole, Bourne's purported evidence of Johnson's knowledge—and therefore ViaQuest's liability—amount to precisely the kind of "conspiratorial theories" that the Sixth Circuit has routinely rejected in retaliation claims. In the absence of the specific facts required under Federal Rule of Civil Procedure 56 to create a genuine dispute of material fact, summary judgement is appropriate.

## IV.    CONCLUSION

For the reasons stated herein, the Court **GRANTS** Provider Defendants' Motion for Summary Judgment as to Count One but **DENIES** the Motion as to Count Two. Doc. 66. The Court **GRANTS** Defendant ViaQuest's Motion for Summary Judgment as to Count Two. Doc. 64. The only claim that survives the Motions is Bourne's post-employment retaliation claim against Provider Defendants, which culminated in her wrongful termination from her employment at ViaQuest. In all other respects, the Motions are **GRANTED**.

---

[7] In an earlier version of this Opinion and Order, (Doc. 87), the Court stated in this paragraph that "Bourne has not satisfied the elements to state a cognizable claim of retaliation in order to withstand Provider Defendants' Motion for Summary Judgment as to Count Two." That sentence was in error. The sentence was intended to relate to Defendant ViaQuest's Motion for Summary Judgment, (Doc. 64), not Provider Defendants' Motion for Summary Judgment. Doc. 66. This amended Opinion and Order corrects the mistake. In all other respects, this amended Opinion and Order (Doc. 88) is substantively the same as the previous Opinion and Order. Doc. 87.

Plaintiffs' claims of FCA retaliation during their employments at Tridia and against Defendant ViaQuest specifically are hereby **DISMISSED WITH PREJUDICE**.

      **IT IS SO ORDERED.**

March 27, 2025
                                     Jeffery P. Hopkins
                                     United States District Judge